NO. 15-25-00134-CV

ACCEPTED
15-25-00134-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/10/2025 12:20 PM
CHRISTOPHER A. PRINE
CLERK

# In the
# Fifteenth Court of Appeals
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
9/10/2025 12:20:18 PM
CHRISTOPHER A. PRINE
Clerk

TEXAS ASSOCIATION OF SCHOOL BOARDS RISK MANAGEMENT FUND,

*Appellant,*

v.

SOUTHWEST TEXAS JUNIOR COLLEGE,

*Appellee.*

Appeal from the 38th Judicial District Court
Uvalde County, Texas, No. 2023-11-35269-CV
The Honorable Kelley T. Kimble, Presiding Judge

## BRIEF OF APPELLANT

Jack W. Higdon
Texas Bar No. 24007360
jack.higdon@blankrome.com
Barry Abrams
Texas Bar No. 00822700
barry.abrams@blankrome.com
Joshua A. Huber
Texas Bar No. 24065457
josh.huber@blankrome.com
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002-2727
Telephone: (713) 228-6601
*Attorneys for Appellant*

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

<u>PARTIES TO THE TRIAL COURT'S ORDER</u>:

APPELLANT:     Texas Association of School Boards Risk Management Fund

APPELLEES:     Southwest Texas Junior College

<u>TRIAL AND APPELLATE COUNSEL</u>:

FOR APPELLANTS:   Jack W. Higdon (*Trial and Appellate*)
State Bar No. 24007360
jack.higdon@blankrome.com
Barry Abrams (*Appellate*)
State Bar No. 00822700
barry.abrams@blankrome.com
Joshua A. Huber (*Appellate*)
State Bar No. 24065457
josh.huber@blankrome.com
Gregory J. Moore (*Trial*)
State Bar No. 24055999
greg.moore@blankrome.com
Christopher W. Caudill (*Trial*)
State Bar No. 24104717
christopher.caudill@blankrome.com
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002-2727

Clarissa M. Rodriguez (*Trial and Appellate*)
State Bar No. 24056222
cmrodriguez@rampagelaw.com
Lori Hanson (*Trial*)
State Bar No. 21128500
lwhanson@rampagelaw.com
DENTON NAVARRO RODRIGUEZ BERNAL SANTEE & ZECH, P.C.
2517 N. Main Avenue
San Antonio, Texas 78212

FOR APPELLEES:   Preston J. Dugas III (*Trial and Appellate*)
State Bar No. 24050189
pdugas@dcclawfirm.com
Vincent P. Circelli (*Trial and Appellate*)
State Bar No. 24058804
vcircelli@dcclawfirm.com
Andrew D. Spadoni (*Trial and Appellate*)
State Bar No. 24109198
aspadoni@dcclawfirm.com
Sarah Arroyo (*Trial and Appellate*)
State Bar No. 24138756
sarroyo@dcclawfirm.com
DUGAS & CIRCELLI, PLLC
4800 Bryant Irvin Ct.,
Fort Worth, Texas 76107

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL..............................................i

STATEMENT REGARDING ORAL ARGUMENT ................................1

ABBREVIATIONS AND RECORD REFERENCES ............................2

I.    STATEMENT OF THE CASE ........................................................3

II.   ISSUES PRESENTED ...................................................................4

III.  STATEMENT OF FACTS .............................................................5

        A.    Governmental Self-Insurance Pools. .....................................5

        B.    The Nature of the Fund .........................................................9

        C.    The Terms of the District's Self-Insurance Coverage
Documents.............................................................................10

                1.    The Coverage Documents. ...........................................10

                2.    The Property Coverage Program: RCV and ACV
Explained. ...................................................................11

                3.    The Provisions Governing Interpretation and Waiver
of Rights and Obligations Under of the Coverage
Documents....................................................................13

        D.    The College Lawsuit Against the Fund and the Trial Court
Proceedings...........................................................................13

IV.  SUMMARY OF THE ARGUMENT ............................................16

V.   STANDARD OF REVIEW ..........................................................21

VI.  ARGUMENT ...............................................................................23

A.  THE FUND IS A GOVERNMENTAL ENTITY WITH IMMUNITY FROM SUIT.............................................................................23

B.  The Legislature Granted a Limited Immunity Waiver for Claims to Enforce Express Contract Terms. ........................23

C.  The College Cannot Expand the Act's Limited Immunity Waiver Through Artful Pleading. .........................................25

D.  The Act Does Not Waive the Fund's Governmental Immunity from Certain of the College's Claims...................27

1.  No Immunity Waiver Exists for the College's Equitable Theories (Waiver, Unconscionability, Voidness) Which Attempt to Expand the Express  Coverage Terms in the Parties' Written Agreement. ..............................28

a.  Governmental Entities Historically Are Immune from Equitable Defenses. .....................29

b.  *Zachry* Broadly Disapproved the Principle that a Court Should Not "Parse" the Pleadings to Determine Whether Asserted Claims, Damages, and Remedies Fall Within the Scope of the Act's Limited Immunity Waiver. .........................30

c.  Section 271.153(c) of the Act Defines the Universe of Equitable Relief Available that the College Can Pursue.........................................33

d.  The College Asserts its Equitable Theories *Offensively* in an Attempt to Create Coverage Where None Exists...........................................37

i.  The Express Terms of the Coverage Documents Do Not Provide RCV Coverage for Unrepaired and Unreplaced Losses.............37

ii. the College Asserts Waiver and Estoppel Offensively, Purportedly to Create RCV Coverage Where None Exists........................39

iii. Section 271.155 Does Not Grant an Immunity Waiver for the College's Equitable Theories. ......................................42

iv. The College Adduced No Jurisdictional Evidence of a Viable Waiver or Unconscionability Theory. ............................46

2. No Waiver Exists of the Fund's Immunity from the College's Intentional Tort Theories. ............................48

a. The Act Expressly Excludes Intentional Tort Liability from the Limited Immunity Waiver....48

b. The College Asserts its Intentional Tort Theories *Offensively* in an Attempt to Create Coverage Where None Exists. ................50

VII. PRAYER ................................................................53

CERFITICATE OF COMPLIANCE........................................55

CERFITICATE OF SERVICE............................................55

APPENDIX

App. A - Order Denying in Part and Granting in Part the Fund's Jurisdiction Plea (CR137-138)

App. B - Coverage Documents (CR56-102)

App. C - The Local Government Contract Claims Act, Tex. Loc. Gov't Code §§ 271.151, *et seq.* (excerpts)

App. D - Texas Government Code (excerpts)

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A Status Constr. LLC v. City of Bellaire*,
No. 01-21-00326-CV, 2022 Tex. App. LEXIS 5149 (Tex.
App.—Houston [1st Dist.] July 26, 2022, no pet.) ............................ 49

*Bailey v. Bailey*,
731 F. App'x 272 (5th Cir. 2018) ...................................................... 52

*Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex.
Political Subdivisions Prop./Cas. Joint Self-Ins. Fund*,
212 S.W.3d 320 (Tex. 2006) ....................................................... 10, 23

*Bland Indep. Sch. Dist. v. Blue*,
34 S.W.3d 547 (Tex. 2000) ......................................................... 22, 28

*City of Galveston v. State*,
217 S.W.3d 466 (Tex. 2007) .............................................................. 28

*City of Houston v. Jackson*,
192 S.W.3d 764 (Tex. 2006) ....................................................... 22, 34

*City of Houston v. Swinerton Builders, Inc.*,
233 S.W.3d 4 (Tex. App.—Houston [1st Dist.] 2007, no
pet.) ................................................................................................... 29

*City of Mesquite v. PKG Contracting, Inc.*,
263 S.W.3d 444 (Tex. App.—Dallas 2008, pet. denied) .......... 31, 32, 33

*City of S. El Monte v. So. Cal. Joint Powers Ins. Auth.*,
45 Cal. Rptr. 2d 729 (Cal. Ct. App. 1995) ........................................... 8

*City of San Antonio v. Maspero*,
640 S.W.3d 523 (Tex. 2022) .............................................................. 22

*City of San Antonio v. Wheelabrator Air Pollution Control, Inc.*,
  381 S.W.3d 597 (Tex. App.—San Antonio 2012, pet. denied)........................................................................17

*Coffman v. Scott Wetzel Servs.*,
  908 S.W.2d 516 (Tex. App.—Fort Worth 1995, no writ)..................8, 9

*Dallas Farm Machinery Co. v. Reaves*,
  158 Tex. 1, 307 S.W.2d 233 (Tex. 1957)..............................................51

*DART v. Whitley*,
  104 S.W.3d 540 (Tex. 2003).........................................................21, 23

*David J. Sacks, P.C. v. Haden*,
  266 S.W.3d 447 (Tex. 2008).................................................................37

*Enterprise Leasing Co. of Houston v. HCTRA*,
  356 S.W.3d 85 (Tex. App.—Houston [1st Dist.] 2011, no pet.)..........................................................................................30

*Ewing Constr. Co. v. Amerisure Ins. Co.*,
  420 S.W.3d 30 (Tex. 2014)...................................................................42

*Farmers Tex. Cnty. Mut. Ins. Co. v. Wilkinson*,
  601 S.W.2d 520 (Tex. App.—Austin 1980, writ ref'd n.r.e.)...............46

*In re FirstMerit Bank, N.A.*,
  52 S.W.3d 749 (Tex. 2001)...................................................................48

*Fitzhugh 25 Partners, L.P. v. KILN Syndicate KLN 501*,
  261 S.W.3d 861 (Tex. App.—Dallas 2008, pet. denied)..........12, 38, 41

*Fortune Prod. Co. v. Conoco, Inc.*,
  52 S.W.3d 671 (Tex. 2000)...................................................................51

*Furmanite Worldwide, Inc. v. NextCorp, Ltd.*,
  339 S.W.3d 326 (Tex. App.—Dallas 2011, no pet.)............................29

*H & H Sand & Gravel, Inc. v. City of Corpus Christi*,
    No. 13-06-00677-CV, 2007 Tex. App. LEXIS 8878 (Tex.
    App.—Corpus Christi Nov. 8, 2007, pet. denied) ............................... 30

*Harris County v. Crooker*,
    112 Tex. 450, 248 S.W. 652 (Tex. 1923) ............................................ 34

*Hays Street Bridge Restoration Grp. v. City of San Antonio*,
    570 S.W.3d 697 (Tex. 2019) ................................................. 34, 35, 36

*Hidalgo Cnty. v. Dyer*,
    358 S.W.3d 698 (Tex. App.—Corpus Christi—Edinburg
    2011, no pet.) ..................................................................... 25, 26

*Hill v. Tex. Council Risk Mgmt. Fund*,
    20 S.W.3d 209 (Tex. App.—Texarkana 2000, pet. denied) .............. 8, 9

*Kan. City S. v. Port of Corpus Christi Auth.*,
    305 S.W.3d 296 (Tex. App.—Corpus Christi 2009, pet.
    denied) ................................................................................... 39

*LeBlanc v. Lange*,
    365 S.W.3d 70 (Tex. App.—Houston [1st Dist.] 2011, no
    pet.) ....................................................................................... 48

*Matzen v. McLane*,
    659 S.W.3d 381 (Tex. 2021) ...................................................... 47, 48

*McLennan Cnty. Water Control & Improvement Dist. #2 v.
    Geer*,
    No. 10-17-00399-CV, 2020 Tex. App. LEXIS 5663 (Tex.
    App.—Waco July 22, 2020, no pet.) (mem. op.) ................................ 25

*Milner v. City of Leander*,
    64 S.W.3d 33 (Tex. App.—Austin 2000, no pet.) ......................... 49, 53

*Mission Consol. Indep. Sch. Dist. v. Garcia*,
    253 S.W.3d 653 (Tex. 2008) ............................................................. 27

*Nat'l Fire Ins. Co. v. State & Cty. Mut. Fire Ins. Co.*,
  No. 01-11-00176-CV, 2012 Tex. App. LEXIS 7729 (Tex.
  App.—Houston [1st Dist.] Aug. 30, 2012, no pet.) ............................ 45

*Nortex Reg'l Planning Comm'n v. City of Bellevue*,
  No. 02-24-00498-CV, 2025 Tex. App. LEXIS 4770 (Tex.
  App.—Fort Worth July 3, 2025, no pet. h.) ........................................ 17

*Nunn v. City of Vernon Emple. Benefit Tr.*,
  No. 07-05-0212-CV, 2006 Tex. App. LEXIS 1545 (Tex.
  App.—Amarillo Feb. 27, 2006, no pet.) ................................................. 8

*Port Freeport v. RLB Contracting Inc.*,
  369 S.W.3d 581 (Tex. App.—Houston [1st Dist.] 2012, pet.
  denied) ...................................................................................................... 31

*Prairie View A&M Univ. v. Chatha*,
  381 S.W.3d 500 (Tex. 2012) ......................................................... 29, 44

*Prime Time Family Entertainment Center, Inc. v. Axis
  Insurance Co.*,
  630 S.W.3d 226 (Tex. App.—Eastland 2020, no pet.) .................. 27, 45

*Reata Constr. Corp. v. City of Dallas*,
  197 S.W.3d 371 (Tex. 2006) ........................................................ 21, 36

*Roma ISD v. Ewing Const. Co.*,
  No. 04-12-00035-CV, 2012 Tex. App. LEXIS 5968 (Tex.
  App.—San Antonio July 25, 2012, pet. denied) ................................ 31

*Rotating Servs. Indus. v. Harris*,
  245 S.W.3d 476 (Tex. App.—Houston [1st Dist.] 2007, pet.
  denied) ...................................................................................................... 45

*San Jacinto River Auth. v. City of Conroe*,
  688 S.W.3d 124 (Tex. 2024) ................................................................ 23

*Self v. W. Cedar Creek Mun. Util. Dist.*,
  No. 12-20-00082-CV, 2021 Tex. App. LEXIS 66 (Tex.
  App.—Tyler Jan. 6, 2021, no pet.) ....................................................... 26

*Seureau v. ExxonMobil Corp.*,
274 S.W.3d 206 (Tex. App.—Houston [14th Dist.] 2008, no
pet.) ...................................................................................... 44, 49

*Sharyland Water Supply Corp. v. City of Alton*,
354 S.W.3d 407 (Tex. 2011) ........................................................39

*Shields Ltd. P'ship v. Bradberry*,
526 S.W.3d 471 (Tex. 2017) ........................................................47

*Southwestern Bell Tel. Co. v. DeLanney*,
809 S.W.2d 493 (Tex. 1991) (Gonzalez, J., concurring) ....................29

*Statewide Ins. Fund v. Star Ins. Co.*,
289 A.3d 448 (N.J. 2023) .............................................................6

*Tex. Ass'n of Sch. Bds. Risk Mgmt. Fund v. Benavides Indep.
Sch. Dist.*,
221 S.W.3d 732 (Tex. App.—San Antonio 2007, no pet.)............. 10, 23

*Tex. Ass'n of Sch. Bds. Risk Mgmt. Fund v. Colo. Indep. Sch.
Dist.*,
660 S.W.3d 767 (Tex. App.—Eastland 2023, no pet.) ............ 39, 40, 41

*Tex. Ass'n of Sch. Bds. Risk Mgmt. Fund v. Greenville Indep.
Sch. Dist.*,
No. 05-21-01012-CV, 2022 Tex. App. LEXIS 4952 (Tex.
App.—Dallas July 19, 2022, pet. denied) ................................... *passim*

*Tex. Dep't of Parks & Wildlife v. Miranda*,
133 S.W.3d 217 (Tex. 2004) ..................................................... *passim*

*Texas Farmers Ins. Co. v. McGuire*,
744 S.W.2d 601 (Tex.1988) ....................................................... 27, 45

*Tooke v. City of Mexia*,
197 S.W.3d 325 (Tex. 2006) ...................................................... 16, 44

*Ulico Cas. Co. v. Allied Pilots Ass'n*,
262 S.W.3d 773 (Tex. 2008) .................................................27, 45, 46

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*,
  578 S.W.3d 506 (Tex. 2019) ...................................... 25, 26

*Washington National Insurance Co. v. Craddock*,
  109 S.W.2d 165 (Tex. 1937) ...................................... 27, 44

*Wichita Falls State Hosp. v. Taylor*,
  106 S.W.3d 692 (Tex. 2003) ........................................... 22

*Zachry Constr. Corp. v. Port of Hous. Auth. of Harris Cty.*,
  449 S.W.3d 98 (Tex. 2014) ...................................... *passim*

## Statutes

CAL. GOV'T CODE § 990.8(c) (West 2010) ................................ 8

COLO. REV. STAT. ANN. § 24-10- 115.5(2) (West 2008) ............... 8

FLA. STAT. ANN. § 624.4622 (West Supp. 2007) ......................... 8

OHIO REV. CODE ANN. § 2744.081(E)(2) (West 2006) ............... 8

OR. REV. STAT. ANN. §§ 731.036(4), (5) (West 2003) ................. 8

TEX. CIV. PRAC. & REM. CODE
  § 101.001(3)(D) ..................................................... 10, 49
  § 101.021 ................................................................. 49
  § 101.025 ................................................................. 49
  § 101.057 ................................................................. 49

2013 Tex. Gen. Laws 1138 ................................................... 35

TEX. GOV'T CODE
  § 311.034 ......................................................... 16, 21, 44
  § 791.001 ............................................................ 8, 9, 23
  § 791.011(a) ................................................................ 9
  § 2259.001 ................................................................ 10
  § 2259.002 ................................................................ 23
  § 2259.031(a) ........................................................ 9, 23
  § 2259.037 ............................................................... 8, 9

TEX. LOC. GOV'T CODE

    § 271.151 ........................................................... 4, 16, 24, 50
    § 271.152 ................................................................... *passim*
    § 271.153 ................................................................... *passim*
    § 271.155 ................................................................... *passim*
    § 271.157 ........................................................... 5, 17, 44, 49

## Other Authorities

Jason E. Doucette, Note, *Wading into the Pool: Interlocal Cooperation in Municipal Insurance and the State Regulation of Public Entity Risk Sharing Pools—A Survey*, 8 CONN. INS. L.J. 533, 537 (2002)................................. 6, 7, 8

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for Appellant requests oral argument because it may assist the Court in understanding the procedural aspects of the case below and afford the members of the Court the opportunity to ask counsel for Appellant and Appellee any questions they may have about the record and the jurisdictional matters involved.

## ABBREVIATIONS AND RECORD REFERENCES

### Abbreviations

"Fund" refers to Appellant, Texas Association of School Boards Risk Management Fund.

"College" refers to Appellee, Southwest Texas Junior College.

### Record References

References to the Clerk's Record are abbreviated "CR [pg#]."

References to the Reporter's Record are abbreviated "RR [pg#]:[ln#]."

# I.
## Statement of the Case

*Nature of the Case:*   This is an intergovernmental contract dispute. The College seeks replacement cost value benefits under a self-insurance contract between it and other members of the Fund, for property damage allegedly sustained during an April 2021 hailstorm.

Claiming a waiver of the Fund's governmental immunity from suit and liability under TEX. LOC. GOV'T CODE § 271.152, the College seeks damages for coverage that does not exist under the coverage documents – *i.e.*, replacement cost value benefits for property damage that has not been repaired nor replaced – based upon the equitable theories of waiver and unconscionability, and allegations that the Fund committed fraud and/or acted in bad faith.

*Course of Proceedings:*   The College sued the Fund on November 17, 2023,[1] and the Fund asserted its governmental immunity from suit in an amended answer and partial plea to the jurisdiction on June 13, 2025 ("Jurisdictional Plea").[2] The Jurisdictional Plea asserted that no waiver of the Fund's immunity from suit and liability exists for the College's: (1) equitable theories of waiver and unconscionability, (2) intentional tort theories of fraud and bad faith, or (3) claims for consequential, exemplary, or treble damages.[3]

The College responded to the Jurisdictional Plea

---

[1]   CR 5-21.

[2]   CR 31-103.

[3]   CR 37-43.

3

on July 18, 2025.[4] The trial court held an oral hearing on the Jurisdictional Plea on July 21, 2025.[5]

*Trial Court Disposition*: The Jurisdictional Plea was granted in part and denied in part, on July 30, 2025.[6] The trial court partially granted the Jurisdictional Plea regarding the College's claims for consequential, exemplary, and treble damages and dismissed those claims with prejudice for lack of subject matter jurisdiction. The trial court partially denied the Jurisdictional Plea regarding the College's equitable and intentional tort theories.

## II.
## ISSUES PRESENTED

TEX. LOC. GOV'T CODE §§ 271.151, *et. seq.* (the "Act") created a narrow immunity waiver to adjudicate claims for breach of written contracts which contain the essential terms of the parties' agreement. *Id.* §§ 271.151(2)(A), 271.152. This limited immunity waiver is further restricted to adjudication awards for defined types of damages (*i.e.,* "the balance due and owed by the local governmental entity under the contract") and a narrow category of equitable relief for certain types of contracts not involved here (*i.e.,* specific performance or injunctive relief).

---

[4] CR 106-123.

[5] CR 104.

[6] CR 137-138.

4

*Id.* §§ 271.153(a)(1), (c). The immunity waiver expressly does not apply to claims involving "a negligent or intentional tort." *Id.* § 271.157.

The College sued the Fund asserting equitable theories of waiver and unconscionability, and intentional tort theories of fraud and bad faith, in an attempt to create coverage that does not exist in the College's self-insurance contract. This would impose open-ended liability beyond the express self-insurance terms to which the Fund and College agreed.

Issue 1:    Did the trial court err by partially denying the Fund's Jurisdictional Plea?

Issue 2:    Does the Act's narrow immunity waiver authorize the College to adjudicate equitable theories of waiver and unconscionability to *create* new and additional self-insurance coverage, or is the scope of the immunity waiver limited to actions to *enforce* the essential self-insurance coverage terms as written?

Issue 3:    Does the Act's narrow immunity waiver authorize the College to adjudicate intentional tort theories of fraud and bad faith to *create* new and additional self-insurance coverage, or is the scope of the immunity waiver limited to actions to *enforce* the essential self-insurance coverage terms as written?

## III.
## STATEMENT OF FACTS

### A.    GOVERNMENTAL SELF-INSURANCE POOLS.

Governmental entity risk pools exist in most states throughout the country. They have been described by the Texas State Comptroller in the

following way:

> a cooperative group of governmental entities joining together to finance an exposure, liability or risk. Risk may include property and liability, workers' compensation, or employee health care. A pool may be a standalone agency or included as part of a larger agency that acts as the pool's sponsor.[7]

When two or more independent public entities desire to share risk, they may do so by forming a pool, rather than independently self-insuring or obtaining coverage from the private insurance market. In general, the member entities of self-insurance pools transfer their risk exposures (minus a deductible) to the pool, sharing with other entities in the pool the transfer of related risks. Jason E. Doucette, Note, *Wading into the Pool: Interlocal Cooperation in Municipal Insurance and the State Regulation of Public Entity Risk Sharing Pools—A Survey*, 8 CONN. INS. L.J. 533, 537 (2002). In most states, governmental risk pooling is considered to be a form of self-insurance. *Id.; see, e.g., Statewide Ins. Fund v. Star Ins. Co.*, 289 A.3d 448, 454 (N.J. 2023) ("'Risk-pooling' arrangements, such as JIFs [Joint Insurance Funds], are different from typical insurance contracts in which an authorized insurer assumes the risk in exchange for a premium. JIF members decidedly retain the risk

---

[7] *See* Statement No. 10 of the Governmental Accounting Standards Board, Pg. 4 (Nov. 1989); see also Texas State Comptroller, Fiscal Management Division (FMX) Website at Note 17- Risk Management, Public Entity Risk Pool (https://fmx.cpa.texas.gov/fmx/pubs/afrrptreq/notes/index.php?menu=2&section=note17&page=note17 ).

6

typically assumed by carriers. Public entities do not purchase insurance from JIFs; instead, they join JIFs, manage risk, and optimize taxpayer dollars by self-insuring or reducing coverage costs.").

Administrative services (*e.g.*, underwriters, claim operations, loss prevention/risk management, reinsurance purchasing) are either provided by the pool or by third parties retained by the pool. Doucette, *supra*, at 537. Rather than issue an insurance policy, pools typically issue a document called a "plan document" or "coverage agreement" that is an intergovernmental contract for coverage among the pool's member entities and the pool itself. Under a coverage agreement, the pool will self-insure the members based on the terms and conditions of the coverage agreement in exchange for a "contribution," rather than a "premium," and it is through these member contributions that the public entities "pool" their funds with the risk pool. *Id.* In most states, governmental entity risk pools have a governance structure organized around a board of directors/chief executive form of organization. *Id.*

Even though most pools' coverage agreements contain terms and concepts similar to those found in insurance policies, with coverage terms, exclusions, exceptions to exclusions, coverage territories, and

coverage periods, pools are not considered insurers and their contracts are excluded from insurance regulation in most states, including Texas.[8/]

Pools provide their members with many advantages. They protect their members from cyclic insurance rates, offer loss prevention services, have expertise with governmental entities, and offer significant savings (because they are non-profit organizations, they do not expend funds for broker fees, and they consist of members with governmental immunity from claims that drive up private-sector insurance prices). Doucette, *supra*, at 535*.*

---

[8/] *See, e.g.,* TEX. GOV'T CODE ANN. § 791.001 *et seq.*; TEX. GOV'T CODE ANN. § 2259.037; *Hill v. Tex. Council Risk Mgmt. Fund*, 20 S.W.3d 209, 213–14 (Tex. App.—Texarkana 2000, pet. denied); *Coffman v. Scott Wetzel Servs.*, 908 S.W.2d 516, 517 (Tex. App.—Fort Worth 1995, no writ); *Nunn v. City of Vernon Emple. Benefit Tr.*, No. 07-05-0212-CV, 2006 Tex. App. LEXIS 1545, *4 (Tex. App.—Amarillo Feb. 27, 2006, no pet.); *City of S. El Monte v. So. Cal. Joint Powers Ins. Auth.*, 45 Cal. Rptr. 2d 729, 732 (Cal. Ct. App. 1995); CAL. GOV'T CODE § 990.8(c) (West 2010) (stating "[t]he pooling of self-insured claims or losses among entities as authorized in subdivision (a) of Section 990.4 shall not be considered insurance nor be subject to regulation under the Insurance Code."); *see also* OHIO REV. CODE ANN. § 2744.081(E)(2) (West 2006) ("A joint self-insurance pool is not an insurance company. Its operation does not constitute doing an insurance business and is not subject to the insurance laws of this state"); COLO. REV. STAT. ANN. § 24-10-115.5(2) (West 2008) ("Any self-insurance pool authorized by subsection (1) of this section shall not be construed to be an insurance company nor otherwise subject to the provisions of the laws of this state regulating insurance or insurance companies . . . "); OR. REV. STAT. ANN. §§ 731.036(4), (5) (West 2003) ("[T]he Insurance Code does not apply to any of the following to the extent of subject matter of the exemption . . . (4) Public bodies . . . that either individually or jointly establish a self-insurance fund for tort liability . . . [or] (5) Public bodies . . . that either individually or jointly establish a self-insurance fund for property damage . . ."); FLA. STAT. ANN. § 624.4622 (West Supp. 2007) (which does not subject pools to the Florida Insurance Code, other than some reporting and initial capitalization requirements).

## B. THE NATURE OF THE FUND.

Texas law authorizes local governments to establish self-insurance funds "to protect the governmental unit and its officers, employees, and agents, from any insurable risk or hazard." TEX. GOV'T CODE ANN. § 2259.031(a). The Texas Interlocal Cooperation Act empowers local governments to contract with one another through interlocal agreements to pool their resources and collectively self-insure against insurable risks and hazards. TEX. GOV'T CODE §§ 791.001, 791.011(a); Op. Tex. Att'y Gen. No. MW-347 (May 29, 1981).

The issuance of public securities and the use of available money for a self-insurance fund are defined public purposes of a governmental unit, and self-insurance funds are not subject to the Texas Insurance Code and other Texas laws relating to the provision of private insurance or regulation of the private insurance market. TEX. GOV'T CODE ANN. § 791.001 *et seq.*; TEX. GOV'T CODE ANN. § 2259.037; *Hill*, 20 S.W.3d at 213–14; *Coffman*, 908 S.W.2d at 517.

The Texas Supreme Court has confirmed that governmental risk pools are themselves governmental entities which exist independent of their government members and are entitled to assert governmental

9

immunity in their own right. *See* TEX. GOV'T CODE ANN. § 2259.001; TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(3)(D); *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivisions Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 326 (Tex. 2006); *Tex. Ass'n of Sch. Bds. Risk Mgmt. Fund v. Benavides Indep. Sch. Dist.,* 221 S.W.3d 732, 737 (Tex. App.—San Antonio 2007, no pet.).

The Fund is one such self-insurance pool, formed pursuant to the Texas Interlocal Cooperation Act.[9] The Fund has over 1,000 political subdivision members, including Texas school districts, community colleges, and other public educational organizations.[10]

## C. THE TERMS OF THE DISTRICT'S SELF-INSURANCE COVERAGE DOCUMENTS.

### 1. The Coverage Documents.

The Fund's 1,000+ members established the Fund and its property self-insurance program through a document called the Interlocal Participation Agreement (the "Interlocal Agreement").[11]

The specific self-insurance coverage afforded individual Fund members is stated in a "Contribution & Coverage Summary" and a

---

[9] CR 33.

[10] CR 33.

[11] CR 56-60.

10

program specific document known as the "Property Coverage Agreement" (collectively, with the Interlocal Agreement, the "Coverage Documents"),[12/] both of which are expressly incorporated by reference in the Interlocal Agreement.[13/]

### 2. The Property Coverage Program: RCV and ACV Explained.

The Fund's property coverage program provides each member with two coverage options from which the member must elect within 180 days after the date of a contractually defined Loss: (1) the option to be reimbursed for amounts the member has actually and necessarily spent to repair or replace the Covered Property ("Replacement Cost Value" or "RCV"); or (2) the option to receive upfront payment for the Actual Cash Value of the Covered Property subject to Loss ("ACV").[14/]

The RCV option provides *reimbursement* coverage and the Coverage Documents expressly state that the maximum allowable RCV reimbursement is for the amounts a member actually and necessarily has spent out of pocket to repair or replace Covered Property, within 365 days of the Loss (unless an extension is granted by the Fund in writing).[15/] If a Fund member does not complete repairs within the 365 day period, or

---

[12/] CR 61-102.

[13/] CR 56, 58-59, 63, 66.

[14/] CR 69-70.

[15/] CR 69.

within a longer period if the member is granted a written extension by the Fund or its representatives, Fund members have agreed that any payments made by the Fund before the end of the RCV period "will be the full and final payment for the Loss."[16]

The amount a member pays out of pocket to repair damaged property is "an additional loss for which [the member] purchased additional coverage." *Fitzhugh 25 Partners, L.P. v. KILN Syndicate KLN 501,* 261 S.W.3d 861, 863 (Tex. App.—Dallas 2008, pet. denied) (collecting cases discussing RCV coverage). If a Fund member such as the College does not pay out of pocket to repair or replace damaged property, it has not incurred an additional loss for which RCV coverage exists. *Id.* at 863-864 ("To allow an insured to recover replacement costs *in the absence of actual replacement* would permit the insured to recover for *a loss he has not suffered.*") (emphasis added).

The ACV option provides *advancement* coverage that is "computed by subtracting the depreciation of the Covered Property subjected to Loss from the actual replacement cost of the Covered Property, using material of like kind and quality at the time of Loss."[17]

The College asserts that the Fund breached the Coverage

---

[16] CR 69.

[17] CR 69-70.

Documents by failing to pay RCV benefits, and it only seeks RCV damages in this case.[18] The College has made no claim for ACV.

### 3. The Provisions Governing Interpretation and Waiver of Rights and Obligations Under of the Coverage Documents.

The Fund members all agreed in the Interlocal Agreement that the terms of the Coverage Documents "*shall not be interpreted against the drafter of this Agreement, but rather in accordance with the fair meaning thereof.*"[19] The Fund members also agreed that any waiver of contract rights or obligations must be in writing by the waiving party, and that "*[n]o waiver shall be implied by delay or any other act or omission.*"[20]

### D. THE COLLEGE LAWSUIT AGAINST THE FUND AND THE TRIAL COURT PROCEEDINGS.

The College notified the Fund of a claim on April 28, 2021, related to an alleged hail event at its Uvalde campus (the "April 2021 Claim").[21] The Fund opened a claim file, assigned an independent adjuster, and adjusted the April 2021 Claim per the terms of the Coverage

---

[18] CR 113 ("[T]he College has sought to recover replacement cost value ('RCV') benefits under the policy as its measure of damages."), 120 ("[T]he College's suit for RCV damages provided for by the insurance policy falls within the statutory waiver of sovereign immunity.").

[19] CR 60 (emphasis added).

[20] CR 60 (emphasis added).

[21] CR 5, 10.

Documents.[22]

More than two and a half years later, on November 17, 2023, the College sued the Fund for breach of contract, seeking, among other things, actual damages, consequential damages, and treble/exemplary damages.[23] The College alleged that various provisions in the Coverage Documents are unenforceable because they supposedly "are void, unconscionable, and/or were waived by [the Fund]."[24] The College initially did not identify any specific provisions that it contended were equitably unenforceable, but it has since claimed that the RCV coverage terms are among them.[25]

The College also alleged that the Fund made various "fraudulent misrepresentation(s)" and acted in "bad faith" concerning the scope of the property coverage program and the April 2021 Claim. *See, e.g.*:[26]

➢ "*[E]ach of these promises and representations proved to be false*—in reality *TASB used the same tactics*, biased inspectors, misreading of policy language, and pretextual investigations *as bad faith insurance carriers . . .*"

➢ "*Based on TASB's representations* listed above, *Plaintiff*

---

[22] CR 10.

[23] CR 6, 11-13, 20-21.

[24] CR 9-10.

[25] CR 113.

[26] CR 8-9, 11.

> *entered into an agreement* with TASB to pay premiums in exchange for comprehensive property damage coverage . . ."

> ➢ "*Defendants . . . made multiple misrepresentations to Plaintiff* about coverage to the Campus."

> ➢ "*Defendants' bad faith* failure to adjust the claim and provide necessary money to repair the Campus *has caused further damage and injury* to the Plaintiff's real property . . ."

(emphasis added).

The Fund filed a Jurisdictional Plea asserting that the College's equitable waiver and unconscionability theories, intentional tort theories, and its claims for consequential, exemplary, and treble damages, were barred by governmental immunity because no legislative immunity waiver exists under the Act (or elsewhere) regarding those legal theories and damages.[27]

On July 30, 2025, the trial court partially granted the Jurisdictional Plea regarding the College's claims for consequential, exemplary, and/or treble damages, and partially denied the Jurisdictional Plea regarding the College's equitable and intentional tort theories, which it viewed as be purely defensive in nature.[28]

---

[27] CR 31-103.

[28] CR 137-138.

15

## IV.
## <u>SUMMARY OF THE ARGUMENT</u>

This case raises important issues concerning the proper application of the governmental immunity doctrine by Texas trial courts. That doctrine serves as an essential component of the separation-of-powers principle and assures that the three coordinate branches of Texas government duly respect the decisions entrusted to each and accord them proper deference.

Governmental entities are immune from both suit and liability, except where the Texas Legislature has clearly and unambiguously waived their immunity by statute. *Tooke v. City of Mexia*, 197 S.W.3d 325, 328-29 (Tex. 2006). Such statutory immunity waivers must be clear and unambiguous and are narrowly construed in favor of retaining immunity. *Id., see also* TEX. GOV'T CODE § 311.034.

The Texas legislature waived immunity in the Act for the limited and defined purpose of "adjudicating a claim for breach" of "written contract[s] stating the essential terms of the agreement . . . that are properly executed on behalf of the governmental entity." *See* TEX. LOC. GOV'T CODE §§ 271.151(2)(A), 271.152. This limited immunity waiver permits a plaintiff to seek only the actual damages owed "under the

16

contract as it may have been amended" and defined categories of equitable relief (*i.e.*, injunctive relief and specific performance) for a specific type of contract that is not at issue here. *Id.* §§ 271.153(a)(1)-(2), (c). The immunity waiver expressly *excludes* any recovery of consequential damages other than those resulting from "owner-caused delays," exemplary damages, and any claims based upon a negligent or intentional tort. *Id.* §§ 271.153(b)(1)-(2), 271.157.

Because the Act does not waive immunity for any other claims, equitable relief, or immunity based upon any tort theories, a plaintiff who invokes the Act must confine its suit to enforcement of the express terms of its written government contract, and limit any recovery to the types of damages and equitable remedies expressly provided for in the Act. *See, e.g.*, *Nortex Reg'l Planning Comm'n v. City of Bellevue*, No. 02-24-00498-CV, 2025 Tex. App. LEXIS 4770, at *10 (Tex. App.—Fort Worth July 3, 2025, no pet. h.) (no immunity waiver under § 271.152 where plaintiff did not allege a failure to perform or tender performance "*as the contract required.*") (emphasis in original).

The Texas Legislature struck a policy balance in the Act. *City of San Antonio v. Wheelabrator Air Pollution Control, Inc.*, 381 S.W.3d 597,

17

602 (Tex. App.—San Antonio 2012, pet. denied). The Legislature waived immunity to allow a contracting party to hold a local governmental entity accountable for its express contractual obligations, while still promoting fiscal predictability by limiting the local governmental entity's financial exposure to the "amounts due and owed" under the written terms of their properly executed contracts. TEX. LOC. GOV'T CODE § 271.153(a)(1).

The College's misinterpretation of the Act would undermine that legislatively-defined balance.

The College contends that a plaintiff can import otherwise immunity-barred equitable and intentional tort theories into its breach of contract case as long as they are characterized as contract "defenses." But this would circumvent the limited nature of the immunity waiver in the Act and expose local government entities to unlimited liability unauthorized by the express, bargained-for terms in their written contracts.

This case well-illustrates the inherent flaw in such an expansive interpretation. The College asserts equitable and intentional tort theories offensively in an attempt to *create* and hold the Fund liable for a financial risk that the Fund and its members did not contractually

agree to share – *i.e.*, RCV coverage for unrepaired and unreplaced property damage.

The trial court's ruling also violates the Texas Supreme Court's instructions on the proper and limited application of the Act's immunity waiver in *Zachry Constr. Corp. v. Port of Hous. Auth. of Harris Cty.*, 449 S.W.3d 98, 109–111 (Tex. 2014) ("*Zachry*"). *Zachry* confirms that the Act does not create a blanket immunity waiver for any and all claims, damage theories, and relief that in any way "relate to" a contract to which the Act applies; immunity has been waived only for specific claims, for specific types of damages, and specific types of equitable relief. *Zachry*, 449 S.W.3d at 109.

The graphic below depicts the proper interrelationship of the statutory immunity waiver in the Act and its other limiting provisions:

## § 271.152 WAIVER OF IMMUNITY TO SUIT FOR CERTAIN CLAIMS

"A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract," subject to all of the "Limitations on the Waiver of Immunity"



## § 271.153 LIMITATIONS ON ADJUDICATION AWARDS

"Section 271.152 uses Section 271.153 to further define to what extent immunity has been waived." *Zachry Constr. Corp., v. Port of Hous. Auth. 449* S.W.3d 98, 110 (Tex. 2014).



## IMMUNITY WAIVED RELIEF UNDER § 271.153

| Damages: | Equitable Remedies: |
| --- | --- |
| "The balance due and owed . . . under the contract as it may have been amended ." | Specific performance |
| Increased performance costs "as a direct result of owner-caused delays or acceleration." | Injunctive relief |



If *both* §271.152 *and* 271.153 Authorize a Waiver Immunity for the Contract Relief Claimed, Then the Act's Remaining Provisions Limit or Effect the Scope of Waiver:

| §271.155 | §271.156 | §271.157 | §271.158 | §271.159 |
| --- | --- | --- | --- | --- |
| NO WAIVER OF OTHER DEFENSES | NO WAIVER OF IMMUNITY TO SUIT IN FEDERAL COURT | NO WAIVER OF IMMUNITY TO SUIT FOR TORT LIABILITY | NO GRANT OF IMMUNITY TO SUIT | JOINT ENTERPRISE |

Because the Act does not waive immunity for equitable relief that the Legislature did not expressly provide in Section 271.153, and by its

terms does not apply to the College's intentional tort theories, the trial court erred when it denied the Fund's Jurisdictional Plea regarding those claims.

## V.
## STANDARD OF REVIEW

Government entities are immune from suit and liability except to the extent the Legislature has expressly waived that immunity. *See DART v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003). Immunity waivers must be based on the application of a statute and the extent of any waiver is limited by the statute's text. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A plaintiff that sues a governmental unit must affirmatively demonstrate the court's jurisdiction by alleging a statutory immunity waiver. *DART*, 104 S.W.3d at 542.

Because a waiver of governmental immunity "may hamper governmental functions by requiring tax resources to be used for defending lawsuits and paying judgments rather than using those resources for their intended purposes," the Texas Supreme Court has long held that such waivers must be "clearly and unambiguously stated." *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006); *see* TEX. GOV'T CODE §311.034. Statutes waiving immunity therefore are

"strictly construed," *City of Houston v. Jackson*, 192 S.W.3d 764, 770 (Tex. 2006), and courts "generally resolve ambiguities by retaining immunity." *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 697 (Tex. 2003).

A plea to the jurisdiction contests a court's subject matter jurisdiction to decide all or some of the issues in a case. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The applicable procedural standard "generally mirrors that of a summary judgment." *Miranda*, 133 S.W.3d at 228. To determine if the plaintiff has met its burden to demonstrate a viable claim within a waiver of immunity, a court must "consider the facts alleged by the plaintiff and, to the extent it is relevant to the jurisdictional issue, the evidence submitted by the parties." *Bland Indep. Sch. Dist.*, 34 S.W.3d at 554. To avoid dismissal, plaintiffs "must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction." *Miranda*, 133 S.W.3d at 227.

A trial court's denial of an assertion of governmental immunity is reviewed de novo. *City of San Antonio v. Maspero*, 640 S.W.3d 523, 528 (Tex. 2022).

## VI.
## ARGUMENT

**A.   THE FUND IS A GOVERNMENTAL ENTITY WITH IMMUNITY FROM SUIT.**

The Fund is an intergovernmental self-insurance risk pool operating under the Texas Interlocal Cooperation Act, TEX. GOV'T CODE §§ 791.001, *et seq.*; and Chapter 2259 of the Government Code. It was created by its local governmental members to administer their self insurance funds as their collective administrative agent, as authorized by the Legislature. *Id.*, § 2259.031(a).  In creating a risk pool, the parties to the Interlocal Agreement did not waive the Fund's immunity, *id.* § 2259.002, which it enjoys to the same extent as any other Texas political subdivision. *Ben Bolt*, 212 S.W.3d at 326; *Benavides Indep. Sch. Dist.*, 221 S.W.3d at 737.

The College has the burden to establish a statutory waiver of the Fund's immunity with respect to each of its claims. *DART*, 104 S.W.3d at 542; *San Jacinto River Auth. v. City of Conroe*, 688 S.W.3d 124, 133 (Tex. 2024) ("jurisdiction is determined on a claim-by-claim basis").

**B.   THE LEGISLATURE GRANTED A LIMITED IMMUNITY WAIVER FOR CLAIMS TO ENFORCE EXPRESS CONTRACT TERMS.**

The College alleges that the Legislature waived the Fund's

23

immunity from the College's claims through Section 271.152 of the Act,[29] which states:

> "*A local governmental entity* that is authorized by statute or the constitution to enter into a contract and *that enters into a contract subject to this subchapter waives sovereign immunity* to suit *for the purpose of adjudicating a claim for breach of the contract*, subject to the terms and conditions of this subchapter."

(emphasis added).

The Act defines the a "contract subject to this subchapter" as "a *written contract stating the essential terms of the agreement* for providing goods or services to the local government entity *that is properly executed on behalf of the local governmental entity.*" *Id.*, §271.151(2)(A)(emphasis added).

The scope of the Act's immunity waiver is further narrowed by the Section 271.153 damages immunity waiver, which limits available contract damages, in relevant part, to the balance "*due and owed . . . under the contract as it may have been amended,*" and available equitable remedies to "*specific performance or injunctive relief*" in suits involving a specific type of contract not at issue here. *See id.* § 271.153

---

[29] CR 6.

(emphasis added); *Zachry*, 449 S.W.3d at 110 ("Section 271.152 uses Section 271.153 to further define to what extent immunity has been waived.").

The Act unambiguously excludes from the scope of its immunity waiver consequential damages (other than increased construction costs directly resulting from "owner-caused delays"), exemplary damages, and any claims involving a negligent or intentional tort. *See* TEX. LOC. GOV'T CODE §§ 271.153(b)(1)-(2), .157; *Zachry*, 449 S.W.3d at 108 ("The waiver does not extend to tort suits.").

## C. THE COLLEGE CANNOT EXPAND THE ACT'S LIMITED IMMUNITY WAIVER THROUGH ARTFUL PLEADING.

A plaintiff may not expand a limited "[immunity] waiver through artful pleading." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 513 (Tex. 2019). To combat artful pleading, Texas courts look to the *substance* of the plaintiff's claims, not the labels attached to the causes of action, to determine whether a plaintiff's claims are barred by immunity. *Hidalgo Cnty. v. Dyer*, 358 S.W.3d 698, 704 (Tex. App.—Corpus Christi—Edinburg 2011, no pet.); *see also McLennan Cnty. Water Control & Improvement Dist. #2 v. Geer*, No. 10-17-00399-CV, 2020 Tex. App. LEXIS 5663, at *8-10 (Tex. App.—Waco July 22,

2020, no pet.) (mem. op.) (concluding trial court erred in denying defendant's plea to the jurisdiction because plaintiffs' factual allegations encompass matters falling outside the limited waiver of immunity in the Texas Tort Claims Act); *Self v. W. Cedar Creek Mun. Util. Dist.*, No. 12-20-00082-CV, 2021 Tex. App. LEXIS 66, at *5 (Tex. App.—Tyler Jan. 6, 2021, no pet.) ("We look to the true nature of the dispute rather than the plaintiff's characterization of the claims.").

The College argued below that it has asserted only one cause of action against the Fund for breach of contract, and that its equitable and tort theories are merely "other allegations [which] support the merits of the College's claim."[30] But the factual allegations and legal theories in the College's live pleadings are what determine the extent to which the College's suit falls within limited statutory immunity waiver, *not* the College's recharacterization its various equitable and intentional tort theories as component parts of a breach of contract claim. *McKenzie*, 578 S.W.3d at 513; *Dyer*, 358 S.W.3d at 704.

The College cannot, through artful pleading, import immunity-barred equitable and intentional tort theories into its breach of contract

---

[30] CR 110.

26

claim to *expand* the limited scope of the immunity waiver in Section 271.152 of the Act and *create* additional RCV coverage that the parties did not include in the express written terms of their agreement.[31]

## D. THE ACT DOES NOT WAIVE THE FUND'S GOVERNMENTAL IMMUNITY FROM CERTAIN OF THE COLLEGE'S CLAIMS.

The College contends that as long as it has alleged a breach of a government contract subject to the Act, the Fund's governmental immunity has been waived for all claims and legal theories that in any way relate to the contract, including waiver, unconscionability, fraud, and bad faith.[32]

But statutory immunity waivers do not operate in such an "all-or-nothing" fashion. *See Miranda*, 133 S.W.3d at 226–227; *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008) ("We interpret statutory waivers of immunity *narrowly...*")(emphasis added).

---

[31] As discussed *infra* at Section VI.D.1.d.iii, the Texas Supreme Court has long held that a plaintiff cannot invoke equitable theories to "create insurance coverage when none exists by the terms of the policy." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 780 (Tex. 2008); *Texas Farmers Ins. Co. v. McGuire,* 744 S.W.2d 601, 602–03 (Tex.1988); *Washington National Insurance Co. v. Craddock,* 109 S.W.2d 165, 166 (Tex. 1937); *see also Prime Time Family Entertainment Center, Inc. v. Axis Insurance Co.*, 630 S.W.3d 226, 232 (Tex. App.—Eastland 2020, no pet.) ("the contractual coverage of an insurance policy cannot be expanded by waiver or estoppel on the part of the insurer . . . The manner in which [the insurer] adjusted the claim cannot create coverage by either waiver or estoppel.").

[32] CR 107-108, 112-114.

When a plaintiff asserts multiple theories of relief in a single lawsuit against a governmental entity, if a statute waives immunity for some claims, damages, or relief, but not others, the trial court must dismiss the claims, damages, or relief over which it lacks jurisdiction and retain only those over which it has jurisdiction. *See Bland Indep. Sch. Dist.*, 34 S.W.3d at 554–55; *Thomas,* 207 S.W.3d at 338–339.

The Act's limited immunity waiver authorizes the College to adjudicate a breach of contract claim to *enforce* the written terms of its contract with the Fund and pursue circumscribed categories of damages and equitable relief. The Act does not provide a blanket immunity waiver for every claim, type of damage, or equitable remedy that may in some way relate to the contract. *See Zachry*, 449 S.W.3d at 106, 109-110; *City of Galveston v. State*, 217 S.W.3d 466, 470 (Tex. 2007). The Act only "waives immunity for contract claims that meet certain conditions: the existence of a specific type of contract, a demand for certain kinds of damages, a state forum, etc." *Zachry*, 449 S.W.3d at 109.

1. <u>No Immunity Waiver Exists for the College's Equitable Theories (Waiver, Unconscionability, Voidness) Which Attempt to Expand the Express  Coverage Terms in the Parties' Written Agreement.</u>

28

### a. Governmental Entities Historically Are Immune from Equitable Defenses.

The College has invoked the equitable doctrines of waiver and unconscionability to argue that certain express contract terms are unenforceable or "void."[33] But breach of contract, waiver, and unconscionability claims are distinct from one another and involve proof of different elements.[34] This remains true whether they are asserted offensively – as the College has done here – or as affirmative defenses to a contract claim.

Absent an express and unambiguous statutory waiver of immunity from suit, governmental entities like the Fund retain their inherent immunity from claims or defenses seeking relief based upon equitable doctrines. *See Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 515 (Tex. 2012)(applying equitable defenses to governmental entities "invades the domain of the Legislature and cuts against the very nature

---

[33] CR 9 ("The Agreement was drafted by TASB and contains provisions that are void, unconscionable, and/or were waived by TASB.").

[34] *City of Houston v. Swinerton Builders, Inc.*, 233 S.W.3d 4, 10 n.7 (Tex. App.—Houston [1st Dist.] 2007, no pet.)(elements of breach of contract claim); *Furmanite Worldwide, Inc. v. NextCorp, Ltd.*, 339 S.W.3d 326, 336 (Tex. App.—Dallas 2011, no pet.)(elements of claim for relief under an equitable waiver doctrine); *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 498–99 (Tex. 1991) (Gonzalez, J., concurring)(elements of equitable claim to strike unconscionable contract terms).

29

of sovereign immunity."); *H & H Sand & Gravel, Inc. v. City of Corpus Christi*, No. 13-06-00677-CV, 2007 Tex. App. LEXIS 8878, at *7 (Tex. App.—Corpus Christi Nov. 8, 2007, pet. denied)("estoppel, waiver, and detrimental reliance claims sound in equity and are not included in section 271.152's limited waiver of governmental immunity."); *see also Enterprise Leasing Co. of Houston v. HCTRA*, 356 S.W.3d 85, 89-90 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Affirmative defenses of waiver and estoppel are equitable in nature. Affirmative defenses based in equity have been consistently held not to apply when the activity complained of is a governmental function.").

Accordingly, under the common law, governmental defendants such as the Fund remain immune from liability based upon equitable theories such as the waiver and unconscionability doctrines asserted by the College, regardless of whether those theories are asserted offensively, or defensively.

> b.  *Zachry* Broadly Disapproved the Principle that a Court Should Not "Parse" the Pleadings to Determine Whether Asserted Claims, Damages, and Remedies Fall Within the Scope of the Act's Limited Immunity Waiver.

Section 271.152 does not waive immunity for a claim for relief that does not satisfy the Act's strict requirements, even if it is somehow

30

"related" to a qualifying contract. *See id.* In *Zachry*, the Texas Supreme Court disapproved an earlier line of lower court decisions, including *City of Mesquite v. PKG Contracting, Inc.*, 263 S.W.3d 444, 447 (Tex. App.—Dallas 2008, pet. denied), that had held to the contrary – that a court need not "parse further the pleadings or contract to determine whether the legislature has waived immunity," as long as the contract being sued on "falls within the provisions of section 271.152." *Id.* at 110 n.54.[35/] *Zachry* made clear that Section 271.152 contains the only immunity waiver in the Act and that the other provisions in the Act – particularly Section 271.153 – contain additional "terms and conditions" that further "limit" the scope of the immunity waiver. *Zachry*, 449 S.W.3d at 106–108, 111.

The College contends that *City of Mesquite* remains the controlling standard.[36/] But a correct reading of *Zachry* confirms that the Texas Supreme Court disapproved *City of Mesquite* expressly.

The *Zachry* court held that the limitations in Section 271.153 are

---

[35/] *See, e.g., Roma ISD v. Ewing Const. Co.*, No. 04-12-00035-CV, 2012 Tex. App. LEXIS 5968, at *9 (Tex. App.—San Antonio July 25, 2012, pet. denied); *Port Freeport v. RLB Contracting Inc.*, 369 S.W.3d 581, 591 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); *City of Mesquite*, 263 S.W.3d at 448.

[36/] CR 108, 114-116.

jurisdictional with respect to determining the scope of the immunity waiver in Section 271.152, and it therefore did not end its immunity analysis after concluding that the government contract at issue in that case was a contract subject to the Act. *Zachry*, 449 S.W.3d at 106, 110 ("The contract between the Port and Zachry qualifies."). The *Zachry* court then proceeded to do what the *City of Mesquite* line of cases had incorrectly held was *not* required – it "parse[d] further" the pleadings and contract to determine whether the damages and remedies the plaintiff sought fell within the scope of those permitted under the other limiting provisions in the Act. *Id.* at 108-110 ("The Act waives immunity for contract claims *that meet certain conditions*: the existence of a specific type of contract, a demand for certain kinds of damages, a state forum, etc.") (emphasis added).

The multi-level analysis the Texas Supreme Court endorsed in *Zachry* is illustrated by the funnel graphic on page 25, *supra*. The scope of the immunity waiver under the Act is limited to only certain claims, certain damages, and certain forms of equitable relief, but not others. *See Zachry*, 449 S.W.3d at 108-110.

This Court should not rely upon *Mesquite* or other disfavored court

32

of appeals decisions that have relied upon *Mesquite*. *Zachry* is the controlling standard for analyzing immunity waivers under Section 271.152, and *Zachry* states that the Court must analyze each of the individual damage and liability theories the College has asserted to determine whether they fall within the scope of the statutory terms that define and limit the narrow immunity waiver in Section 271.152.

### c. Section 271.153(c) of the Act Defines the Universe of Equitable Relief Available that the College Can Pursue.

The College apparently contends that because it has asserted a claim for breach of the Coverage Documents, it can import into its case equitable theories like waiver and unconscionability to ***create*** RCV coverage nowhere found in the parties' agreement, and then prosecute a breach of contract claim based upon that newly-created and fictitious coverage.[37] But using equitable theories to create coverage nowhere included within the express terms of the parties' contract, is not a permissible equitable remedy enumerated in Section 271.153 – where the Legislature expressly defined the limited damages and equitable relief (*i.e.*, specific performance and injunctive relief) that fall within the scope

---

[37] CR 113.

33

of the narrow immunity waiver in the Act. *See Harris County v. Crooker*, 112 Tex. 450, 458, 248 S.W. 652, 655 (Tex. 1923) ("The rule *expressio unius est exclusio alterius* is a sound one, frequently applied in the construction of statutes.").

Under the express terms of the Act, the Fund's immunity from suit has been waived *only* for damages owed under the actual express terms of the parties' contract <u>plus</u> a limited category of other damages and specific types of equitable relief not implicated here. Section 271.153 does not purport to authorize any recovery (and any corresponding immunity waiver) based upon other equitable theories. The College's contrary argument is foreclosed by the clear and unambiguous language in Section 271.153, which this Court must strictly construe. *Jackson*, 192 S.W.3d at 770.

The College's reliance below on the Texas Supreme Court's 2019 decision in *Hays Street Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697 (Tex. 2019), for the proposition that the Act waives immunity for all equitable theories arising out of a qualifying contract under the Act, is misplaced.[38] *Hays Street* is distinguishable and

---

[38] CR 119-120.

inapplicable for multiple reasons.

First, *Hays Street* interpreted and applied the materially different 2005 version of the Act in which Section 271.153 was silent about the availability of any equitable remedies, to determine whether government immunity had been waived to authorize specific performance of a contract (as opposed to a recovery of monetary damages). The Texas Supreme Court noted that the Texas Legislature has since amended Section 271.153 in 2013 expressly to authorize the equitable remedies of specific performance and injunctive relief in certain limited situations. *Id.* at n.65. The Court reserved the issue whether the 2013 version of Act now limits immunity waivers for equitable relief to the specific categories the Legislature has now authorized. *Id.*

The College does not distinguish between the inapplicable 2005 version of the Act that applied in *Hays Street*, and the current 2013 version of the Act applicable here.[39] *Hays Street* is therefore inapposite because it interpreted an earlier version of the Section 271.153. The

---

[39] The 2013 version of the Act applies to "a claim that arises under a contract executed on or after the effective date" of the Act. Acts 2013, 83rd Leg., ch. 1138 (H.B. 3511), §§3, 4(c) [effective June 14, 2013]; 2013 Tex. Gen. Laws 1138. Here, the applicable CCS was signed in 2020 and the Property Coverage Agreement "covered losses occurring from September 1, 2020 through August 31, 2021." CR 61, 66, 67.

applicable version of Section 271.153 expressly limits any immunity waiver for equitable remedies to two circumstances, neither of which is implicated here. 570 S.W.3d at 699 n.2.

Second, the specific performance sought in *Hays Street* was not akin to the equitable relief the College seeks. The *Hays Street* plaintiff sought specific performance to ***enforce*** the express terms of a governmental contract subject to the Act. *See id.* at 701. The College seeks antithetical equitable relief that would ***create*** new RCV coverage nowhere contained in the parties' agreement; it does not seek to enforce the express written terms of its contract with the Fund, which foreclose any contractual recovery. 570 S.W.3d at 701. Neither *Hays Street* nor the Act authorizes this sort of judicially-created immunity waiver. *See id.*[40/] *Hays Street* therefore is distinguishable from this case on a fundamental level, regardless of which version of the Act applies.

---

[40/] In *Reata Constr. Corp. v. City of Dallas*, the Texas Supreme Court judicially abrogated governmental immunity for government entities who choose voluntarily to engage in litigation and assert affirmative claims for monetary damages, but only to the extent of any claims that are "germane to, connected to, and properly defensive to claims asserted by the [government], to the extent any recovery on those claims will offset any recovery by the [government]." *Id.* at 375, 378. The *Reata* waiver principle is not applicable here, where the Fund has asserted no claims for monetary relief, and the College's supposedly defensive theories are equitable in nature, and not asserted as an offset to the Fund's non-existent claim for money damages.

36

### d.   The College Asserts its Equitable Theories *Offensively* in an Attempt to Create Coverage Where None Exists.

#### i.   *The Express Terms of the Coverage Documents Do Not Provide RCV Coverage for Unrepaired and Unreplaced Losses.*

Relying exclusively on the allegations in its pleadings, the College asserts that it has pled a viable claim within the Act's immunity waiver because it contends that the RCV damages it seeks are amounts purportedly due and owing under the Coverage Documents.[41/]  But the College cannot rely simply on its pleadings for that proposition, because the Fund disputed the College's jurisdictional damages allegations below and offered evidence that conclusively disproved them.

The proper analysis of the College's RCV damages theory starts with an examination of the plain and unambiguous language of the RCV coverage terms in the Coverage Documents. *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) ("An unambiguous contract will be enforced as written."). The Property Coverage Agreement expressly limits RCV coverage to the *lesser* of three amounts – one of which is the out-of-pocket expenses a member paid to actually and necessarily repair

---

[41/]  CR 120 (Response to PPTJ at p. 15).

or replace damaged property.[42] Thus, unless the College incurred unreimbursed, out of pocket expenses to actually and necessarily repair or replace the College's allegedly damaged property, no RCV coverage exists under the express terms of the Coverage Documents.

"[C]ourts across the country that have considered the meaning of the same or similar [RCV] language in a property insurance policy have universally held that such language requires repair or replacement of the destroyed property before the insured is entitled to recover replacement cost damages." *Fitzhugh 25 Partners, L.P.,* 261 S.W.3d at 863 (collecting cases). "**[T]he replacement of damaged property** is an event that *triggers coverage* . . . **[and] [t]o allow an insured to recover** replacement costs *in the absence of actual replacement* **would permit the insured to recover** for *a loss he has not suffered*." *Id.* at 863-864 (emphasis added).

The College only seeks to recover RCV damages.[43] However, the College did not plead or adduce any jurisdictional evidence that it has repaired or replaced *any* of the allegedly damaged properties for which it

---

[42] CR 69.

[43] CR 113 ("[T]he College has sought to recover replacement cost value ('RCV') benefits under the policy as its measure of damages."), 120 ("[T]he College's suit for RCV damages provided for by the insurance policy falls within the statutory waiver of sovereign immunity.")).

now claims it is entitled to RCV coverage. Nor did the College plead or adduce any jurisdictional evidence that it did so within the 365-day period to do so. Accordingly, no RCV coverage is "due and owed/owing" under the express terms of the Coverage Document, because no such coverage exists in the absence of actual repair or replacement. *See, e.g.*, *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 413 (Tex. 2011) (a request for damages not recoverable under the contract is not an amount "due and owing" for purposes of Section 271.153); *Kan. City S. v. Port of Corpus Christi Auth.*, 305 S.W.3d 296, 307 (Tex. App.—Corpus Christi 2009, pet. denied) (same).

ii.      *The College Asserts Waiver and Estoppel Offensively, Purportedly to Create RCV Coverage Where None Exists.*

For the reasons just discussed, the College's breach of contract claim does not seek to enforce the express terms of the Coverage Documents against the Fund – *i.e.*, the only claim for which the Legislature has narrowly waived the Fund's immunity – because the express terms of the Coverage Documents do not provide RCV coverage for hypothetical repairs to or replacement of damaged property that have

not actually and necessarily been made.[44]

The College instead attempts to utilize the equitable doctrines of waiver and unconscionability to create new and different RCV coverage for itself that does not require the College to first suffer a "loss" by making (and paying for) actual repairs or replacement of damaged property. *See* College Brief, at 26-27. It is that "equitably-created RCV coverage" that the College sues to have the Fund pay.[45]

In support of its argument, the College relied heavily on two sister court opinions in *Colorado* and *Greenville*.[46] But *Colorado* and *Greenville* are materially distinguishable from this case because the College asserts its equitable theories *offensively* in an attempt to create coverage where none otherwise exists, not simply as defenses to the satisfaction of a condition precedent asserted by the Fund.

The *Colorado* court emphasized that its decision turned on "constru[ing] the context in which these [equitable] theories have been

---

[44] CR 69.

[45] CR 113.

[46] *Tex. Ass'n of Sch. Bds. Risk Mgmt. Fund v. Colo. Indep. Sch. Dist.*, 660 S.W.3d 767, 769 (Tex. App.—Eastland 2023, no pet.) ("*Colorado*"); *Tex. Ass'n of Sch. Bds. Risk Mgmt. Fund v. Greenville Indep. Sch. Dist.*, No. 05-21-01012-CV, 2022 Tex. App. LEXIS 4952, at *8 (Tex. App.—Dallas July 19, 2022, pet. denied) ("*Greenville*").

asserted." *Colorado*, 660 S.W.3d at 769. And, because the school district in that case invoked the equitable doctrines of waiver and estoppel in its amended pleadings solely "in response to the defense of an unfulfilled condition precedent raised by the Fund," the court held that they were "raised in a *defensive* context [and] fall within the Act's waiver of immunity." *Id.* (emphasis in original); *see also Greenville*, 2022 Tex. App. LEXIS 4952, at *8 ("Greenville's *defensive* theories benefit from the same waiver of immunity.") (emphasis added).

Here, the College first raised its waiver theory in its *Original Petition*, not in response to any defense that the College had failed to satisfy a condition precedent.[47] In addition, contrary to the College's mischaracterization below, the RCV coverage terms are not "conditions precedent" or "affirmative defenses" to recovery under the Coverage Documents.[48] The repair and replacement provisions are **coverage terms** that define the scope of RCV coverage afforded the College and all of the Fund's other governmental members. *See Fitzhugh 25 Partners, L.P.,* 261 S.W.3d at 863 ("It is the act of replacing the property that causes the

---

[47] CR 9-10.

[48] CR 113.

insured to suffer an additional loss for which he purchased additional [RCV] coverage."). As a breach of contract plaintiff, the College has the threshold burden to prove that it has suffered a loss for which RCV coverage exists under the Coverage Documents – *i.e.*, unreimbursed, out-of-pocket expenses to actually repair or replace damaged property. *Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 33 (Tex. 2014). It cannot rely upon immunity-barred equitable theories to avoid its obligation to meet that threshold coverage burden.

The context in which this case arises therefore is materially different from the circumstances in *Colorado/Greenville.*

### iii. Section 271.155 Does Not Grant an Immunity Waiver for the College's Equitable Theories.

The College has also taken the position that its request for equitable relief is not immunity-barred because Section 271.155 states that the Act does not waive defenses "available to a party" to a contract.[49] The courts of appeals that have considered this argument thus far have misconstrued Section 271.155. *See Colorado*, 660 S.W.3d at 769; *Greenville*, 2022 Tex. App. LEXIS 4952, at \*8.

---

[49] CR 107, 111.

The purpose of Section 271.155 is to ensure that the Act only waives a *defendant* governmental entity's immunity and not any of *its* other defenses or damage limitations. *Zachry*, 449 S.W.3d at 107 ("Section 271.155 preserves defenses other than immunity."). The title of Section 271.155 is "No Waiver of *Other* Defenses" (emphasis added), indicating that it refers to *other* defenses *of the party whose immunity is being waived by the Act*. That section therefore only applies in circumstances where a party that has sued a local government contends that the Act has also waived the *defendant* local government's contractual or equitable defenses—its *other* defenses—in addition to its immunity. *Zachry* makes clear that Section 271.155 is a "*limitation*[ ] on the waiver of immunity" in Section 271.152. *Zachry*, 449 S.W.3d at 108.

The *Colorado* and *Greenville* courts' interpretation of Section 271.155, which the College advocates for here, results in a significant and unlimited *expansion* of the immunity waiver in Section 271.152. Under that reading of the statute, the Act would no longer provide only a limited waiver of immunity to adjudicate contract disputes based upon the express terms of a written government contract. Local governments would instead be exposed to open-ended liability based upon alleged

43

extra-contractual conduct in reliance upon otherwise immunity-barred equitable and/or intentional tort theories,[50] as long as a plaintiff characterized them as contract "defenses." Such a construction does not comport with the plain meaning of the statute or the legal requirement to narrowly construe waivers of immunity. *See* TEX. GOV'T CODE § 311.034; *Tooke*, 197 S.W.3d at 328–29.

There is another reason why Section 271.155 does not waive the Fund's immunity for the College's equitable theories. By its terms, Section 271.155 preserves only "a defense or limitation on damages *available to a party to a contract . . .*" (emphasis added). As a matter of law, neither waiver nor unconscionability is a defense "available" to the College to create RCV coverage where it does not exist.

More than 85 years ago, the Texas Supreme Court held in *Washington National Insurance Co. v. Craddock* that an insured cannot use the equitable waiver doctrine to create coverage in an insurance

---

[50] *See Chatha*, 381 S.W.3d at 515 (applying equitable defenses to governmental entities "invades the domain of the Legislature and cuts against the very nature of sovereign immunity."); *Seureau v. ExxonMobil Corp.*, 274 S.W.3d 206, 219 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("[T]he Legislature has not waived immunity with respect to the intentional tort of fraud"); TEX. LOC. GOV'T CODE § 271.157 ("This subchapter does not waive sovereign immunity to suit for a cause of action for a negligent or intentional tort.").

44

contract. 109 S.W.2d at 166. The rule has since evolved to include the other equitable doctrines such as estoppel, and has repeatedly been reaffirmed by the Texas Supreme Court and various intermediate appellate courts. *See, e.g.*, *Ulico Cas. Co.*, 262 S.W.3d at 780 ("[W]aiver and estoppel cannot create a new and different contract with respect to risks covered by the policy.") (emphasis omitted); *McGuire,* 744 S.W.2d at 602–03 ("The doctrine of estoppel cannot be used to create insurance coverage when none exists by the terms of the policy"); *Nat'l Fire Ins. Co. v. State & Cty. Mut. Fire Ins. Co.,* No. 01-11-00176-CV, 2012 Tex. App. LEXIS 7729, at *15 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, no pet.) (same); *Prime Time Family Entertainment Center, Inc.*, 630 S.W.3d at 232 ("[T]he contractual coverage of an insurance policy cannot be expanded by waiver or estoppel on the part of the insurer . . . The manner in which [the insurer] adjusted the claim cannot create coverage by either waiver or estoppel."); *Rotating Servs. Indus. v. Harris*, 245 S.W.3d 476, 487-488 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)("Settled Texas law precludes a party from invoking estoppel to create insurance coverage where none exists under the terms of the policy."); *Farmers Tex. Cnty. Mut. Ins. Co. v. Wilkinson*, 601 S.W.2d 520 (Tex. App.—Austin

1980, writ ref'd n.r.e.), abrogated by *Ulico Cas. Co.*, 262 S.W.3d 773 ("It is well established that, whereas the doctrines of waiver and estoppel may operate to avoid conditions that would cause a forfeiture of an insurance policy, they will not operate to change, re-write or enlarge the risks covered by the policy.").

Accordingly, even if the College had asserted its equitable theories in a purely defensive context, which it did not do, waiver and unconscionability are not "available to [the College]" to create RCV coverage that does not exist under the express terms of the Coverage Documents. Section 271.155 therefore does not expand Section 271.152's limited waiver of immunity to include liability based upon the College's equitable theories.

### iv. *The College Adduced No Jurisdictional Evidence of a <u>Viable</u> Waiver or Unconscionability Theory.*

Under the plea to the jurisdiction standard, which mirrors the Texas summary judgment procedure, mere allegations of a potential claim are insufficient to establish an immunity waiver. The plaintiff must affirmatively demonstrate that its claim is *viable* and that immunity does not apply or has been waived. *See, e.g.*, *Matzen v. McLane*, 659 S.W.3d 381, 389 (Tex. 2021).

46

Where, as here, the government defendant contests the jurisdictional allegations and offers evidence to defeat them, the plaintiff has the burden to adduce its own evidence creating a genuine fact issue to survive dismissal. *Miranda*, 133 S.W.3d at 227. The Fund challenged and contested the sufficiency of the College's jurisdictional allegations regarding its equitable remedies based on waiver and unconscionability, and submitted evidence that conclusively disproved the College's allegations.[51/] The College therefore could not rest on its allegations alone. *Id.*

The College adduced no evidence creating a genuine fact issue on its waiver and unconscionability theories, including any evidence to rebut:

- The enforceable "no waiver" provision in the underlying contract, which permits waiver of a contractual right or obligation "only when expressly waived in writing by the waiving party," and forecloses any implied waiver based upon mere "act or omission."[52/] *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017) ("[A]s a general proposition, nonwaiver provisions are binding and enforceable.");

- The lack of any "shocking" circumstances surrounding the

---

[51/] CR 37 ("The Fund contests the sufficiency of the College's jurisdictional allegations and has submitted evidence that under Texas law disproves conclusively the possibility of allegations upon which jurisdiction might be based . . .")

[52/] CR 60.

47

negotiation of the underlying contract between the Fund and the various government entities who created the Fund. *LeBlanc v. Lange*, 365 S.W.3d 70, 88 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("[T]he circumstances surrounding the negotiations must be shocking" to warrant a finding of procedural unconscionability.); and

- The absence of any contract terms that are "so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 757 (Tex. 2001).

Accordingly, even if the College were permitted to assert equitable waiver and unconscionability theories against the Fund, which it cannot do, the College did not satisfy its evidentiary burden to create a genuine fact issue about whether it has *viable* equitable claims that could effect a waiver of the Fund's immunity. *Matzen*, 659 S.W.3d at 389; *Miranda*, 133 S.W.3d at 227.

2. <u>No Waiver Exists of the Fund's Immunity from the College's Intentional Tort Theories.</u>

a. The Act Expressly Excludes Intentional Tort Liability from the Limited Immunity Waiver.

The College alleges that the Fund acted with "bad faith" and made "multiple misrepresentations" to the College concerning the Coverage Documents and April 2021 Claim.[53] Fraud and bad faith claims are

---

[53] CR 8-9, 11.

48

intentional torts. *See Seureau*, 274 S.W.3d at 219 ("[T]he Legislature has not waived immunity with respect to the intentional tort of fraud"); *Milner v. City of Leander*, 64 S.W.3d 33, 40 (Tex. App.—Austin 2000, no pet.) ("bad faith is an intentional tort."). The Act expressly states that it does not waive immunity for negligent or intentional tort claims. TEX. LOC. GOV'T CODE § 271.157 ("This subchapter does not waive sovereign immunity to suit for a cause of action for a negligent or intentional tort."); *see also A Status Constr. LLC v. City of Bellaire*, No. 01-21-00326-CV, 2022 Tex. App. LEXIS 5149, at *22 (Tex. App.—Houston [1st Dist.] July 26, 2022, no pet.).

Nor has the Legislature elsewhere waived the Fund's immunity from intentional torts. The Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001 *et seq.* ("TTCA"), which contains a limited immunity waiver from suit and from liability for certain tort claims against "governmental units," does not waive immunity for an "intentional tort." *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.021, 101.025, 101.057.

The College's intentional tort theories also appear to be based on various statements that the Fund is alleged to have made on its

webpage.[54] Statements on a webpage cannot, as a matter of law, implicate the Act's immunity waiver. The Act defines the term "contract subject to this subchapter" as "*a written contract stating the essential terms of the agreement* for providing goods or services to the local government entity *that is properly executed on behalf of the local governmental entity.*" *Id.* §271.151(2)(A) (emphasis added). The Fund webpage on which the College relies – published years after the relevant storm April 2021 Claim – does not satisfy any of those requirements.

The Fund therefore remains immune from any claims for relief that attribute and seek to recover from the Fund for any alleged tortious conduct. The trial court erred when it denied the Fund's jurisdictional challenge on these grounds.

> b. The College Asserts its Intentional Tort Theories *Offensively* in an Attempt to Create Coverage Where None Exists.

As with its equitable theories, the College cannot assert immunity-barred intentional tort theories against the Fund simply by characterizing the theories as purported contract "defenses."[55] The

---

[54] CR 8-9.

[55] For the reasons discussed *supra* at Section VI.D.1.d.iii, which the Fund incorporates by reference, Section 271.155 does not expand Section 271.152's limited waiver of immunity to include liability based upon equitable or intentional

50

College asserted fraud and bad faith theories *offensively* in its Original Petition – not in response to any defense theory raised by the Fund.[56] The College's allegations and requested relief further clarify that it has not asserted fraud and bad faith as defenses, but as a means to obtain extra-contractual relief not available under the Act.

The College alleged that it entered the Coverage Documents "[b]ased on" alleged misrepresentations by the Fund regarding the scope of the College's self-insurance coverage.[57] There are two alternative remedies for fraudulent inducement: a party can rescind the contract, or it can affirm the contract and recover for damages flowing from the fraud. *Dallas Farm Machinery Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233, 238-39 (Tex. 1957); *see also Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 676-77 (Tex. 2000). But, where litigants "only assert[] fraudulent inducement as a defense," and not as an affirmative claim for relief, "rescission [is] their only option." *Bailey v. Bailey*, 731 F. App'x 272, 280-81 (5th Cir. 2018). Thus, the determination whether the

tort theories labeled as a plaintiff's purported contract "defenses." Section 271.155 operates only to preserve the Fund's "*other* defenses" other than immunity.

[56] CR 9, 11.

[57] CR 9.

51

College has asserted fraud offensively or defensively, is guided by the relief it seeks.

The College has not pled for rescission – *i.e.*, the only remedy available for defensive fraudulent inducement. *Id.* To the contrary, the College seeks to create new and different RCV coverage for unreplaced and unrepaired property damage – a risk that the Fund's 1,000+ members did not agree to share in the Coverage Documents.[58] "A court cannot make a new contract to which the parties did not agree." *Id.* (citing *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987)). The College's labeling of its fraud allegations as "defenses" does not control; the substance of the College's claim does. And, here, the substance of the College's claim for relief forecloses any argument that its fraud and misrepresentation theories have been raised purely as contract "defenses."

The College's allegations of bad faith also are not raised defensively to any Fund affirmative defense. Bad faith is an intentional tort. *Milner*, 64 S.W.3d at 40. Unlike fraudulent inducement, which can be invoked defensively to *rescind* a contract, the Fund has located no authority

---

[58] CR 113.

recognizing bad faith as a breach of contract defense for any purpose in Texas.

Accordingly, even if the Court were to adopt the College's incorrect interpretation of Section 271.155, the College has not asserted fraud defensively, and bad faith is not a recognized contract defense in Texas.

## VII.
## PRAYER

The Fund requests that this Court reverse the trial court's partial denial of the Fund's Jurisdictional Plea and dismiss the College's equitable and intentional tort theories for lack of subject matter jurisdiction, and grant the Fund such other and further relief, whether legal or equitable, to which it may show itself to be justly and equitably entitled.

Respectfully submitted,


By: */s/ Jack W. Higdon*

Jack W. Higdon
jack.higdon@blankrome.com
State Bar No. 24007360
Barry Abrams
barry.abrams@blankrome.com
State Bar No. 00822700
Joshua A. Huber
josh.huber@blankrome.com
State Bar No. 24065457
BLANK ROME LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002-2727
(713) 228-6601
(713) 228-6605 (Fax)

ATTORNEYS FOR APPELLANT, TEXAS ASSOCIATION OF SCHOOL BOARDS RISK MANAGEMENT FUND

54

## CERTIFICATE OF COMPLIANCE

Pursuant to TEX. R. APP. P. 9.4(i)(3), I certify that this brief complies with the type-volume restrictions of TEX. R. APP. P. 9.4(e), (i)(2)(B). Exclusive of the portions exempted by Rule 9.4(i)(1), this brief contains **8,623** words.

*/s/ Jack W. Higdon*
Jack W. Higdon

## CERTIFICATE OF SERVICE

I certify pursuant to TEX. R. APP. P. 9.5(b)(1) that a true and correct copy of the foregoing and/or attached instrument was electronically served on counsel for all parties on September 10, 2025, through the Fifteenth District Court of Appeals' electronic filing manager, as indicated below:

**Via Electronic Service:**
Preston J. Dugas III
pdugas@dcclawfirm.com
Vincent P. Circelli
vcircelli@dcclawfirm.com
Andrew D. Spadoni
aspadoni@dcclawfirm.com
Sarah Arroyo
sarroyo@dcclawfirm.com
DUGAS & CIRCELLI, PLLC
4800 Bryant Irvin Ct.,
Fort Worth, Texas 76107

*/s/ Jack W. Higdon*
Jack W. Higdon

NO. 15-25-00134-CV

# In the
# Fifteenth Court of Appeals
# Austin, Texas

TEXAS ASSOCIATION OF SCHOOL BOARDS RISK MANAGEMENT FUND,

*Appellant,*

v.

SOUTHWEST TEXAS JUNIOR COLLEGE,

*Appellee.*

Appeal from the 38th Judicial District Court
Uvalde County, Texas, No. 2023-11-35269-CV
The Honorable Kelley T. Kimble, Presiding Judge

## APPENDIX

App. A - Order Denying in Part and Granting in Part the Fund's Jurisdiction Plea (CR137-138)

App. B - Coverage Documents (CR56-102)

App. C - The Local Government Contract Claims Act, Tex. Loc. Gov't Code §§ 271.151, *et seq.* (excerpts)

App. D - Texas Government Code (excerpts)

# APP. A

| | | |
|---|---|---|
| SOUTHWEST TEXAS JUNIOR COLLEGE | § § § | IN THE DISTRICT COURT OF |
| v. | § § | UVALDE COUNTY, TEXAS |
| TEXAS ASSOCIATION OF SCHOOL BOARDS RISK MANAGEMENT FUND, AND ABERCROMBIE, SIMMONS, & GILLETTE, INC. | § § § § | 38TH JUDICIAL DISTRICT |

## ORDER GRANTING IN PART AND DENYING IN PART THE FUND'S PARTIAL PLEA TO THE JURISDICTION

Before the Court is Defendant Texas Association of School Boards Risk Management Fund's (the "Fund") Partial Plea to the Jurisdiction (the "Jurisdictional Plea") against Plaintiff Southwest Texas Junior College (the "College"). The Court, having considered the Jurisdictional Plea, any timely filed responses or replies to the Jurisdictional Plea, and arguments of counsel, has determined that the Jurisdictional Plea should be GRANTED IN PART and DENIED IN PART.

IT IS ORDERED that the Jurisdictional Plea is GRANTED with respect to the College's claims for exemplary, consequential, or treble damages, and all such claims are dismissed with prejudice for lack of subject matter jurisdiction.

IT IS FURTHER ORDERED that the Jurisdictional Plea is DENIED with respect to the College's claims in the following 4 areas, because they are defensive in nature and benefit from the same waiver of immunity as set forth in TEX. LOC. GOV'T CODE § 271.152:

1.  Waiver or estoppel of contractual provisions;

2.  Reliance on statements made on a Fund Webpage

FILED
7/29/2025 3:43 PM
Christina Ovalle, District Clerk
Uvalde County, TX
By Alexis Vera

3.   Fraud or misrepresentation by the Fund specifically relating to the parties' written contract; and

4.   Bad faith of the Fund relating to the parties' written contract.

**7/30/2025**

DATED:_____, 2025.

_____
Hon. Kelley T. Kimble
Uvalde County District Judge

**APPROVED AS TO FORM ONLY:**

By:_*/s/ Jack W. Higdon*_____
    Jack W. Higdon
    Texas Bar No. 24007360
    jack.higdon@blankrome.com
    BLANK ROME LLP
    717 Texas Avenue, Suite 1400
    Houston, Texas 77002-2727
    (713) 228-6601
    (713) 228-6605 (Fax)

*Counsel for Defendant, Texas Association of School Boards Risk Management Fund*

2

# APP. B

## TASB RISK MANAGEMENT FUND
## INTERLOCAL PARTICIPATION AGREEMENT

Pursuant to the Texas Interlocal Cooperation Act, Chapter 791 of the Texas Government Code, this Interlocal Participation Agreement (Agreement) is entered into by and between the Texas Association of School Boards Risk Management Fund (Fund) and the undersigned local government of the State of Texas (Fund Member). The Fund is an administrative agency of local governments (Fund Members) that cooperate in performing administrative services and governmental functions relative to risk management.

### TERMS AND CONDITIONS

In consideration of the mutual covenants and conditions contained in this Agreement and other good and valuable consideration, including, without limitation, the agreement of the Fund and Fund Members to provide risk management programs as detailed in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Fund Member and the Fund, intending to be legally bound, and subject to the terms, conditions, and provisions of this Agreement, agree as follows:

1.  **Authority.** Fund Member hereby approves and adopts the Restatement of Interlocal Agreement, dated May 20, 1997, which restated the Interlocal Agreement dated July 2, 1974, establishing the predecessor of the Fund. The Restatement of Interlocal Agreement is incorporated into this Agreement by reference and is available from the Fund upon request. This Agreement serves to outline the relationship between the Fund and Fund Member. While the Texas Interlocal Cooperation Act provides the overarching basis for the Fund, certain Fund programs are further authorized pursuant to various statutes, such as Chapter 205 of the Texas Labor Code, pertaining to unemployment compensation; Chapter 504 of the Texas Labor Code, pertaining to workers' compensation; and Chapter 2259, Subchapter B, of the Texas Government Code, pertaining to other risks or hazards.

2.  **Program Participation.** This Agreement enables Fund Member to participate in one or more of the Fund's available programs, including but not limited to, property, liability, auto, workers' compensation, and unemployment compensation coverage. Because this is an enabling Agreement, Fund Member must also execute a separate Contribution and Coverage Summary (CCS) for each Fund program from which it seeks coverage and/or administrative services. Only a valid CCS will confer the right to participate in a specific program and each CCS shall be incorporated into this Agreement. Through participation in any Fund program, Fund Member waives none of its immunities and authorizes the Fund, or its designee, to assert such immunities on its behalf and on behalf of the Fund or its designee.

3.  **Term of Agreement.** This Agreement shall be effective from the date of the last signature below and shall remain in effect unless terminated as provided in this Agreement. This Agreement will automatically terminate if Fund Member ceases to participate in at least one of the Fund's programs (due to the expiration of a CCS participation term or the valid termination of same) or fails to meet the membership qualifications of the Fund as provided in this Agreement and as determined by the Fund in writing.

4.  **Termination.** Unless this Agreement is automatically terminated as described above, this Agreement, and/or any component CCS applicable to Fund Member, can be terminated as set forth below. However, the termination of any single Fund program under a CCS shall not also result in the automatic termination of another pending CCS, or this enabling Agreement if any other CCS is still in force for Fund Member. Rather, each Fund program can only be terminated as provided in this Agreement.

    a   **By Either Party with 30 Days Notice before Renewal.** Any CCS may be terminated by either party with termination to be effective on any successive renewal date by giving written notice to the other party no later than 30 days prior to automatic renewal.

    b.  **By Fund Member upon Payment of Late Notice Fee.** If Fund Member fails to terminate a CCS as provided above, it may still terminate participation in any Fund program prior to the renewal date by paying a late notice fee as herein provided. If Fund Member terminates the CCS before the renewal date, but with fewer than 30 days' advance written notice, Fund Member agrees to pay the Fund a late notice fee in the amount of 25% of the annual contribution for the expiring participation term. Fund Member expressly acknowledges that the late notice fee is not a penalty, but a reasonable approximation of the Fund's damages for the Fund Member's untimely withdrawal from the program identified in the CCS. However,



TASB RISK
MANAGEMENT FUND

Page 1 of 6

once the renewal term of a CCS commences, Fund Member can no longer terminate the CCS by paying a late notice fee; the CCS shall renew and Fund Member shall be bound thereby

c.   **By the Fund upon Breach by Fund Member.**

1)   The Fund may terminate this Agreement or any CCS based on breach of any of the following obligations, by giving 10 days' written notice to Fund Member of the breach; and Fund Member's failure to cure the breach within said 10 days (or other time period allowed by the Fund):

2)   Fund Member fails or refuses to make the payments or contributions required by this Agreement;

3)   Fund Member fails to cooperate and comply with any reasonable requests for information and/or records made by the Fund;

4)   Fund Member fails or refuses to follow loss prevention or statutory compliance requirements of the Fund, as provided in this Agreement; or

5)   Fund Member otherwise breaches this Agreement.

If the Fund terminates this Agreement, or any CCS, based on breach as described above, Fund Member agrees that the Fund will have no responsibility of any kind or nature to provide coverage on the terminated Fund program post-termination. Further, Fund Member shall bear the full financial responsibility for any unpaid open claim and expense related to any claim, asserted or unasserted and reported or unreported, against the Fund or Fund Member, or incurred by the agents or representatives of Fund Member.

In addition to the foregoing, if termination is due to Fund Member's failure to make required payments or contributions, Fund Member agrees that it shall pay the Fund liquidated damages in the amount of 50% of the annual contribution for the participation term identified in the terminated CCS.

5.   **Contributions.**

a.   **Agreement to Pay.** Fund Member agrees to pay its contribution for each Fund program in which it participates based on a plan developed by the Fund. The amount of contribution will be stated in the relevant CCS and will be payable upon receipt of an invoice from the Fund. Late fees amounting to the maximum interest allowed by law, but not less than the rate of interest authorized under Chapter 2251, Texas Government Code, shall begin to accrue daily on the first day following the due date and continue until the contribution and late fees are paid in full. If Fund Member owes the Fund payments under this Agreement, including any CCS, the Fund may offset such amounts from any Fund Member funds held by the Fund, regardless of program.

b.   **Estimated Contribution.** In specified situations, the amount of contribution shown in the CCS will be identified as an estimate. The Fund reserves the right to request an audit of updated exposure information at the end of the CCS participation term and adjust contributions if Fund Member's exposure changes during the CCS participation term. As a result of the exposure review, any additional contribution payable to the Fund shall be paid by Fund Member, and any overpayment of contribution by Fund Member shall be returned by the Fund. The Fund reserves the right to audit the relevant records of Fund Member in order to conduct this exposure review.

Upon expiration of each participation period, Fund Member may request a contribution adjustment due to exposure changes. Such request must be made in writing within 60 days after the end of the participation period. Fund Member must provide documentation as requested by the Fund to demonstrate that the exposure change warrants a contribution adjustment.

c.   **Contribution Adjustment.** Should the Fund's underwriting income for any program within a given program year be inadequate to pay the ultimate cost of claims incurred for that year, the Fund may collect an adjusted contribution from any current or former Fund Member if that Fund Member's contribution is inadequate to pay the Fund Member's claims incurred during that year.



TASB RISK
MANAGEMENT FUND

Interlocal Participation Agreement
Fund Board Approved, April 15, 2012
Effective September 1, 2012

6.  **Contribution and Coverage Summary.** Fund Member agrees to abide by each CCS that governs its participation. A CCS will incorporate the program specific coverage document, if any, which sets forth the scope of coverage and/or services from the Fund. A CCS for a Fund program will state the participation term. After Fund Member's initial execution of a CCS, the CCS will automatically renew annually, unless terminated in accordance with this Agreement. Any renewal containing a change in the amount of contribution or other terms will be subject to the Amendment by Notice process described in this Agreement.

7.  **Loss Prevention.** The Fund may provide loss prevention services to Fund Member. Fund Member agrees to adopt the Fund's reasonable and customary standards for loss prevention and to cooperate in implementing any and all reasonable loss prevention and statutory compliance recommendations or requirements.

8.  **Other Duties of Fund Member.**

    a.  **Standards of Performance.** Time shall be of the essence in Fund Member's reporting of any and all claims to the Fund, payment of any contributions or monies due to the Fund, and delivery of any written notices under this Agreement.

    b.  **Claims Reporting.** Notice of any claim must be provided to the Fund no more than 30 days after Fund Member knows or should have known of the claim or circumstances leading to the claim, unless a different reporting requirement is required by law or provided for in the CCS. Failure by Fund Member to timely report a claim may result in denial of coverage or payment of fines or penalties imposed by law or regulatory agencies. If the Fund advances payment of any fine or penalty arising from Fund Member's late claim reporting, Fund Member will reimburse the Fund for all such costs.

9.  **Administration of Claims.** The Fund or its designee agrees to administer all claims for which Fund Member has coverage after Fund Member provides timely written notice to the Fund. Fund Member hereby authorizes the Fund or its designee to act in all matters pertaining to handling of claims for which Fund Member has coverage pursuant to this Agreement. Fund Member expressly agrees that the Fund has sole authority in all matters pertaining to the administration of claims and grants the Fund or its designee full decision-making authority in all matters, including without limitation, discussions with claimants and their attorneys or other duly authorized representatives. Fund Member further agrees to be fully cooperative in supplying any information reasonably requested by the Fund in the handling of claims. All decisions on individual claims shall be made by the Fund or its designee, including, without limitation, decisions concerning claim values, payment due on the claim, settlement, subrogation, litigation, or appeals.

10. **Excess Coverage/Reinsurance.** The Fund, in its sole discretion, may purchase excess coverage or reinsurance for any or all Fund programs. In the event of a substantial change in terms or cost of such coverage, the Fund reserves the right to make adjustments to the terms and conditions of a CCS as allowed by the Amendment by Notice process under this Agreement. If any reinsurer, stop loss carrier, and/or excess coverage provider fails to meet its obligations to the Fund or any Fund Member, the Fund is not responsible for any payment or any obligations to Fund Member from any reinsurer, stop loss carrier, or excess coverage provider.

11  **Subrogation and Assignment of Rights.** Fund Member, on its own behalf and on behalf of any person entitled to benefits under this Agreement, assigns all subrogation rights to the Fund. The Fund has the right, in its sole discretion, without notice to Fund Member, to bring all claims and lawsuits in the name of Fund Member or the Fund. Fund Member agrees that all subrogation rights and recoveries belong first to the Fund, up to the amount of benefits, expenses, and attorneys' fees incurred by the Fund, with the balance, if any, being paid to Fund Member, unless otherwise specifically stated in the Agreement. Award of funds to any person entitled to coverage, whether by judgment or settlement, shall be conclusive proof that the injured party has been made whole. Fund Member's right to be made whole is expressly superseded by the Fund's subrogation rights. If Fund Member procures alternate coverage for a risk covered by the Fund, the latter acquired coverage shall be deemed primary coverage concerning that risk.

12. **No Waiver of Subrogation Rights.** Fund Member shall do nothing to prejudice or waive the Fund's existing or prospective subrogation rights under this Agreement. If Fund Member has waived any subrogation right without first obtaining the Fund's written approval, the Fund shall be entitled to recover from Fund Member any sums that it would have been able to recover absent such waiver. Recoverable amounts include attorneys' fees, costs, and expenses.



Interlocal Participation Agreement
Fund Board Approved, April 15, 2012
Effective September 1, 2012

13. **Appeals.** Fund Member shall have the right to appeal any written decision or recommendation to the Fund's Board of Trustees, and the Board's determination will be final. Any appeal shall be made in writing to the Board Chair within 30 days of the decision or recommendation.

14. **Bylaws, Policies, and Procedures.** Fund Member agrees to abide by the Bylaws of the Fund, as they may be amended from time to time, and any and all written policies and procedures established by the Fund (which are available from the Fund upon written request). If a change is made to the Fund's Bylaws, written policies or procedures which conflicts with or impairs a CCS, such change will not apply to Fund Member until the renewal of such CCS, unless Fund Member specifically agrees otherwise.

15. **Payments.** Fund Member represents and warrants that all payments required under this Agreement of Fund Member shall be made from its available current revenues.

16. **Cooperation and Access.** Fund Member agrees to cooperate and to comply in a timely manner with all reasonable requests for information and/or records made by the Fund. Fund Member further agrees to provide complete and accurate statements of material facts, to not misrepresent or omit such facts, engage in fraudulent conductor make false statements to the Fund. The Fund reserves the right to audit the relevant records of Fund Member to determine compliance with this Agreement.

17. **Fund Member's Designation of Coordinator.** Fund Member agrees to designate a coordinator ("Program Coordinator") for Fund Member on this Agreement or any CCS executed by Fund Member. Fund Member's Program Coordinator shall have express authority to represent and to bind Fund Member, and the Fund will not be required to contact any other individual regarding matters arising from or related to this Agreement. Fund Member reserves the right to change its Program Coordinator as needed, by giving written notice to the Fund; such notice is not effective until actually received by the Fund. Notice provided to the Chief Executive Officer of Fund Member shall also serve as notice to the Program Coordinator.

18. **Security of Documents.** Under this agreement the Fund may grant Fund Member access to sensitive or protected information. Fund Member agrees to assume the responsibility for maintaining the security of this information and to take all reasonable steps to avoid unauthorized disclosure of this information.

19. **Insurance Terminology.** The Fund is not "insurance", but is instead a mechanism through which eligible governmental entities join together to collectively self-insure and administer certain risk exposures. Any reference in this Agreement to an insurance term or concept is coincidental, is not intended to characterize the Fund as "insurance" as defined by law, shall be deemed to apply to self-insurance, and is not to be construed as being contrary to the self-insurance concept.

20. **Representation.** Fund Member authorizes the Fund to represent Fund Member in any lawsuit, dispute, or proceeding arising under or relating to any Fund program and/or coverage in which Fund Member participates. The Fund may exercise this right in its sole discretion and to the fullest extent permitted or authorized by law. Fund Member shall fully cooperate with the Fund, its designee, and the Fund's chosen counsel, including, without limitation, supplying any information necessary or relevant to the lawsuit, dispute, or proceeding in a timely fashion. Subject to specific revocation, Fund Member designates the Fund to act as a class representative on its behalf in matters arising out of this Agreement.

21. **Members' Equity.** The Fund Board, in its sole discretion, may declare a distribution of the Fund's members' equity to Fund Members. Members' equity belongs to the Fund. No individual Fund Member is entitled to an individual allocation or portion of members' equity.

22. **Entire Agreement.** This Agreement, together with the Restated Interlocal Agreement, Bylaws and CCS's that are in effect as to Fund Member from time to time, represent and contain the complete understanding and agreement of the Fund and Fund Member, and there are no representations, agreements, arrangements, or undertakings, oral or written, between the Fund and Fund Member other than those set forth in this Agreement duly executed in writing. In the event of conflict between the terms of this Agreement and the Restated Interlocal Agreement, Bylaws or any CCS, the specific terms of the later adopted agreement shall prevail to the extent necessary to resolve the conflict. This Agreement replaces all previous Interlocal Participation Agreements between the Fund and Fund Member. Notwithstanding the foregoing, this Agreement does not supersede any unexpired participation term or pending claim under an existing agreement between Fund Member and Fund.



TASB RISK
MANAGEMENT FUND

Interlocal Participation Agreement
Fund Board Approved, April 15, 2012
Effective September 1, 2012

23. **Amendment by Notice.** This Agreement, including any of its component CCSs or coverage documents, may be amended by the Fund, in writing, by providing Fund Member with written notice before the earlier of (i) the effective date of the amendment or (ii) the date by which Fund Member can terminate without payment of late notice fees or liquidated damages. Unless this Agreement expressly provides otherwise, an amendment shall only apply prospectively and Fund Member shall have the right to terminate this Agreement, or a component CCS to which the amendment applies, before the amendment becomes effective, as provided in this Agreement. If Fund Member fails to give the Fund timely written notice of termination, Fund Member shall be deemed to have consented to the Fund's amendment and agrees to abide by and be bound by the amendment, without necessity of obtaining Fund Member's signature.

The Fund may amend this Agreement or any CCS effective upon renewal. Amendments may be for any reason including changes to the terms or contribution amount.

The Fund may also amend this Agreement or any CCS, effective during the term of a CCS, for any reason including but not limited to the following:

a. State or federal governments, including any court, regulatory body or agency thereof, adopt a statute, rule, decision, or take any action that would substantially impact the rights or financial obligations of the Fund as it pertains to this Agreement, or any Fund program or CCS.

b. The terms of the Fund's stop-loss or excess coverage or reinsurance change substantially.

If the Fund exercises the option to amend the Agreement or any CCS during the term of a CCS and prior to renewal, the Fund shall give Fund Member 30 days advance written notice. Fund Member will then have the right during the 30-day period to give the Fund written notice of termination of the applicable Fund program, effective upon the expiration of the 30-day notice period (or longer period if so provided by the Fund in writing).

24. **Severability; Interpretation.** If any portion of this Agreement shall be declared illegal or held unenforceable for any reason, the remaining portions shall continue in full force and effect. Any questions of particular interpretation shall not be interpreted against the drafter of this Agreement, but rather in accordance with the fair meaning thereof.

25. **Governing Law; Venue; Attorneys' Fees.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to the conflicts of law principles of such state. Venue for the adjudication or resolution of any dispute arising out of or relating to this Agreement shall lie in Travis County, Texas, unless otherwise mandated by law. In the event of a lawsuit or formal adjudication between Fund Member and the Fund, the prevailing party is entitled to recover reasonable and necessary attorneys' fees that are equitable and just.

26. **Waiver.** No provision of this Agreement will be deemed waived by either party unless expressly waived in writing by the waiving party. No waiver shall be implied by delay or any other act or omission. No waiver by either party of any provision of this Agreement shall be deemed a waiver of such provision with respect to any subsequent matter relating to such provision.

27. **Assignment.** This Agreement or any duties or obligations imposed by this Agreement shall not be assignable by Fund Member without the prior written consent of the Fund.

28. **Authorization.** By the execution of this Agreement, the undersigned individuals warrant that they have been authorized by all requisite governance action to enter into and to perform the terms and conditions of this Agreement.

29. **Notice.** Unless expressly stated otherwise in this Agreement, any notice required or provided under this Agreement by either party to the other party shall be in writing and shall be sent by first class mail, postage prepaid or by a carrier for overnight service or by electronic means typically used in commerce. Notice to the Fund shall be sufficient if made or addressed as follows: TASB Risk Management Fund, P.O. Box 301, Austin, Texas 78767-0301, or tasbrmf@tasbrmf.org. Notice to a Fund Member shall be sufficient if addressed to the Program Coordinator or Fund Member's Chief Executive Officer and mailed to Fund Member's physical or electronic address of record on file with the Fund.



Interlocal Participation Agreement
Fund Board Approved April 15, 2012
Effective September 1, 2012



TASB Risk Management Fund • 12007 Research Blvd., Austin, Texas 78759-2439
P.O. Box 301 • Austin, Texas 78767-0301 • 800.482.7276 • tasbrmf.org
Administered by the Texas Association of School Boards

## Southwest Texas Junior College

### Contribution & Coverage Summary (CCS)

| Participation Period: September 1, 2020 through August 31, 2021 | | | |
|---|---|---|---|
| **PROPERTY**<br>Risk of Direct Physical Loss to Buildings, Personal Property, and Other Structures | Per Occurrence Limit | Deductible | Contribution |
| All Perils Except Wind, Hurricane, and Hail | Blanket Replacement Cost $124,721,000 | $25,000 | $128,243 |
| Wind, Hurricane, and Hail | | $50,000 | Included |
| Flood | $2,000,000 | $50,000 | Included |
| Earthquake | $2,000,000 | $50,000 | Included |
| Crime | $100,000 | $5,000 | Included |
| Additional Sublimits and/or Deductibles | | | |
| Sublimit for Wind, Hurricane, and Hail Loss to single ply membrane roofs and accompanying roof systems; all other deductibles apply | $1,000,000 | $50,000 | Included |
| Equipment Breakdown | | | |
| Equipment Breakdown | $100,000,000 | $25,000 | Included |

| **SCHOOL LIABILITY** | Per Claim/Occurrence Limit | Deductible | Contribution |
|---|---|---|---|
| Professional Legal Liability<br>Subject to $1,000,000 Maximum Annual Aggregate | $1,000,000 | $15,000 | $13,467 |
| General Liability | $1,000,000 | $0 | Included |
| Employee Benefits Liability | $100,000 | $0 | Included |

| **PRIVACY & INFORMATION SECURITY** | | Deductible | Contribution |
|---|---|---|---|
| $250,000 Limit | | $0 | $2,500 |

TASB Risk Management Fund
Auto, Liability, Property, & Workers' Compensation CCS
RP232501-2020-2

Southwest Texas Junior College
June 25, 2020
Page 1 of 6

Page 61 of 166

| AUTOMOBILE | Limit | Deductible | Contribution |
|---|---|---|---|
| Automobile Liability $100,000 per Person Bodily Injury Limits/$300,000 per Occurrence Bodily Injury Limits/$100,000 per Occurrence Property Damage Limits | $100/$300/$100 | $1,000 | $15,266 |
| Automobile Physical Damage | | | $7,626 |
| Comprehensive | Actual Cash Value | $1,000 | Included |
| Collision | Actual Cash Value | $1,000 | Included |
| Catastrophic Automobile Physical Damage | Actual Cash Value | $25,000 | Included |

## WORKERS' COMPENSATION AGGREGATE DEDUCTIBLE

### Estimated Payroll and Contribution - Subject to Audit

| Classification | Estimated Payroll | Net Annual Rate | Estimated Contribution |
|---|---|---|---|
| 7380 - Bus Drivers | $0 | 0.003298 | $0 |
| 7720 - Police Officers | $134,246 | 0.004109 | $552 |
| 8810 - Clerical | $2,028,521 | 0.000216 | $438 |
| 8868 - Professional | $16,737,667 | 0.000584 | $9,775 |
| 9101 - All Other | $1,369,529 | 0.004325 | $5,923 |
| Totals | $20,269,963 | | $16,688 |

| | A. | Estimated Contribution | | $16,688 |
|---|---|---|---|---|
| Claims Liability Calculation | B. | Aggregate Deductible Rate | | 0.002044390 |
| | C. | Estimated Payroll per above | | $20,269,963 |
| | D. | Estimated Claims Liability (B x C) | | $41,440 |
| | E. | Estimated Maximum Program Cost (A+D) for the Participation Period | | $58,128 |

| Ancillary Coverage | Per Occurrence Limit | Deductible | Contribution |
|---|---|---|---|
| Violent Acts | $250,000 | $0 | $0 |

| TOTAL CONTRIBUTION | $183,790 |
|---|---|
| *This is not an Invoice.* | |

TASB Risk Management Fund
Auto, Liability, Property, & Workers' Compensation CCS
RP232501-2020-2

Southwest Texas Junior College
June 25, 2020
Page 2 of 6

Page 62 of 166

## Property

Named Windstorm: All Loss and damage directly caused by, resulting from, or arising out of Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression that is designated by name or number by the National Weather Bureau or National Hurricane Center, including Loss caused by flood, storm surge, wave wash, surface water, overflow of bodies of water, or spray from any of these.

The term "Tier 1" shall mean the Texas Counties of Aransas, Brazoria, Calhoun, Cameron, Chambers, Galveston, Jackson, Jefferson, Kenedy, Kleberg, Matagorda, Nueces, Refugio, San Patricio and Willacy.

The term "Tier 2" shall mean the Texas Counties of Bee, Brooks, Fort Bend, Goliad, Hardin, Hidalgo, Jasper, Jim Wells, Liberty, Live Oak, Newton, Orange, Victoria and Wharton.

The term "Harris County" shall mean the Texas County of Harris.

Location: A single street address where Covered Property is sited.

Flood Zone Exclusions: As to the Flood endorsement, Fund Member properties are excluded from coverage if they are located in certain Special Flood Hazard Areas (SFHA) identified on the Flood Insurance Rate Map. Fund Member property in the following SFHAs are excluded: Zone A, Zone AO, Zone AH, Zones A1-A30, Zone AE, Zone A99, Zone AR, Zone AR/AE, Zone AR/AO, Zone AR/A1-30, Zone AR/A, Zone AR/AH, Zone V, Zone VE, Zone VO, and Zones V1-V30. Fund Members with such properties should seek coverage under the National Flood Insurance Program (NFIP) or other Flood Program.

Other Limits: If more than one Per Occurrence Limit may be applicable, the Fund shall determine which limit will apply.

Statement of Values: Fund Member has provided the Fund with the most current and accurate statement of values for all applicable property, including a complete and accurate listing of vehicles owned by the Fund Member. Fund Member agrees to allow the Fund to conduct property appraisals of the Fund Member's property on a periodic basis and agrees to accept values provided by the Fund.

Salvage: The Fund will have the right, in its sole discretion, to exercise rights of salvage to any damaged property paid for or replaced under the terms of this Agreement.

Claims Reporting: Fund Member will provide to the Fund timely notice of all claims as required in the Interlocal Participation Agreement and the Fund's Coverage Agreement.

Single Ply Membrane: 'Single Ply Membrane' is synthetic roofing material that includes but is not limited to EPDM, TPO, and PVC membranes.

## Liability

Prior Acts: Fund Member certifies that all known or reported acts for which it is reasonably believed may result in a legal claim against the Member, have been fully disclosed. Additionally, Fund Member acknowledges that this coverage excludes any claims arising from such known or reported acts. This Agreement does not void coverage afforded to Fund Member under any previous Fund Agreement.

Claims Reporting: Fund Member will provide to the Fund timely notice of all claims as required in the Interlocal Participation Agreement and the Fund's Coverage Agreement.

TASB Risk Management Fund
Auto, Liability, Property, & Workers' Compensation CCS
RP232501-2020-2

Southwest Texas Junior College
June 25, 2020
Page 3 of 6

Page 63 of 166

## Automobile

Statement of Values: Fund Member has provided the Fund with the most current and accurate statement of values for all applicable property, including a complete and accurate listing of vehicles owned by the Fund Member. Fund Member agrees to allow the Fund to conduct property appraisals of the Fund Member's property on a periodic basis and agrees to accept values provided by the Fund.

Salvage: The Fund will have the right, in its sole discretion, to exercise rights of salvage to any damaged property paid for or replaced under the terms of this Agreement.

Claims Reporting: Fund Member will provide to the Fund timely notice of all claims as required in the Interlocal Participation Agreement and the Fund's Coverage Agreement

## Workers' Compensation - Aggregate Deductible

Benefit Limits: Workers' Compensation benefits paid to Fund Member's employees under this Agreement will be as defined in the Texas Workers' Compensation Act (the Act). The Fund is responsible for claims payments as reflected in this CCS. This Agreement does not cover the defense of any suit or claim against a Fund Member except a workers' compensation claim by an eligible employee or former employee of Fund Member for the payment of statutory workers' compensation benefits.

Cooperation: The Fund Member designates the TASB Risk Management Fund as the Workers' Compensation claim administrator of record for all purposes. Fund Member agrees to use the Fund's contractors for services related to the administration of claims and to follow the Fund's election under Section 504.053 of the Labor Code to direct care through the Political Subdivision Workers' Compensation Alliance.

Claim Reporting: For Workers' Compensation claims arising during the CCS participation period, the Fund Member agrees that it will report those claims solely to the Fund. The report of Workers' Compensation claims to any other entity, regardless of reporting sequence, will waive all Fund liability under this agreement for those claims.

## General

Coverage: Coverage terms and limits provided are as set out in this CCS and the Fund's Coverage Agreement for this participation period.

Definitions: Any terms not defined in this CCS will use the definition for that term from the corresponding Fund coverage agreement.

Payment: The Fund Member agrees to pay contributions based on a plan developed by the Fund. All contributions are payable upon receipt of an invoice from the Fund. The Fund shall determine the applicable program for each contribution. Termination under this Agreement of any program shall not affect the remaining programs.

Termination: This CCS may be terminated by either party with termination to be effective on any successive renewal date by giving written notice to the other party no later than 30 days prior to automatic renewal in accordance with Section 4(a) of the Interlocal Participation Agreement. If this CCS is not terminated, the renewal CCS becomes effective on the automatic renewal date and the member shall be bound by the terms of the renewal CCS.

TASB Risk Management Fund
Auto, Liability, Property, & Workers' Compensation CCS
RP232501-2020-2

Southwest Texas Junior College
June 25, 2020
Page 4 of 6

Page 64 of 166

## Program Coordinators

Coordinator:

The Fund Member is required to designate a Program Coordinator (Coordinator) with express authority to represent and bind the Fund Member in all program matters. Below are the current program coordinators as wo have listed.

Property - Oscar Garcia
Liability - Oscar Garcia
Automobile - Oscar Garcia
Workers' Compensation - Oscar Garcia

If a Coordinator's name and contact information is not provided above, the current designated Coordinator and contact information will need to be completed below:

| Program | Name | Title | Address | Phone | Email |
|---|---|---|---|---|---|
| Property | | | | | |
| Liability | | | | | |
| Automobile | | | | | |
| Workers' Compensation | | | | | |

TASB Risk Management Fund
Auto, Liability, Property, & Workers' Compensation CCS
RP232501-2020-2

Southwest Texas Junior College
June 25, 2020
Page 5 of 6

Page 65 of 166

Fund Member Authorization:

I approve this Contribution and Coverage Summary (CCS) and certify that this information is correct. I affirm that I am duly authorized to approve this CCS and that I have read and agree to this CCS and the Interlocal Participation Agreement.

_____          7-2-2020
Authorized signature                     Date

Oscar S. Garcia                          Human Resource Coordinator
Printed name                             Title

TASB Risk Management Fund                              Southwest Texas Junior College
Auto, Liability, Property, & Workers' Compensation CCS          June 25, 2020
RP232501-2020-2                                        Page 6 of 6

Page 66 of 166

# PROPERTY COVERAGE AGREEMENT

## PART A
## GENERAL

1. **Recitals and Acknowledgments.** The TASB Risk Management Fund (the Fund) provides coverage for property risk to educational entities in Texas. This coverage relies on information provided by the Fund Member. It is contingent on the Fund Member's full compliance with the Agreements: collectively, this Property Coverage Agreement and its endorsements (Coverage Agreement), the Contribution and Coverage Summary (CCS), and all other agreements between the Fund and the Fund Member with provisions relating to coverage under this Coverage Agreement. This Coverage Agreement is a risk sharing and risk participation agreement and is not a contract of insurance. The Fund is not an insurance company nor is any member an insured. The Fund is a self-insured risk pool through which its members agree to share risk and actively participate in their contractual obligations to lessen risk and cost for all members. The Fund Member and the Fund agree that, as sophisticated entities, any interpretation of the Agreements' coverage provisions will reflect the risk sharing nature of the Fund's purpose and the Fund Member's risk participation obligations contained in the Agreements, and disputes will be decided in favor of the Fund Member sharing risk with the Fund rather than transferring risk to the Fund. As restated in § 13.1, it is a condition precedent to coverage that the Fund Member gives the Fund notice of any Loss as soon as possible but in no event more than 365 days from the date of the Occurrence. This § 1 is incorporated into the terms of this Coverage Agreement.

2. **Grant of Coverage.** For an agreed contribution and subject to the limits of liability in the CCS and this coverage, the Fund agrees to pay the Fund Member over any deductible for **Direct Physical Loss (Loss)** to **Covered Property** resulting from an **Occurrence** during the **Participation Period**. All applicable deductibles apply separately. The provisions of the Agreements may further limit or exclude coverage for any **Loss**. The sublimits and supplemental coverages are within the overall limits stated in the CCS unless otherwise indicated. The Fund has sole authority in claim administration and subrogation, including the extent to which any coverage or limit applies. The Fund Member retains all rights afforded by law.

3. **Defined Terms.** The following bolded and first-letter capitalized terms are defined in this § 3 and applicable throughout this Coverage Agreement unless otherwise limited or excluded:

   3.1 **Direct Physical Loss (Loss)** means sudden, unanticipated, and unforeseen **Damage** or **Aesthetic Impairment** directly resulting from an **Occurrence**.

   3.2 **Damage** means physical harm to **Covered Property** that has substantially reduced or eliminated the **Covered Property's** ability to function for its intended purpose. **Damage** is distinct from and is not considered **Aesthetic Impairment**. The final determination of whether the **Covered Property** has suffered **Damage** will be at the sole discretion of the Fund.

   3.3 **Aesthetic Impairment** means physical harm that has conspicuously and substantially disfeatured **Covered Property** within an easily observable public view, and this harm has not substantially reduced the **Covered Property's** ability to function for its intended purpose. **Aesthetic Impairment** is distinct from and is not considered **Damage**. Final determination of whether the **Covered Property** has suffered **Aesthetic Impairment** will be at the sole discretion of the Fund.

   3.4 **Occurrence** means any single incident or event or a series of related incidents or events resulting from the original **Occurrence**. But an incident or event involving wind or hail that occurs during a continuous period of 72 hours will be deemed a single **Occurrence**.

   3.5 **Participation Period** means the effective dates of coverage as stated in the CCS.



**3.6 Covered Property** means the Fund Member's legal interest in **Buildings**, **Personal Property**, and **Other Structures** as outlined below:

(A) **Building** means:

  (1) a permanent building structure;

  (2) additions and extensions attached to a building; or

  (3) any fixture, machinery, or equipment that constitutes a permanent part of and is related to the service of a building.

(B) **Personal Property** means items or property owned by the Fund Member at any location. **Personal Property** includes:

  (1) **Building** contents;

  (2) furniture;

  (3) books and educational materials or other supplies;

  (4) tools and sports equipment;

  (5) landscape and maintenance equipment;

  (6) electronic data processing equipment and media such as servers, computers, monitors, laptops, tablets, disc drives, discs, and other media on which data is stored;

  (7) self-propelled motor-driven equipment (such as lawnmowers, golf carts, all-terrain vehicles, forklifts, or tractors) that is not registered for use on public roads; or

  (8) personal property of others under the Fund Member's care, custody, and control through a written lease or rental agreement.

(C) **Other Structures** means a structure, other than a **Building**, that is located outdoors and used in connection with the operations of the Fund Member. **Other Structures** include:

  (1) portable buildings, sheds, walkway coverings, and awnings;

  (2) signs, whether or not attached to a **Building** or structure;

  (3) stadiums and athletic fields, including bleachers, grandstands, tracks, and natural or artificial grass surfaces that serve as playing fields for school events;

  (4) lights, lighting supports, and flagpoles;

  (5) radio and television towers and antennas;

  (6) playground equipment;

  (7) fences or retaining walls not constituting a part of a **Building**; or

  (8) swimming pools, including diving platforms and related equipment.



**3.7 Pollutant** means any solid, liquid, gaseous, or thermal irritant or contaminant, including petroleum products, asbestos, smoke, vapor, lead, soot, fumes, acids, alkalis, electromagnetic radiation, **Mold**, chemicals, and waste. Waste includes materials to be recycled, reconditioned, or reclaimed.

**3.8 Mold** means any type or form of fungus, including mold or mildew, or any mycotoxins, spores, scents, or by-products produced or released by fungi.

**3.9 Named or Numbered Windstorm (NWS)** means all **Loss** directly caused by, resulting from, or arising out of any hurricane, typhoon, tropical cyclone, tropical storm, or tropical depression that is designated by name or number by the National Weather Bureau or National Hurricane Center, including **Loss** caused by flood, storm surge, wave wash, surface water, overflow of bodies of water, or spray from any of these.

PART B
PROPERTY COVERAGE PAYMENTS

4.  **Payment for Damage.** If the Fund determines that a **Loss** to Covered Property resulted from **Damage**, the Fund Member must notify the Fund in writing of their election to accept a settlement option offered in either § 4.1 *or* § 4.2 related to this **Damage** before being entitled to payment. This election by the Fund Member is mandatory and irrevocable and must occur as soon as practicable but in no event later than 180 days from the date of this **Loss**.

    **4.1 Repair or replacement payments.** If the Fund Member elects to repair or replace this **Covered Property**, the Fund will make contemporaneous payments, subject to the limitations in this Coverage Agreement, for this **Damage** on a schedule agreed on by the Fund and the Fund Member and related to the Fund Members' contractual obligations for the repair or replacement, and subject to the following:

    (A) **Completion within 365 days.** Repair or replacement must be completed within 365 days of the above election notice unless an extension is requested in writing by the Fund Member within this same period and granted in writing by the Fund. If the repair or replacement is not completed and an extension is not requested during this period or is not granted, payments made before the end of this period will be the full and final payment for this **Damage**;

    (B) **Fund liability.** The Fund will pay for the actual and necessary cost (with material of like kind and quality and for the same use and occupancy of the premises) incurred by the Fund Member to repair or replace this **Covered Property**. Any excess payment made by the Fund is immediately due to the Fund. Additionally, the Fund will not pay more than the lowest amount of the following:

        (1) the applicable limit or sublimit of liability;

        (2) the actual and necessary costs described above; or

        (3) the amount the Fund Member spent to repair or replace this **Covered Property**;

    (C) **Salvage.** The Fund Member must transfer possession and ownership of all or any part of the **Covered Property** subjected to **Damage**, at the Fund's discretion, on payment of the cost to rebuild or replace the **Covered Property** with other material of like kind and quality; and

    (D) **Abandoned property.** The Fund Member may not abandon **Covered Property** subjected to **Damage** to the Fund.

    **4.2 Actual cash value payments.** If the Fund Member elects to receive payment for the actual cash value (ACV)



of this **Covered Property**, the Fund will pay, subject to the limitations in this Coverage Agreement, based on the valuation of ACV. The Fund will compute this value by determining the actual and necessary replacement cost (with material of like kind and quality and for the same use and occupancy of the premises) at the time of and for this **Damage**, and then subtract the depreciation of this **Covered Property**.

5.  **Payment for Aesthetic Impairment.** If the Fund determines that a **Loss** to **Covered Property** resulted from **Aesthetic Impairment**, then the Fund will pay, subject to the limitations in this Coverage Agreement, for this diminution in aesthetic value. Any payment for **Aesthetic Impairment** will be credited towards any future claim for **Loss** to the same portion of **Covered Property**.

**PART C**
**LIMITED COVERAGE, SUPPLEMENTAL COVERAGE, EXCLUDED PROPERTY, AND EXCLUDED LOSS**

6.  **Limited Coverages.** Unless otherwise excluded or limited, the following coverages for **Loss** are limited as indicated:

    6.1 **New construction or renovation by employees.** The Fund will pay up to $1,000,000 per **Occurrence** for **Damage** to **Buildings** and **Other Structures** that are under new construction or renovation by the Fund Member's employees. This sublimit applies to **Damage** arising from the work, materials, and activities related to this new construction or renovation, or any portion of it. Coverage under this § 6.1 does not extend to materials, supplies, tools, and equipment of others while located on the premises unless otherwise covered under § 3.6(B)(8).

    6.2 **Athletic field surfaces.** The Fund will pay for **Loss** to **Other Structures** that are athletic field surfaces (both natural and artificial) unless caused by disease, drought, heat, freezing, flood, improper maintenance, or lack of maintenance.

    6.3 **Art, statues, or antiques.** The Fund will pay up to $100,000 per **Occurrence** for **Loss** to **Personal Property** that is art, statues, antiques, or other items of historical or sentimental value including paintings, etchings, photographs, pictures, tapestries, antique furniture, rare or out-of-print books, antique silver, rare glassware, awards, or other rare or hard to replace items.

    6.4 **Aesthetic Impairment.** The Fund will pay up to $100,000 per **Occurrence** for physical harm resulting from a **Loss** due to **Aesthetic Impairment**. If the **Aesthetic Impairment** affects **Covered Property** that is a metal roof, the Fund Member may elect to waive its right to this payment and instead be paid for the **Aesthetic Impairment** at 50% of the final repair or replacement Fund Member incurred cost up to $1,000,000 per **Occurrence**, with no ACV payment available.

    6.5 **Vital documents and records.** If appropriate secured and maintained, the Fund will pay up to $50,000 per **Occurrence** for **Loss** to **Personal Property** that are vital records such as written, printed, or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages, and manuscripts.

7.  **Supplemental Coverages.** Unless otherwise excluded or limited, this coverage extends to the property and costs described below. All of these costs and physical harms must arise from a **Loss**.

    7.1 **Debris removal.** The Fund will pay for debris removal at the actual cost up to 25 percent of the amount of the **Loss**.



**7.2 Code compliance.** The Fund will pay for cost increases due to compliance with any building or construction code, ordinance, or law regulating repair, reconstruction, or demolition. The limit of coverage is the reimbursement of the actual cost of compliance up to 10 percent of the **Loss** amount per structure and will not exceed $1,000,000 per **Occurrence**.

**7.3 Pollutant clean-up.** The Fund will pay up to $100,000 per **Occurrence** to extract **Pollutants** from land or water located on Fund Member's premises.

**7.4 Electronic data replacement.** The Fund will pay up to $50,000 per **Occurrence** for the cost of replacement or recovery of information stored on electronic data processing equipment and media, such as records, data, or software.

**7.5 Extra expense and loss in revenue.** The Fund will pay up to $500,000 per **Occurrence** for the actual cost incurred by the Fund Member for "extra expense" or "loss in revenue" directly resulting from the interruption of their operations. "Extra expense" means the additional cost that the Fund Member incurs to continue operations while its **Covered Property** is being repaired or replaced after a **Loss**. "Loss in revenue" means a reduction in revenue to the Fund Member from any source excluding state or federal funding, taxes, or public or private grants.

**7.6 Food spoilage.** The Fund will pay up to $100,000 per **Occurrence** for the actual cost of replacing food or beverage that has been spoiled.

**7.7 Landscaping and grass surfaces.** The Fund will pay for landscaping and grass surfaces as follows:

(A) **Landscaping.** The Fund will pay up to $1,000 for the removal and replacement cost for the destruction of any single tree, shrub, or landscaping plant caused by vandalism, theft, fire, wind, hail, or other covered weather-related **Occurrence**. The Fund will pay no more than $25,000 per **Occurrence** under this § 7.7(A), and this coverage does not apply to **Loss** resulting from disease, drought, heat, freezing, flood, improper maintenance, or lack of maintenance; or

(B) **Grass surfaces.** The Fund will pay for Loss to grass surfaces unless caused by disease, drought, heat, freezing, flood, improper maintenance, or lack of maintenance.

**7.8 Animals.** The Fund will pay up to $25,000 per **Occurrence** for death to livestock owned by the Fund Member. The Fund will not pay for the harm caused by illness or disease, neglectful care, or mysterious disappearance. The amount paid will be based on the fair market value of comparable livestock at the time of **Loss** and not their competitive livestock show value.

8. **Excluded Property.** The following indicates property for which this coverage is excluded unless an exception is indicated:

**8.1 Vacant Buildings or Other Structures.** Coverage is excluded from vacant **Buildings** or vacant **Other Structures** if the **Loss** is caused by arson, vandalism, sprinkler leakage, glass breakage, water, theft, or attempted theft unless the Fund has specifically extended coverage in writing for the vacant **Building** or **Other Structure**. "Vacant" means a **Building** or **Other Structure** that is abandoned, is no longer capable of intended Fund Member operations, or is set for demolishment. **Personal Property** within a vacant **Building** or vacant **Other Structure** is also excluded if a **Loss** is otherwise subject to this § 8.1.

**8.2 Property under conditional sale.** Coverage is excluded from any property sold by the Fund Member under a conditional sale, trust agreement, installment plan, or other deferred payment plans after its transfer of care, custody, and control to buyers.



**8.3 Accounts and other valuables.** Coverage is excluded from accounts, bills, currency, evidence of debt, money or securities, furs, jewelry, precious metal, or precious stones, except as otherwise covered under Crime and Employee Dishonesty Endorsement.

**8.4 Property of others.** Coverage is excluded from the property of others, except personal property under the care, custody, and control of the Fund Member through a written lease or rental agreement.

**8.5 Vehicles or motorized equipment.** Coverage is excluded from self-propelled motor-driven equipment registered for use on public roads, or any automobiles, motor vehicles, trailers, or semi-trailers, whether registered or not.

**8.6 Real estate.** Coverage is excluded from land.

**8.7 Aircraft and watercraft.** Coverage is excluded from aircraft or motorized watercraft, including their motors, equipment, or accessories. Coverage will extend to drones or unmanned aerial vehicles.

**8.8 Transmission lines.** Coverage is excluded from transmission or distribution lines of every type except for those lines located on the Fund Member's premises.

**8.9 Oil rigs.** Coverage is excluded from offshore oil rigs, platforms, or any property contained on them.

**8.10 Dams.** Coverage is excluded from dams or dikes.

**8.11 Crops.** Coverage is excluded from any crops.

9. **Excluded Loss.** The following indicates **Loss**, caused directly or indirectly by the described **Occurrence**, from which this coverage is excluded unless an exception is indicated:

**9.1 Precipitation or particulates.** Coverage is excluded from **Loss** caused by rain, snow, sand, or dust (whether driven by wind or not) unless the Building sustains **Damage** to the roof or walls. Coverage will extend to any ensuing **Loss** only.

**9.2 Animals or insects.** Coverage is excluded from **Loss** caused by animals, birds, vermin, or termites or other insects.

**9.3 Named or Numbered Windstorm.** Coverage is excluded from **Loss** arising from a **Named or Numbered Windstorm** in counties located in Tier 1, Tier 2, or Harris County.

**9.4 Flood.** Coverage is excluded from **Loss** caused by flood, surface water, waves, tidal water or tidal wave, storm surge, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not.

**9.5 Subsurface water.** Coverage is excluded from **Loss** caused by water below the surface of the ground, including water that exerts pressure on, or flows, seeps, or leaks through, any sidewalks, driveways, foundations, walls, basements, pavement, or windows, doors or any other openings, in or on **Covered Property**. Coverage will extend to any ensuing **Loss** to the interior of a **Building** or any **Personal Property** within that **Building**.

**9.6 Water or steam leakage.** Coverage is excluded from **Loss** caused by continuous or repeated seepage, leakage, penetration, transpiration, or intrusion of water or steam from any system of heating, air conditioning, automatic fire protective sprinkler, or plumbing, or any appliance or equipment.



**9.7 Earth movement.** Coverage is excluded from **Loss** caused by earth movement, including earthquake, landslide, or mudflow, or earth sinking, rising, or shifting.

**9.8 Expansion or contraction.** Coverage is excluded from **Loss** caused by settling, swelling, cracking, contraction, bulging, or expansion of any pavements, foundations, walls, floors, roofs, or ceilings.

**9.9 Faulty workmanship.** Coverage is excluded from **Loss** caused by faulty workmanship to, the use of faulty or defective materials with, or inadequate maintenance to any property on or off the **Fund Member's** premises.

**9.10 Faulty planning or construction.** Coverage is excluded from **Loss** caused by faulty or inadequate planning, adherence to zoning requirements, site preparation, development, design, remodeling, or construction.

**9.11 New construction.** Coverage is excluded from **Loss** if it arose from new construction of or renovation to **Buildings** and **Other Structures** under written contract with and performed by third parties or is covered under any other coverage or insurance.

**9.12 Deterioration or defect.** Coverage is excluded from **Loss** caused by wear and tear, deterioration, rust, corrosion, erosion, wet or dry rot, or inherent or latent defect.

**9.13 Delay or consequential loss.** Coverage is excluded from **Loss** caused by delay, interruption of operations, or consequential loss of any nature, except as otherwise allowed by this Coverage Agreement.

**9.14 Mechanical breakdown.** Coverage is excluded from **Loss** caused by mechanical breakdown, including rupture or bursting caused by centrifugal force.

**9.15 Failure of equipment in general.** Coverage is excluded from **Loss** caused by the inherent defect, failure, or breakdown of machinery or equipment. Coverage will extend to any ensuing **Loss** only.

**9.16 Failure of steam equipment in particular.** Coverage is excluded from **Loss** caused by events inside steam boilers, steam pipes, steam turbines, or steam engines unless the **Loss** is caused by a combustion explosion inside the equipment and the equipment is owned, leased, or operated by the **Fund Member**.

**9.17 System failures.** Coverage is excluded from **Loss** caused by power, heating, or cooling system failure due to the disruption of power or other utility service supplied to the **Fund Member** unless the failure of service is a direct result of a **Loss**. Coverage will extend to any ensuing **Loss** only.

**9.18 Generated electrical currents.** Coverage is excluded from **Loss** caused by artificially generated electrical currents unless a **Loss** by fire or explosion results. Coverage will extend to any ensuing **Loss** only.

**9.19 Agricultural or industrial operations.** Coverage is excluded from **Loss** caused by smog, smoke, vapor, or gas from third-party agricultural or industrial operations.

**9.20 Substances harmful to humans.** Coverage is excluded from **Loss** caused by, and expense from, the removal or other treatment of substances that are considered physically harmful to humans. This exclusion includes the removal of asbestos, **Mold**, chemicals, metals, or other sources of contamination, and whether such activities are voluntary, imposed by law, or required by administrative rulings of a governmental agency.

**9.21 Fungi.** Coverage is excluded from **Loss** caused by, and expense from, **Mold** or other fungi. This includes any cost for testing, monitoring, repair, remediation, rebuilding, restoration, or replacement due to **Mold** or other fungi.

**9.22 Pollutants.** Coverage is excluded from **Loss** caused by, and expense from, the actual, alleged, or threatened



discharge, dispersal, seepage, migration, release, or escape of **Pollutants**, except as provided elsewhere in this Coverage Agreement.

**9.23 Nuclear.** Coverage is excluded from **Loss** caused by a nuclear reaction, nuclear radiation, or radioactive contamination, regardless of cause.

**9.24 Governmental seizure.** Coverage is excluded from **Loss** caused by seizure or destruction of **Covered Property** by order of any governmental authority.

**9.25 War.** Coverage is excluded from **Loss** caused by war, including undeclared war, civil war, warlike action by a military force, or action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents.

**9.26 Insurrection.** Coverage is excluded from **Loss** caused by insurrection, rebellion, revolution, usurped power, or action taken by any governmental authority in hindering or defending against any of these.

**9.27 Terrorism.** Coverage is excluded from **Loss** caused by any acts of terrorism or actions taken by any government branch or agency in response. This exclusion applies whether any acts of terrorism are committed in concert with or on behalf of any organization or government.

**9.28 Legal proceedings.** Coverage is excluded from **Loss** caused by or as a result of any legal proceeding.

**9.29 Moral hazard.** Coverage is excluded from ensuing **Loss** caused by the Fund Member's neglect, intentional act, or omission, to use all reasonable means to save and preserve the **Covered Property** after a **Loss**.

**9.30 Cyber-related Loss.** Coverage is excluded from any **Loss** directly or indirectly caused by, arising from, or resulting from a cyber-based **Occurrence** to or from any computer system, regardless of its ownership, operation, or location, including **Loss** to or from any computer system's software, associated devices, equipment, or electronic data. This exclusion applies regardless of any other cause contributing concurrently or in any sequence. Coverage will extend to any ensuing **Loss**, including coverage under § 7.4, caused by fire or explosion unless the **Loss** arises from an unauthorized, malicious or criminal act or a series of related unauthorized, malicious or criminal acts, regardless of time and place, or the threat or hoax of them, involving access to, processing of, use of or operation of any computer system.

PART D

OTHER INSURANCE OR COVERAGE

**10. Other Coverage or Insurance.** If the Fund Member has other available coverage for the **Loss**, the following conditions and limitations apply:

**10.1 Other Fund coverage available.** If there is other Fund coverage available to the Fund Member under separate Fund coverage agreements that cover the same **Loss**, the Fund will determine which coverage agreement, limits, or deductibles that will apply. This provision intends that there be no accumulation or stacking of Fund coverage.

**10.2 Non-Fund coverage available.** If there is non-Fund coverage or insurance available to the Fund Member that covers the same **Loss**, the Fund will pay for the amount of the **Loss** in excess of the other coverage or insurance whether the Fund Member can collect it or not. In no event will the Fund pay more than the applicable limit of coverage in this Coverage Agreement or CCS. Non-Fund coverage or insurance cannot be used to satisfy a Fund deductible unless otherwise indicated by this Coverage Agreement.



11. **Representations and Warranties.** The Fund Member represents and warrants that all roofs for **Covered Property** are regularly inspected and well maintained, and that an accurate record of **Buildings** and **Other Structures** has been maintained and is available on request from the Fund.

12. **Loss Duties.** In case of a **Loss**, the Fund Member must perform the following, and any other duties in this Coverage Agreement:

    12.1 **Law enforcement notification.** The Fund Member must notify the proper law enforcement agency when a **Loss** is caused by employee dishonesty, crime, theft, vandalism, or other violation of the law.

    12.2 **Cooperation.** The Fund Member must fully cooperate with and assist the Fund in its investigation and adjudication of claims including reasonable and timely access to Fund Member property, personnel, records, contracts, or any other element of the claim as often as the Fund reasonably requires, and communicate directly with the Fund and not through third parties unless agreed to by the Fund.

    12.3 **Repair quotes.** The Fund Member must solicit multiple quotes for the repair or replacement of **Covered Property** when requested by the Fund.

    12.4 **Vendor panel.** The Fund Member must agree to the use of any Fund preferred vendor panel when requested by the Fund.

    12.5 **Harm mitigation.** The Fund Member must protect the **Covered Property** by making temporary repairs, providing security, or taking other actions as reasonably necessary to mitigate further harm.

    12.6 **Recordkeeping.** The Fund Member must keep an accurate record of repair expenses that support claims, including original receipts, photographs, and other related documents, and provide these records to the Fund when requested.

    12.7 **Loss description.** The Fund Member must furnish a complete description of the **Loss**, including an inventory of the **Personal Property** subject to the **Loss**.

    12.8 **Legal compliance.** The Fund Member must comply with all legal requirements for securing contractors, professionals, and other service and labor providers that perform the necessary work and compensate them at the prevailing competitive rates in the area.

    12.9 **Warranty claims.** The Fund Member must pursue all potential warranty claims for **Covered Property** subjected to **Loss** as soon as practicable and independently from any claim with the Fund. In the event of any possible warranty recovery, the Fund Member must notify the Fund immediately. If the Fund Member elects to repair or replace the **Covered Property** under § 4.1, any warranty recovery, whether monetary or otherwise, must be the primary recovery for the Fund Member. If the Fund determines that the Fund Member has reasonably exhausted any warranty claim, then the Fund will only be liable for repair or replacement of the portion of the **Covered Property** subjected to **Loss** that is not covered under warranty. If a Fund Member elects to receive an ACV payment under § 4.2 and subsequently recovers under any warranty, an immediate reimbursement to the Fund of the full ACV payment is required. Because the payment election type under § 4 is irrevocable, the Fund is not obligated for a further payment on this **Loss**.



## PART F
## CONDITIONS OF COVERAGE

13. **Conditions.** The Fund Member must comply with the provisions of the Agreements, including the following general conditions of coverage and any other conditions of coverage in this Coverage Agreement. If not, a delay or denial of a claim or a loss of coverage may result:

13.1 **Notice.** Because time is of the essence for claim administration, and because these notice provisions are a material part of the bargained-for exchange between the Fund and the Fund Member for the issuance of this Coverage Agreement, the Fund Member agrees to abide by all of the following conditions for this notice:

(A) **365-day requirement.** The Fund Member must give notice to the Fund of any Loss as soon as possible but in no event more than 365 days from the Occurrence;

(B) **Condition precedent.** This notice requirement is a condition precedent for coverage; and

(C) **Material breach.** Reporting any Loss more than 365 days after the date of the Occurrence is a substantial and material breach by the Fund Member of this Coverage Agreement. No coverage will be available to the Fund Member if notice is late.

13.2 **Property inspection and repair.** The Fund Member must regularly inspect and maintain in good repair all Covered Property. Any failure to do so that results in a greater Loss may result in a denial of coverage. The Fund may request a copy of the Fund Member's maintenance and inspection logs or similar records to verify compliance.

13.3 **Accuracy of information.** The Fund Member must provide complete and accurate statements of material facts in any documentation required by the Fund, including applications, worksheets, audit sheets, disclosure statements, loss forms, exhibits, renewal information forms, claim history (including pending or potential claims), and requests for proposals. The Fund Member may not intentionally conceal or misrepresent any material fact or circumstance, engage in fraudulent conduct, or make false statements.

## PART G
## MISCELLANEOUS TERMS

14. **No Assignments.** The Fund Member may not assign their interest under this Coverage Agreement, and any attempted assignment will not bind the Fund. The Fund Member is prohibited from entering into any assignment or agreement that inhibits direct communications between the Fund and the Fund Member, as determined by the Fund.

15. **Insolvency.** In the event of the Fund Member's insolvency, the Fund will not be relieved of the payment for any Loss.

16. **Actions Against the Fund.** Fund Member may not act against the Fund unless, as a condition precedent, the Fund Member has fully complied with all provisions of the Agreements. No person has a right under this Coverage Agreement to join the Fund as a party or otherwise bring it into a suit filed against the Fund Member.

17. **New Construction.** The Fund's coverage will not commence until any new construction or renovation is completed by the contractor, accepted by the Fund Member, and reported in writing to the Fund.



18. **"Including."** Unless the context requires otherwise, the term "including," and its variants, mean "including but not limited to."

19. **Singular Usage.** Unless the context requires otherwise, any use of the singular form of a word will include its plural.

20. **"Coverage Agreement."** Unless the context requires otherwise, any use of the term "Coverage Agreement" will include its endorsements and the Fund Member's CCS.

21. **Fund Designee.** Unless the context requires otherwise, any use of the term "Fund" includes its designees.

22. **Severability.** If a court for any reason holds a provision of this Coverage Agreement unenforceable, the rest remains fully enforceable.

23. **Headings.** Unless the context requires otherwise, such as with the defined terms, headings are only for convenience and do not affect the interpretation of this Coverage Agreement.



# FLOOD ENDORSEMENT

1. **Endorsement Intent.** This endorsement modifies coverage under the Property Coverage Agreement. Coverage is amended, as set forth in this endorsement, and deletes the language related only to Flood as included in § 9.4 "Flood" of Part C "Limited Coverage, Supplemental Coverage, Excluded Property, and Excluded Loss" of the Property Coverage Agreement. Coverage under this Flood Endorsement is excluded as an Occurrence if coverage is otherwise extended under the Named/Numbered Windstorm (NWS) Endorsement. For this Flood Endorsement, **Flood** means: a general and temporary condition of partial or complete inundation of normally dry land areas from the overflow of inland or tidal waters; the unusual and rapid accumulation or runoff of surface waters from any source; or a river or flow of liquid mud proximately caused by flooding. **Flood** does not include any of the following if wind-driven and resulting from a Named or Numbered Windstorm: tidal water, tidal wave, storm surge or spray.

2. **Payments.** The Fund will pay for the amount of a Loss to Covered Property resulting from Flood that is in excess of the deductible amount up to $2,000,000 per **Occurrence**/annual aggregate or the limit of coverage specified in the Contribution and Coverage Summary (CCS), with the CCS amount controlling. For this endorsement coverage to apply, the Covered Property must be located in either Low-risk flood zones (Zone C or X-unshaded) or Moderate-risk flood zones (Zones B or X-shaded) as designated by the National Flood Insurance Program (NFIP) Flood Insurance Rate Map (FIRM). Under this Flood Endorsement, the Low-risk zones and Moderate-risk zones are handled individually as follows:

   (A) For Loss in Low-risk flood zones (Zones C and X-unshaded), the Fund will pay in excess of NFIP or any other flood coverage acquired by the Fund Member for these zones; and

   (B) For Loss in Moderate-risk flood zones (Zones B and X-shaded), the Fund will pay in excess of the maximum policy limits available for buildings or contents from NFIP or any other flood coverage applicable to these zones whether the Fund Member acquires such coverage or not.

3. **Deductible.** The deductible shown on the CCS applies as follows: for Loss in Low-risk flood zones (Zones C or X-unshaded), the deductible only applies if other flood coverage has not been acquired; for Loss in Moderate-risk flood zones (Zones B or X-shaded), the deductible is waived, whether the member acquires such underlying flood coverage or not.

4. **Excluded Covered Property.** Fund Member Covered Property is excluded from coverage under this endorsement if it is located in certain Special Flood Hazard Areas (SFHA) identified on the Flood Insurance Rate Map (FIRM): Zone A, Zone AO, Zone AH, Zones A1-A30, Zone AE, Zone A99, Zone AR, Zone AR/AE, Zone AR/AO, Zone AR/A1-30, Zone AR/A, Zone AR/AH, Zone V, Zone VE, Zone VO, and Zones V1-V30.

5. **Other Applicability.** All other provisions of the Property Coverage Agreement and CCS remain applicable.



Flood Endorsement
Property Coverage Agreement
Effective 9/1/2020
© 2020 TASB Risk Management Fund

Page 1 of 1

Page 78 of 166

# EARTHQUAKE ENDORSEMENT

1. **Endorsement Intent.** This endorsement modifies coverage provided under the Property Coverage Agreement. Coverage is amended, as set forth in this endorsement, to modify the language related only to "earthquake" as included in § 9.7 "Earth Movement" of Part C "Limited Coverage, Supplemental Coverage, Excluded Property, and Excluded Loss" in the Property Coverage Agreement.

2. **Payments.** The Fund will pay for the amount of a Loss to Covered Property resulting from earthquake that is in excess of the deductible amount up to $2,000,000 per Occurrence/annual aggregate or the limit specified in the Contribution and Coverage Summary (CCS), with the CCS amount controlling.

3. **Related Occurrences.** If more than one Occurrence involving an earthquake occurs within a period of 72 hours during the term of this coverage, such Occurrence, including aftershocks, will be considered a single Occurrence.



Earthquake Endorsement
Property Coverage Agreement
Effective 9/1/2020
© 2020 TASB Risk Management Fund

Page 1 of 1

Page 79 of 166

# CRIME AND EMPLOYEE DISHONESTY ENDORSEMENT

1. **Endorsement Intent.** This endorsement modifies the Fund's Property Coverage Agreement related to limitations for money and securities included in § 8.3 "Accounts and other valuable" of Part C "Limited Coverage, Supplemental Coverage, Excluded Property, and Excluded Loss."

2. **Payments.** The Fund will pay up to $100,000 or the limit specified in the Contribution and Coverage Summary (CCS), with the CCS amount controlling, and only for an Occurrence involving:

   (A) a loss of money or securities in excess of the deductible that the Fund Member sustains as a result of an employee's fraudulent or dishonest act (including embezzlement or forgery) or omission in the performance of the employee's duty. Coverage applies whether an employee acted alone or in collusion with others; or,

   (B) a loss of money or securities by their actual destruction, disappearance, burglary, or robbery.

3. **Discovery and Single Occurrence.** This endorsement applies to any past such Occurrence discovered by the Fund Member during the Participation Period and reported to the Fund during the Participation Period or within 30 days after the expiration of the Participation Period. Fraudulent or dishonest acts by an employee, whether an individual act, the combined total of all separate acts whether or not related, a series of acts whether or not related, or collusion between employees regarding the any of these, will be treated as one fraudulent or dishonest act and considered a single Occurrence.

4. **Applicability.** This endorsement applies only to money and securities owned by the Fund Member, or only to money in the possession of the Fund Member but owned by a Fund Member-affiliated entity at the time of loss. Coverage under this endorsement cancels immediately with respect to an employee upon discovery by the Fund Member of any dishonest act by that employee covered under this endorsement. This endorsement is not applicable for loss caused by any employee required by law to be individually bonded.



Crime and Employee Dishonesty Endorsement
Property Coverage Agreement
Effective 9/1/2020
© 2020 TASB Risk Management Fund

Page 1 of 1

Page 80 of 166

# TASB RISK MANAGEMENT FUND
## EQUIPMENT BREAKDOWN COVERAGE SUMMARY

These coverages apply to the Fund Member's Covered Property under the TASB Management Fund's Property Coverage Agreement.

| Coverages | Limits |
|---|---|
| Equipment Breakdown Limit | As stated in the Contribution & Coverage Summary (CCS). |
| Property Damage | Included |
| Business Income | Included |
| Extra Expense | Included |
| Contingent Business Income | $250,000 |
| Data Restoration | $250,000 |
| Demolition | $1,000,000 |
| Excavation Costs | $25,000 |
| Expediting Expenses | $250,000 |
| Hazardous Substances | $250,000 |
| Newly Acquired Locations | Included |
| Off Premises Equipment Breakdown | $500,000 |
| Ordinance or Law | $1,000,000 |
| Perishable Goods | $250,000 |
| Public Relations | $5,000 |
| Service Interruption | Included |

## Deductibles

As stated in the Contribution & Coverage Summary (CCS).

## Other Conditions

Newly Acquired Locations – 90 Days
Extended Period of Restoration – 30 Days

*[additional Other Conditions may be added to reflect individual referral account needs]*



# EQUIPMENT BREAKDOWN COVERAGE AGREEMENT

In consideration of the contribution charged, and in reliance upon the TASB Risk Management Fund Member's statements and representations, and subject to the Interlocal Participation Agreement, the Participation Period and coverage limits stated in the Contribution and Coverage Summary, the Equipment Breakdown Coverage Summary, and the terms, Exclusions, and Conditions of this Equipment Breakdown Coverage Agreement, the TASB Risk Management Fund will cover the **Fund Member** against all direct loss under the following Equipment Breakdown Coverage Agreement.

Various provisions in this Equipment Breakdown Coverage Agreement restrict coverage. Read the entire Coverage Agreement carefully to determine rights, duties, and what is and is not covered.

Throughout this Equipment Breakdown Coverage Agreement, the words "you" and "your" refer to the Fund Member shown in the Contribution and Coverage Summary. The words "we," "us" and "our" refer to the Fund providing this coverage. Words and phrases that appear in quotation marks and/or boldface have special meaning and are defined in Section G or in other parts of this Equipment Breakdown Coverage Agreement. These words and phrases and their meaning apply for Equipment Breakdown Coverage only and do not apply to any other of the Fund's Coverage Agreements. Examples are shown for illustrative purposes only and do not represent predicted or expected outcomes.

## A. COVERAGE

This Equipment Breakdown Coverage provides coverage for a Covered Cause of Loss as defined in A.1. below. In the event of a Covered Cause of Loss, we will pay for loss as described in A.2. below.

### 1. Covered Cause of Loss

#### "Accident" and "Electronic Circuitry Impairment"

The Covered Cause of Loss for this Equipment Breakdown Coverage is an "accident" or "electronic circuitry impairment." Without an "accident" or "electronic circuitry impairment" there is no Equipment Breakdown Coverage.

### 2. Coverages Provided

This section lists the coverages that may apply in the event of a Covered Cause of Loss. Each coverage is subject to a specific limit as shown in the Equipment Breakdown Coverage Summary. See paragraph C.2. for details.

These coverages apply only to the direct result of a Covered Cause of Loss. For each coverage, we will pay only for that portion of the loss, damage or expense that is solely attributable to the Covered Cause of Loss.

#### a. Property Damage

We will pay for physical damage to "covered property" that is at a location indicated in the Equipment Breakdown Coverage Summary at the time of the Covered Cause of Loss. We will consider "electronic circuitry impairment" to be physical damage to "covered equipment."

#### b. Business Income

(1) We will pay your actual loss of "business income" during the "period of restoration" that results directly from the necessary total or partial interruption of your business.

(2) We will also pay any necessary expenses you incur during the "period of restoration" to reduce the amount of loss under this coverage. We will pay for such expenses to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

(3) We will consider the actual experience of your business before the Covered Cause of Loss and the probable experience you would have had without the Covered Cause of Loss in determining the amount of our payment.

#### c. Extra Expense

We will pay the reasonable and necessary "extra expense" to operate your business during the "period of restoration."

#### d. Contingent Business Income

We will pay for your loss and expense as defined under Business Income and Extra Expense coverages that



results from an "interruption of supply."

**e.  Course of Construction**

This coverage is automatically included and does not need to be indicated in the Equipment Breakdown Coverage Summary.

(1)  You will notify us promptly of any expansion or rehabilitation of any location described in the Equipment Breakdown Coverage Summary.

(2)  All coverages applicable to any location described in the Equipment Breakdown Coverage Summary are extended to an expansion or rehabilitation of that location.

(3)  This coverage begins at the time you begin the expansion or rehabilitation project.

**f.  Data Restoration**

(1)  We will pay for your reasonable and necessary cost to research, replace or restore lost "data."

(2)  We will pay for your reasonable and necessary cost to research, replace or restore "data" that is lost as the result of an "interruption of service."

(3)  Coverage under f. (2) above applies to "data" stored in "covered equipment."

(4)  Coverage under f.(2) above also applies to "data" stored in the equipment of a "cloud computing services" provider with whom you have a contract.

(5)  We will also pay for your loss and expense as defined under Business Income coverage and Extra Expense coverage as described in this Equipment Breakdown Coverage Agreement that is the result of f. (1) and f.(2) above, if such coverage is otherwise applicable under this Equipment Breakdown Coverage. This coverage is included within and subject to your Data Restoration limit.

**g.  Demolition**

(1)  This coverage applies if a Covered Cause of Loss damages a building that is "covered property" and the loss is increased by an ordinance or law that:

(a)  Requires the demolition of a building that is otherwise reparable;

(b)  Is in force at the time of the Covered Cause of Loss; and

(c)  Is not addressed under Hazardous Substances coverage.

(2)  We will pay for the following additional costs to comply with such ordinance or law:

(a)  Your actual and necessary cost to demolish and clear the site of the undamaged parts of the building; and

(b)  Your actual and necessary cost to reconstruct the undamaged parts of the building.

(3)  As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no such ordinance or law been in force at the time of the Covered Cause of Loss.

(4)  We will also pay for your loss and expense as defined under Business Income coverage and Extra Expense coverage as described in this Equipment Breakdown Coverage Agreement that is the result of g.(1) above, if such coverage is otherwise applicable under this Equipment Breakdown Coverage. This coverage is included within and subject to your Demolition limit.

**h.  Excavation Costs**

We will pay to excavate "buried vessels or piping" that are a part of a Geothermal closed or open loop heating, ventilating and air conditioning  system during the repair or replacement following a Covered Cause of Loss to such piping or vessels and to restore the excavated area to the same condition prior to the Covered Cause of Loss.

The most we will pay under this coverage is $25,000.  This limit is a part of, and not in addition to, the Equipment Breakdown Limit.

**i.  Expediting Expenses**

With respect to your damaged "covered property," we will pay the reasonable extra cost to:

(1)  Make temporary repairs; and

(2)  Expedite permanent repairs or permanent replacement.



**j. Hazardous Substances**

(1) We will pay for the additional cost to repair or replace "covered property" because of contamination by a "hazardous substance." This includes the additional expenses to clean up or dispose of such property. This does not include contamination of "perishable goods" by refrigerant, including but not limited to ammonia, which is addressed in Perishable Goods, A.2.n.(3).

(2) As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

(3) We will also pay for your loss and expense as defined under Business Income coverage and Extra Expense coverage that is the result of j.(1) above, if such coverage is otherwise applicable under this policy. This coverage is included within and subject to your Hazardous Substances limit.

**k. Newly Acquired Locations**

(1) You will notify us promptly of any newly acquired location that you have purchased or leased during the Participation Period.

(2) All coverages applicable to any scheduled location under this Equipment Breakdown Coverage are extended to a newly acquired location that you have purchased or leased during the Participation Period.

(3) This coverage begins at the time you acquire the property. As respects newly constructed properties, we will only consider them to be acquired by you when you have fully accepted the completed project.

(4) This coverage ends when any of the following first occurs:

    (a) This Equipment Breakdown Coverage expires;

    (b) The number of days specified in the Equipment Breakdown Coverage Summary for this coverage expires after you acquire the location;

    (c) The location is incorporated into regular coverage under the Fund's Property Coverage Agreement; or

    (d) The location is incorporated into the regular coverage of another Equipment Breakdown Coverage Document or policy you have.

(5) If limits or deductibles vary by location, the highest limits and deductibles will apply to newly acquired locations. However, the most we will pay for loss, damage or expense arising from any "one equipment breakdown" is the amount shown as the Newly Acquired Locations limit in the Equipment Breakdown Coverage Summary.

**l. Off Premises Equipment Breakdown**

(1) We will pay for physical damage to transportable "covered equipment" that, at the time of the Covered Cause of Loss, is not at a location indicated in the Equipment Breakdown Coverage Summary; or any other location owned or leased by you.

(2) We will also pay for your loss and expense as defined under Business Income coverage and Extra Expense coverage that is the result of l.(1) above, if such coverage is otherwise applicable under this Equipment Breakdown Coverage Agreement. This coverage is included within and subject to your Off Premises Equipment Breakdown limit.

(3) We will also pay for your loss and expense as defined under Data Restoration coverage that is the result of l.(1) above, is such coverage is otherwise applicable under this policy. This coverage is included within and subject to your Off Premise Equipment Breakdown limit.

**m. Ordinance or Law**

(1) This coverage applies if a Covered Cause of Loss damages a building that is "covered property" and the loss is increased by an ordinance or law that:

    (a) Regulates the construction or repair of buildings, including "building utilities";

    (b) Is in force at the time of the Covered Cause of Loss; and

    (c) Is not addressed under Demolition coverage or Hazardous Substances coverage.

(2) We will pay for the following additional costs to comply with such ordinance or law:

    (a) Your actual and necessary cost to repair the damaged portions of the building;



(b) Your actual and necessary cost to reconstruct the damaged portions of the building; and

(c) Your actual and necessary cost to bring undamaged portions of the building into compliance with the ordinance or law.

(3) As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no such ordinance or law been in force at the time of the Covered Cause of Loss.

(4) We will also pay for your loss and expense as defined under Business Income coverage and Extra Expense coverage that is the result of m.(1) above, if such coverage is otherwise applicable under this Equipment Breakdown Coverage. This coverage is included within and subject to your Ordinance or Law limit.

n. **Perishable Goods**

(1) We will pay for physical damage to "perishable goods" due to "spoilage."

(2) We will also pay for physical damage to "perishable goods" due to "spoilage" that is the result of an "interruption of service."

(3) We will also pay for physical damage to "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia.

(4) We will also pay any necessary expenses you incur during the "period of restoration" to reduce the amount of loss under this coverage. We will pay for such expenses to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

o. **Public Relations**

(1) This coverage only applies if you have sustained an actual loss of "business income" covered under this policy.

(2) We will pay for your reasonable costs for professional services to create and disseminate communications, when the need for such communications arises directly from the interruption of your business. This communication must be directed to one or more of the following:

(a) The media;

(b) The public; or

(c) Your customers, clients or members.

(3) Such costs must be incurred during the "period of restoration" or up to 30 days after the "period of restoration" has ended.

p. **Service Interruption**

We will pay for your loss and expense as defined under Business Income coverage and Extra Expense coverage that is the result of an "interruption of service."

## B. EXCLUSIONS

We will not pay for any excluded loss, damage or expense, even though any other cause or event contributes concurrently or in any sequence to the loss, damage or expense.

1. We will not pay for loss, damage or expense caused directly or indirectly by any of the following, whether or not caused by or resulting from a Covered Cause of Loss.

a. **Fire and Explosion**

(1) Fire, including smoke from a fire.

(2) Combustion explosion. This includes, but is not limited to, a combustion explosion of any steam boiler or other fired vessel.

(3) Any other explosion, except as specifically provided in the definition of "accident."

b. **Ordinance or Law**

The enforcement of, or change in, any ordinance, law, regulation, rule or ruling regulating or restricting repair, replacement, alteration, use, operation, construction or installation, except as specifically provided in A.2.g., j. and m. (Demolition, Hazardous Substances and Ordinance or Law coverages).



c. **Earth Movement**

Earth movement, whether natural or human-made, including but not limited to earthquake, shock, tremor, subsidence, landslide, rock fall, earth sinking, sinkhole collapse or tsunami.

d. **Nuclear Hazard**

Nuclear reaction, detonation or radiation, or radioactive contamination, however caused.

e. **War and Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, political violence or action taken by governmental authority in hindering or defending against any of these.

f. **Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow; or

(3) Water that backs up or overflows from a sewer, drain or sump.

However, if electrical "covered equipment" requires drying out because of the above, we will pay for the amount you actually expend to dry out such equipment, subject to the applicable Property Damage limit and Direct Coverage deductible. We will not pay more than the Actual Cash Value of the affected electrical "covered equipment." We will not pay to replace such equipment or for any other loss, damage or expense.

g. **Failure to Protect Property**

Your failure to use all reasonable means to protect "covered property" from damage following a Covered Cause of Loss.

h. **Fines**

Fine, penalty or punitive damage.

i. **Mold**

Mold, fungus, mildew or yeast, including any spores or toxins created or produced by or emanating from such mold, fungus, mildew or yeast. This includes, but is not limited to, costs arising from clean-up, remediation, containment, removal or abatement of such mold, fungus, mildew, yeast, spores or toxins. However, this exclusion does not apply to "spoilage" of personal property that is "perishable goods" to the extent that such "spoilage" is covered under Perishable Goods coverage.

j. **Deliberate Acts**

The deliberate act of any person to cause damage or harm, including but not limited to vandalism, malicious mischief or sabotage.

2. We will not pay for a Covered Cause of Loss caused by or resulting from any of the following causes of loss:

a. Lightning.

b. Windstorm or Hail. However, this exclusion does not apply when:

(1) "Covered equipment" located within a building or structure suffers a Covered Cause of Loss that results from wind-blown rain, snow, sand or dust; and

(2) The building or structure did not first sustain wind or hail damage to its roof or walls through which the rain, snow, sand or dust entered.

c. Collision or any physical contact caused by a "vehicle." This includes damage by objects falling from aircraft. However, this exclusion does not apply to any unlicensed "vehicles" which you own or which are operated in the course of your business.

d. Riot or Civil Commotion.

e. Leakage or discharge of any substance from an automatic sprinkler system, including collapse of a tank that is part of the system.



    **f.**   Volcanic Action.

    **g.**   An electrical insulation breakdown test.

    **h.**   A hydrostatic, pneumatic or gas pressure test.

    **i.**   Water or other means intended to extinguish a fire, even when such an attempt is unsuccessful.

    **j.**   Elevator collision.

**3.**  We will not pay for a Covered Cause of Loss caused by or resulting from any of the following perils, if such peril is a covered cause of loss under another coverage part or policy of insurance you have, whether collectible or not, and without regard to whether or not the other coverage part or policy of insurance provides the same coverage or scope of coverage as this policy.

    **a.**   Falling Objects.

    **b.**   Weight of Snow, Ice or Sleet.

    **c.**   Water Damage, meaning discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance containing water or steam.

    **d.**   Collapse.

    **e.**   Breakage of Glass.

    **f.**   Freezing caused by cold weather.

    **g.**   Discharge of molten material from equipment, including the heat from such discharged material.

**4.**  Exclusions 2. and 3. do not apply if all of the following are true:

    **a.**   The excluded peril occurs away from any location described in the Equipment Breakdown Coverage Summary and causes an electrical surge or other electrical disturbance;

    **b.**   Such surge or disturbance is transmitted through utility service transmission lines to a described location;

    **c.**   At the described location, the surge or disturbance results in a Covered Cause of Loss to "covered equipment" that is owned or operated under the control of you or your landlord; and

    **d.**   The loss, damage or expense caused by such surge or disturbance is not a covered cause of loss under another coverage or insurance policy you have, whether collectible or not, and without regard to whether or not the other coverage or insurance policy provides the same coverage or scope of coverage as this Equipment Breakdown Coverage.

**5.**  With respect to Business Income, Extra Expense and Service Interruption coverages, we will also not pay for:

    **a.**   Loss associated with business that would not or could not have been carried on if the Covered Cause of Loss had not occurred;

    **b.**   Loss caused by your failure to use due diligence and dispatch and all reasonable means to resume business;

    **c.**   That part of any loss that extends beyond or occurs after the "period of restoration." This includes, but is not limited to:

        **(1)**   "Business income" that would have been earned after the "period of restoration," even if such loss is the direct result of the suspension, lapse or cancellation of a contract during the "period of restoration"; and

        **(2)**   "Extra expense" to operate your business after the "period of restoration," even if such loss is contracted for and paid during the "period of restoration."

    **d.**   Any increase in loss resulting from an agreement between you and your customer or supplier. This includes, but is not limited to, contingent bonuses or penalties, late fees, demand charges, demurrage charges and liquidated damages.

**6.**  With respect to Contingent Business Income, Off-Premises Equipment Breakdown, Service Interruption, paragraph (2) of Data Restoration and paragraph (2) of Perishable Goods, we will also not pay for a Covered Cause of Loss caused by or resulting from any of the perils listed in Exclusion 3. above, whether or not such peril is a covered cause of loss under another coverage part or policy of insurance you have.

**7.**  With respect to Data Restoration coverage, we will also not pay to reproduce:

    **a.**   Software programs or operating systems that are not commercially available; or

    **b.**   "Data" that is obsolete, unnecessary or useless to you.



8. With respect to Demolition and Ordinance or Law coverages, we will also not pay for:

    a. Increased demolition or reconstruction costs until they are actually incurred; or

    b. Loss due to any ordinance or law that:

        (1) You were required to comply with before the loss, even if the building was undamaged; and

        (2) You failed to comply with;

        whether or not you were aware of such non-compliance.

## C. LIMITS OF INSURANCE

Any payment made under this Equipment Breakdown Coverage will not be increased if more than one Fund Member is shown in the Contribution and Coverage Summary or if you are comprised of more than one legal entity.

1. **Equipment Breakdown Limit**

    The most we will pay for loss, damage or expense arising from any "one equipment breakdown" is the amount shown as the Equipment Breakdown Limit in the Equipment Breakdown Coverage Summary.

2. **Coverage Limits**

    a. The limit of your coverage under each of the coverages listed in A.2. from loss, damage or expense arising from any "one equipment breakdown" is the amount indicated for that coverage in the Equipment Breakdown Coverage Summary. These limits are a part of, and not in addition to, the Equipment Breakdown Limit. If an amount of time is shown, coverage will continue for no more than that amount of time immediately following the "accident." If a coverage is shown as "Included," that coverage is provided up to the remaining amount of the Equipment Breakdown Limit. If no limit is shown in the Equipment Breakdown Coverage Summary for a coverage, or if a coverage is shown as Excluded in the Equipment Breakdown Coverage Summary, that coverage will be considered to have a limit of $0.

    b. Loss arising from any "one equipment breakdown" may continue to be present or recur in a later policy period. In such a case, the most we will pay for all loss, damage or expense arising out of any "one equipment breakdown" is the coverage limit applicable at the time of the Covered Cause of Loss.

    c. If two or more coverage limits apply to the same loss or portion of a loss, we will pay only the smallest of the applicable limits for that loss or portion of the loss. This means that if:

        (1) You have a loss under one of the coverages listed in A.2.; and

        (2) All or part of the loss is not covered because the applicable coverage is excluded or has a limit that is less than the amount of your loss,

        we will not pay the remaining amount of such loss under any other coverage.

**EXAMPLE 1**

Property Damage Limit: $7,000,000

Business Income Limit: $1,000,000

Newly Acquired Locations Limit: $500,000

There is a Covered Cause of Loss at a newly acquired location that results in a Property Damage loss of $200,000 and a Business Income loss of $800,000.

We will pay $500,000, because the entire loss is subject to the Newly Acquired Locations Limit of $500,000.

**EXAMPLE 2**

Property Damage Limit: $7,000,000

Business Income Limit: $500,000

Hazardous Substances Limit: $25,000

There is a Covered Cause of Loss that results in a loss of $100,000. If no "hazardous substance" had been involved, the property damage loss would have been $10,000 and the business income loss would have been $20,000. The presence of the "hazardous substance" increased the loss by $70,000 (increasing the clean up and repair costs by $30,000 and increasing the business income loss by $40,000).

We will pay $55,000 ($10,000 property damage plus $20,000 business income plus $25,000 hazardous substances).



## D. DEDUCTIBLES

### 1. Deductibles for Each Coverage

a. Unless the Equipment Breakdown Coverage Summary indicates that your deductible is combined for all coverages, multiple deductibles may apply to any "one equipment breakdown."

b. We will not pay for loss, damage or expense under any coverage until the amount of the covered loss or damage exceeds the deductible amount indicated in the Equipment Breakdown Coverage Summary. We will then pay the amount of loss, damage or expense in excess of the applicable deductible amount, subject to the applicable limit indicated in the Equipment Breakdown Coverage Summary.

c. If deductibles vary by type of "covered equipment" and more than one type of "covered equipment" is involved in any "one equipment breakdown," only the highest deductible for each coverage will apply.

d. The following applies when a deductible is expressed as a function of the horsepower rating of a refrigerating or air conditioning system. If more than one compressor is used with a single system, the horsepower rating of the largest motor or compressor will determine the horsepower rating of the system.

### 2. Direct and Indirect Coverages

a. Direct Coverages Deductibles and Indirect Coverages Deductibles, if applicable, may be indicated in the Equipment Breakdown Coverage Summary.

b. Unless more specifically indicated in the Equipment Breakdown Coverage Summary:

   (1) Indirect Coverages Deductibles apply to Business Income and Extra Expense loss, regardless of where such coverage is provided in this Equipment Breakdown Coverage; and

   (2) Direct Coverages Deductibles apply to all remaining loss, damage or expense covered by this Equipment Breakdown Coverage.

**EXAMPLE**

A Covered Cause of Loss results in covered losses as follows:

$100,000  Total Loss (all applicable coverages)

$35,000  Business Income Loss (including $2,000 of business income loss payable under Data Restoration coverage)

$5,000  Extra Expense Loss

In this case, the Indirect coverages loss totals $40,000 before application of the Indirect Coverage Deductible. The Direct coverages loss totals the remaining $60,000 before application of the Direct Coverage Deductible.

### 3. Application of Deductibles

a. **Dollar Deductibles**

We will not pay for loss, damage or expense resulting from any "one equipment breakdown" until the amount of loss, damage or expense exceeds the applicable deductible or deductibles shown in the Equipment Breakdown Coverage Summary. We will then pay the amount of loss, damage or expense in excess of the applicable deductible or deductibles, subject to the applicable limits shown in the Equipment Breakdown Coverage Summary.

b. **Time Deductibles**

If a time deductible is shown in the Equipment Breakdown Coverage Summary, we will not be liable for any loss occurring during the specified number of hours or days immediately following the Covered Cause of Loss. If a time deductible is expressed in days, each day shall mean twenty-four consecutive hours.

c. **Multiple of Average Daily Value (ADV) Deductibles**

If a deductible is expressed as a number times ADV, that amount will be calculated as follows:

The ADV (Average Daily Value) will be the "business income" that would have been earned during the period of interruption had no Covered Cause of Loss occurred, divided by the number of working days in that period. The ADV applies to the "business income" value of the entire location, whether or not the loss affects the entire location. If more than one location is included in the valuation of the loss, the ADV will be the combined value of all affected locations. For purposes of this calculation, the period of interruption may not extend beyond the "period of restoration."

The number indicated in the Equipment Breakdown Coverage Summary will be multiplied by the ADV as



determined above. The result will be used as the applicable deductible.

**EXAMPLE**

Business is interrupted, partially or completely, for 10 working days. If there had been no Covered Cause of Loss, the total "business income" at the affected location for those 10 working days would have been $5,000. The Indirect Coverages Deductible is 3 Times ADV.

$5,000 / 10 = $500 ADV

3 X $500 = $1,500 Indirect Coverages Deductible

**d. Percentage of Loss Deductibles**

If a deductible is expressed as a percentage of loss, we will not be liable for the indicated percentage of the gross amount of loss, damage or expense (prior to any applicable deductible or coinsurance) insured under the applicable coverage. If the dollar amount of such percentage is less than the indicated Minimum Deductible, the Minimum Deductible will be the applicable deductible.

## E. LOSS CONDITIONS

The following conditions apply in addition to the Additional Conditions:

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Brands and Labels**

If branded or labeled merchandise that is "covered property" is damaged by a Covered Cause of Loss, but retains a salvage value, you may, at your expense:

a. Stamp the word SALVAGE on the merchandise or its containers if the stamp will not physically damage the merchandise; or

b. Remove the brands or labels, if doing so will not physically damage the merchandise. You must re-label the merchandise or its containers to comply with the law.

We will pay for any reduction in value of the salvage merchandise resulting from either of these two actions, subject to all applicable limits.

If a Brands and Labels Limit is shown on the Equipment Breakdown Coverage Summary, we will not pay more than the indicated amount for coverage under this Condition.

**3. Coinsurance - Business Income Coverage**

a. Unless otherwise shown in the Equipment Breakdown Coverage Summary, Business Income coverage is subject to coinsurance. This means that we will not pay the full amount of any "business income" loss if the "business income actual annual value" is greater than the "business income estimated annual value" at the affected location at the time of the Covered Cause of Loss. Instead, we will determine the most we will pay using the following steps:

(1) Divide the "business income estimated annual value" by the "business income actual annual value" at the time of the Covered Cause of Loss;

(2) Multiply the total amount of the covered loss of "business income" by the amount determined in paragraph (1) above;

(3) Subtract the applicable deductible from the amount determined in paragraph (2) above;

The resulting amount, or the Business Income Limit, whichever is less, is the most we will pay. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

b. Coinsurance applies separately to each location owned by the Fund Member.

c. If you report a single "business income estimated annual value" for more than one location, without providing information on how that amount should be distributed among the locations, we will distribute the amount evenly among all applicable locations.

**EXAMPLE 1 (Underinsurance)**

When:

The "business income actual annual value" at the location of loss at the time of the Covered Cause of Loss is $200,000.



**TASB RISK FUND**

Equipment Breakdown Coverage Agreement
Effective 9/1/2020
© 2020 TASB Risk Management Fund

Page 9 of 20
Page 90 of 166

The "business income estimated annual value" shown in the Equipment Breakdown Coverage Summary for the location of loss is $100,000.

The actual loss of "business income" resulting from the Covered Cause of Loss is $40,000.

The Business Income limit is $100,000.

The Business Income deductible is $5,000.

Step 1: $100,000 / $200,000 = .5

Step 2: $40,000 x .5 = $20,000

Step 3: $20,000 - $5,000 = $15,000

The total "business income" loss recovery, after deductible, would be $15,000. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

We will also charge you an additional contribution in recognition of the "business income actual annual value."

**EXAMPLE 2 (Adequate Insurance)**

When:

The "business income actual annual value" at the location of loss at the time of the Covered Cause of Loss is $200,000.

The "business income estimated annual value" shown in the Equipment Breakdown Coverage Summary for the location of loss is $200,000.

The actual loss of "business income" resulting from the Covered Cause of Loss is $40,000.

The Business Income limit is $100,000.

The Business Income deductible is $5,000.

Step 1: $200,000 / $200,000 = 1

Step 2: $40,000 x 1 = $40,000

Step 3: $40,000 - $5,000 = $35,000

The total "business income" loss recovery, after deductible, would be $35,000.

4. **Coinsurance – Coverages other than Business Income**

   Coverages other than Business Income may be subject to coinsurance if so indicated in the Equipment Breakdown Coverage Summary. If a Coinsurance percentage is shown in the Equipment Breakdown Coverage Summary, the following condition applies.

   a. We will not pay the full amount of any loss if the value of the property subject to the coverage at the time of the Covered Cause of Loss times the Coinsurance percentage shown for it in the Equipment Breakdown Coverage Summary is greater than the applicable limit.

      Instead, we will determine the most we will pay using the following steps:

      (1) Multiply the value of the property subject to the coverage at the time of the Covered Cause of Loss by the Coinsurance percentage;

      (2) Divide the applicable limit by the amount determined in step (1);

      (3) Multiply the total amount of loss, before the application of any deductible, by the amount determined in step (2); and

      (4) Subtract the deductible from the amount determined in step (3).

      We will pay the amount determined in step (4) or the applicable limit, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

   b. Coinsurance applies separately to each member location.

   **EXAMPLE 1 (Underinsurance)**

   When:

   The actual value of "perishable goods" at the location of loss at the time of the Covered Cause of Loss is $200,000.

   The Perishable Goods limit is $100,000 @ 80% coinsurance.

   The loss under Perishable Goods coverage resulting from the Covered Cause of Loss is $60,000.

   The Perishable Goods deductible is $5,000.


**TASB RISK FUND**

Equipment Breakdown Coverage Agreement
Effective 9/1/2020
© 2020 TASB Risk Management Fund

Page 10 of 20
Page 91 of 166

Step 1: $200,000 x 80% = $160,000

Step 2: $100,000/$160,000 = .625

Step 3: $60,000 x .625 = $37,500

Step 4: $37,500 - $5,000 = $32,500

The total Perishable Goods loss recovery, after deductible, would be $32,500. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**EXAMPLE 2 (Adequate Insurance)**

When:

The actual value of "perishable goods" at the location of loss at the time of the Covered Cause of Loss is $100,000.

The Perishable Goods limit is $100,000 @ 80% coinsurance.

The loss under Perishable Goods coverage resulting from the Covered Cause of Loss is $60,000.

The Perishable Goods deductible is $5,000.

Step 1: $100,000 x 80% = $80,000

Step 2: $100,000/$80,000 = 1.25

Coinsurance does not apply.

Step 3: $60,000 - $5,000 = $55,000

The total Perishable Goods loss recovery, after deductible, would be $55,000.

5. **Defense**

We have the right, but are not obligated, to defend you against suits arising from claims of owners of property in your care, custody or control. When we do this, it will be at our expense.

6. **Duties in the Event of Loss or Damage**

You must see that the following are done in the event of loss or damage:

a. Give us a prompt notice of the loss or damage, including a description of the property involved.

b. You must reduce your loss, damage or expense, if possible, by:

(1) Protecting property from further damage. We will not pay for your failure to protect property, as stated in Exclusion B.1.g.;

(2) Resuming business, partially or completely at the location of loss or at another location;

(3) Making up lost business within a reasonable amount of time. This includes working extra time or overtime at the location of loss or at another location. The reasonable amount of time does not necessarily end when the operations are resumed;

(4) Using merchandise or other property available to you;

(5) Using the property or services of others; and

(6) Salvaging the damaged property.

c. Allow us a reasonable time and opportunity to examine the property and premises before repair or replacement is undertaken or physical evidence of the Covered Cause of Loss is removed. But you must take whatever measures are necessary for protection from further damage.

d. Make no statement that will assume any obligation or admit any liability, for any loss, damage or expense for which we may be liable, without our consent.

e. Promptly send us any legal papers or notices received concerning the loss, damage or expense.

f. As often as may be reasonably required, permit us to inspect your property, premises and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

g. If requested, permit us to examine you and any of your agents, employees and representatives under oath. We may examine any agent, employee or representative under oath while not in the presence of any other agent, employee or representative. Such examination:

(1) May be at any time reasonably required;

(2) May be about any matter relating to this insurance, your loss, damage or expense, or your claim,


**TASB™ RISK FUND**

including, but not limited to, your books and records; and

  (3)  May be recorded by us by any methods we choose.

 h. Send us a signed, sworn proof of loss containing the information we request. You must do this within 60 days after our request.

 i. Cooperate with us in the investigation and settlement of the claim.

**7. Errors and Omissions**

 a. We will pay your loss covered by this Equipment Breakdown Coverage if such loss is otherwise not payable solely because of any of the following:

  (1) Any error or unintentional omission in the description or location of property as covered under the Fund's Property Coverage Agreement;

  (2) Any failure through error to include any premises owned or occupied by you at the inception of the Fund's Property Coverage Agreement; or

  (3) Any error or unintentional omission by you that results in cancellation of any premises covered under the Fund's Property Coverage Agreement.

 b. No coverage is provided as a result of any error or unintentional omission by you in the reporting of values or the coverage you requested.

 c. It is a condition of this Equipment Breakdown Coverage that such errors or unintentional omissions shall be reported and corrected when discovered.  The contribution may be adjusted accordingly to reflect the date the premises should have been added had no error or omission occurred.

 d. If an Errors and Omissions Limit is shown on the Equipment Breakdown Coverage Summary, we will not pay more than the indicated amount for coverage under this Condition.

**8. Proving Your Loss**

It is your responsibility, at your own expense, to provide documentation to us:

 a. Demonstrating that the loss, damage or expense is the result of a Covered Cause of Loss  covered under this Equipment Breakdown Coverage; and

 b. Calculating the dollar amount of the loss, damage and expense that you claim is covered.

Your responsibility in 8.a. above is without regard to whether or not the possible Covered Cause of Loss occurred at your premises or involved your equipment.

**9. Salvage and Recoveries**

When, in connection with any loss under this Equipment Breakdown Coverage, any salvage or recovery is received after the payment for such loss, the amount of the loss shall be refigured on the basis on which it would have been settled had the amount of salvage or recovery been known at the time the loss was originally determined. Any amounts thus found to be due either party from the other shall be paid promptly.

**10. Valuation**

We will determine the value of "covered property" as follows:

 a. Except as specified otherwise, our payment for damaged "covered property" will be the smallest of:

  (1) The cost to repair the damaged property;

  (2) The cost to replace the damaged property on the same site; or

  (3) The amount you actually spend that is necessary to repair or replace the damaged property.

 b. The amount of our payment will be based on the most cost-effective means to replace the function, capacity and remaining useful life of the damaged property. This may include the use of generic, used or reconditioned parts, equipment or property.

 c. Except as described in d. below, you must pay the extra cost of replacing damaged property with property of a better kind or quality or of a different size or capacity.

 d. Environmental, Safety and Efficiency Improvements

  If "covered equipment" requires replacement due to a Covered Cause of Loss, we will pay your additional cost to replace with equipment that we agree is better for the environment, safer for people or more energy or water efficient than the equipment being replaced, subject to the following conditions:



    (1)      We will not pay more than 150% of what the cost would have been to replace with like kind and quality;

    (2)      We will not pay to increase the size or capacity of the equipment;

    (3)      This provision only applies to Property Damage coverage;

    (4)      This provision does not increase any of the applicable limits;

    (5)      This provision does not apply to any property valued on an Actual Cash Value basis; and

    (6)      This provision does not apply to the replacement of component parts.

e.    The following property will be valued on an Actual Cash Value basis:

    (1)      Any property that does not currently serve a useful or necessary function for you;

    (2)      Any "covered property" that you do not repair or replace within 24 months after the date of the Covered Cause of Loss; and

    (3)      Any "covered property" for which Actual Cash Value coverage is specified in the Equipment Breakdown Coverage Summary.

Actual Cash Value includes deductions for depreciation.

f.    If any one of the following conditions is met, property held for sale by you will be valued at the sales price as if no loss or damage had occurred, less any discounts and expenses that otherwise would have applied:

    (1)      The property was manufactured by you;

    (2)      The sales price of the property is less than the replacement cost of the property; or

    (3)      You are unable to replace the property before its anticipated sale.

g.    Except as specifically provided for under Data Restoration coverage, "data" and "media" will be valued on the following basis:

    (1)      For mass-produced and commercially available software, at the replacement cost.

    (2)      For all other "data" and "media," at the cost of blank "media" for reproducing the records. We will not pay for "data" representing financial records based on the face value of such records.

h.    Air conditioning or refrigeration equipment that utilizes a refrigerant containing CFC (chlorofluorocarbon) substances will be valued at the cost to do the least expensive of the following:

    (1)      Repair or replace the damaged property and replace any lost CFC refrigerant;

    (2)      Repair the damaged property, retrofit the system to accept a non-CFC refrigerant and charge the system with a non-CFC refrigerant; or

    (3)      Replace the system with one using a non-CFC refrigerant.

In determining the least expensive option, we will include any associated Business Income or Extra Expense loss. If option (2) or (3) is more expensive than (1), but you wish to retrofit or replace anyway, we will consider this better for the environment and therefore eligible for valuation under paragraph d., Environmental, Safety and Efficiency Improvements. In such case, E.10.d.(1) is amended to read: "We will not pay more than 150% of what the cost would have been to repair or replace with like kind and quality."

## F.  ADDITIONAL CONDITIONS

The following conditions apply in addition to the Loss Conditions:

### 1.  Loss Payee

If a person or organization is designated in this Equipment Breakdown Coverage as a Loss Payee, we will consider them to be covered under this Equipment Breakdown Coverage only to the extent of their interest in the "covered property."

### 2.  Bankruptcy

The bankruptcy or insolvency of you or your estate will not relieve you or us of any obligation under this Equipment Breakdown Coverage.

### 3.  Concealment, Misrepresentation or Fraud

We will not pay for any loss and coverage will be void if you or any Loss Payee at any time:



a. Intentionally cause or allow loss, damage or expense in order to collect on insurance; or

b. Intentionally conceal or misrepresent a material fact concerning:

   (1) This Equipment Breakdown Coverage;

   (2) The "covered property";

   (3) Your interest in the "covered property"; or

   (4) A claim under this Equipment Breakdown Coverage.

**4. Jurisdictional Inspections**

It is your responsibility to comply with any state or municipal boiler and pressure vessel regulations. If any "covered equipment" that is "covered property" requires inspection to comply with such regulations, at your option we agree to perform such inspection.

**5. Liberalization**

If we adopt any standard form revision for general use that would broaden the coverage under this Equipment Breakdown Coverage without additional contribution, the broadened coverage will apply to this Equipment Breakdown Coverage commencing on the date that such revision becomes effective in the jurisdiction where the Covered Cause of Loss occurs.

**6. Loss Payable**

a. We will pay you and the loss payee shown in the Equipment Breakdown Coverage Summary for loss covered by this Equipment Breakdown Coverage, as interests may appear. This Equipment Breakdown Coverage protects the interest of the loss payee unless the loss results from conversion, secretion or embezzlement on your part or on the part of the loss payee.

b. The Fund may cancel this Equipment Breakdown Coverage as allowed by Interlocal Participation Agreement.

c. If we make any payment to the loss payee, we will obtain their rights against any other party as provided within the Interlocal Participation Agreement.

**7. Maintaining Covered Property and Equipment**

It is your responsibility to appropriately maintain your property and equipment. We will not pay your costs to maintain, operate, protect or enhance your property or equipment, even if such costs are to comply with our recommendations or prevent loss, damage or expense that would be covered under this Equipment Breakdown Coverage.

**8. Mortgage Holders**

a. The term mortgage holder includes trustee.

b. We will pay for direct damage to "covered property" due to a Covered Cause of Loss to "covered equipment" to you and each mortgage holder shown in the Equipment Breakdown Coverage Summary in their order of precedence, as interests in the "covered property" may appear.

c. The mortgage holder has the right to receive loss payment even if the mortgage holder has started foreclosure or similar action on the "covered property."

d. If we deny your claim because of your acts or because you have failed to comply with the terms of this Equipment Breakdown Coverage Agreement, the mortgage holder will still have the right to receive loss payment, provided the mortgage holder does all of the following:

   (1) Pays any contribution due under this Equipment Breakdown Coverage at our request if you have failed to do so;

   (2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so;

   (3) Has notified us of any change in ownership or material change in risk known to the mortgage holder; and

   (4) Has complied with all other terms and conditions of this Equipment Breakdown Coverage Agreement and any Fund participation documents or agreements.

   All of the terms of this Equipment Breakdown Coverage Agreement will then apply directly to the mortgage holder.

e. If we pay the mortgage holder for any loss and deny payment to you because of your acts or because you



have failed to comply with the terms of this Equipment Breakdown Coverage Agreement:

(1) The mortgage holder's right under the mortgage will be transferred to us to the extent of the amount we pay; and

(2) The mortgage holder's right to recover the full amount of the mortgage holder's claim will not be impaired.

At our option, we may pay to the mortgage holder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

9. **Other Insurance**

If there is other insurance that applies to the same loss, damage or expense, this Equipment Breakdown Coverage shall apply only as excess insurance after all other applicable insurance has been exhausted.

10. **Participation Period, Coverage Territory**

Under this Equipment Breakdown Coverage:

a. The Covered Cause of Loss must occur during the Participation Period as stated on the Contribution and Coverage Summary, but expiration of the Participation Period does not limit our liability.

b. The Covered Cause of Loss must occur within the following coverage territory:

(1) The United States of America (including its territories and possessions);

(2) Puerto Rico; and

(3) Canada.

c. As respects Off Premises Equipment Breakdown coverage only, the Covered Cause of Loss may occur in any country except one in which the United States has imposed sanctions, embargoes or similar restrictions on the provision of insurance.

11. **Privilege to Adjust with Owner**

In the event of loss, damage or expense involving property of others in your care, custody or control, we have the right to settle the loss, damage or expense with respect to such property with the owner of the property. Settlement with owners of that property will satisfy any claim of yours.

12. **Suspension**

Whenever "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the coverage against loss from a Covered Cause of Loss to that "covered equipment." This can be done by delivering or mailing a written notice of suspension to:

a. Your last known address; or

b. The address where the "covered equipment" is located.

Once suspended in this way, coverage can be reinstated only by an endorsement for that "covered equipment."

If we suspend your coverage, you may receive a pro rata refund of contribution for that "covered equipment" for the period of suspension. But the suspension will be effective even if we have not yet made or offered a refund.

13. **Transfer of Rights of Recovery Against Others to the Fund**

If any person or organization to or for whom we make payment under this Equipment Breakdown Coverage has rights to recover damages from another, those rights are transferred to us to the extent of our payment as provided within the Interlocal Participation Agreement. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

a. Prior to a Covered Cause of Loss.

b. After a Covered Cause of Loss only if, at time of the Covered Cause of Loss, that party is one of the following:

(1) Someone insured by this Equipment Breakdown Coverage; or

(2) A business firm:

(a) Owned or controlled by you; or

(b) That owns or controls you.

## G. DEFINITIONS



1. **"Accident"**
   a. **"Accident"** means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:
      (1) Mechanical breakdown, including rupture or bursting caused by centrifugal force;
      (2) Artificially generated electrical current, including electrical arcing, that damages electrical devices, appliances or wires;
      (3) Explosion, other than combustion explosion, of steam boilers, steam piping, steam engines or steam turbines;
      (4) An event inside steam boilers, steam pipes, steam engines or steam turbines that damages such equipment;
      (5) An event inside hot water boilers or other water heating equipment that damages such equipment; or
      (6) Bursting, cracking or splitting.
   b. None of the following is an "accident," however caused and without regard to whether such condition or event is normal and expected or unusual and unexpected:
      (1) Depletion, deterioration, rust, corrosion, erosion, settling or wear and tear;
      (2) Any gradually developing condition;
      (3) Any defect, programming error, programming limitation, computer virus, malicious code, loss of "data," loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind;
      (4) Contamination by a "hazardous substance"; or
      (5) Misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.

2. **"Boilers and Vessels"** means:
   a. Boilers;
   b. Steam piping;
   c. Piping that is part of a closed loop used to conduct heat from a boiler;
   d. Condensate tanks; and
   e. Unfired vessels which, during normal usage, operate under vacuum or pressure, other than the weight of contents.

   This term does not appear elsewhere in this coverage form, but may appear in the Equipment Breakdown Coverage Summary.

3. **"Building Utilities"** means "covered equipment" permanently mounted on or in a building and used to provide any of the following services within the building: heating, ventilating, air conditioning, electrical power, hot water, elevator or escalator services, central vacuum, natural gas service or communications. "Building utilities" does not include personal property or equipment used in manufacturing or processing.

4. **"Buried Vessels or Piping"**
   a. **"Buried Vessels or Piping"** means any piping or vessel buried or encased in the earth, concrete or other material, whether above or below grade, or in an enclosure which does not allow access for inspection and repair.
   b. **"Buried Vessels or Piping"** does not mean piping or vessels buried or encased in the earth, concrete or other material that are a part of a Geothermal closed or open loop heating, ventilating and air conditioning system used for building heating or cooling.

5. **"Business Income"** means the sum of:
   a. The Net Income (net profit or loss before income taxes) that would have been earned or incurred; and
   b. Continuing normal and necessary operating expenses incurred, including employee payroll.

6. **"Business Income Actual Annual Value"** means the "business income" for the current fiscal year that would have been earned had no Covered Cause of Loss occurred.

   In calculating the "business income actual annual value," we will take into account the actual experience of your



business before the Covered Cause of Loss and the probable experience you would have had without the Covered Cause of Loss.

7.  **"Business Income Estimated Annual Value"** means the anticipated "business income" reported to us and shown in the Equipment Breakdown Coverage Summary. If no value is shown in the Equipment Breakdown Coverage Summary, the "business income estimated annual value" will be the most recent report of anticipated "business income" values on file with us.

8.  **"Cloud Computing Services"** means professional, on-demand, self-service data storage or data processing services provided through the Internet or over telecommunications lines. This includes services known as IaaS (infrastructure as a service), PaaS (platform as a service), SaaS (software as a service) and NaaS (network as a service). This includes business models known as public clouds, community clouds and hybrid clouds. "Cloud computing services" include private clouds if such services are owned and operated by a third party.

9.  **"Covered Equipment"**

    a.  **"Covered Equipment"** means the following:

        (1)  Unless specified otherwise in the Equipment Breakdown Coverage Summary:

            (a)  Equipment that generates, transmits or utilizes energy, including electronic communications and data processing equipment; or

            (b)  Equipment which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

            "Covered equipment" may utilize conventional design and technology or new or newly commercialized design and technology.

        (2)  Except as specifically provided for under Contingent Business Income, Off Premises Equipment Breakdown, Service Interruption, Contingent Business Income and paragraph (2) of Perishable Goods, such equipment must be at a location described in the Equipment Breakdown Coverage Summary and must be owned or leased by you or operated under your control.

    b.  None of the following is "covered equipment":

        (1)  Structure, including but not limited to the structural portions of buildings and towers and scaffolding;

        (2)  Foundation;

        (3)  Cabinet, compartment, conduit or ductwork;

        (4)  Insulating or refractory material;

        (5)  "Buried vessels or piping";

        (6)  Waste, drainage or sewer piping;

        (7)  Piping, valves or fittings forming a part of a sprinkler or fire suppression system;

        (8)  Water piping that is not part of a closed loop used to conduct heat or cooling from a boiler or a refrigeration or air conditioning system;

        (9)  "Vehicle" or any equipment mounted on a "vehicle";

        (10) Satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

        (11) Dragline, excavation or construction equipment;

        (12) Equipment manufactured by you for sale;

        (13) "Data; or

        (14) Well casings.

10. **"Covered Property"**

    a.  **"Covered Property"** means property that you own or property that is in your care, custody or control and for which you are legally liable. Such property must be at a location described in the Equipment Breakdown Coverage Summary except as provided under Off Premises Equipment Breakdown coverage.

    b.  None of the following is "covered property":

        (1)  Accounts, bills, currency, deeds or other evidences of debt, money, notes or securities;

        (2)  Fine arts, jewelry, furs or precious stones;

        (3)  Precious metal, unless forming a part of "covered equipment";



    (4)   Animals;

    (5)   Contraband, or property in the course of illegal transportation or trade;

    (6)   Land (including land on which the property is located), water, trees, growing crops or lawns; or

    (7)   Shrubs or plants, unless held indoors for retail sale.

11.  **"Data"** means information or instructions stored in digital code capable of being processed by machinery.

12.  **"Electrical Generating Equipment"**

    **a.**   "Electrical Generating Equipment" means equipment which converts any other form of energy into electricity. This includes, but is not limited to, the following:

       (1)   Boilers used primarily to provide steam for one or more turbine-generator units;

       (2)   Turbine-generators (including steam, gas, water or wind turbines);

       (3)   Engine-generators;

       (4)   Fuel cells or other alternative electrical generating equipment;

       (5)   Electrical transformers, switchgear and power lines used to convey the generated electricity; and

       (6)   Associated equipment necessary for the operation of any of the equipment listed in (1) through (5) above.

    **b.**   "Electrical Generating Equipment" does not mean:

       (1)   Elevator or hoist motors that generate electricity when releasing cable; or

       (2)   Equipment intended to generate electricity solely on an emergency, back-up basis.

This term does not appear elsewhere in this coverage form, but may appear in the Equipment Breakdown Coverage Summary.

13.  **"Electronic Circuitry"** means microelectronic components, including but not limited to circuit boards, integrated circuits, computer chips and disk drives.

14.  **"Electronic Circuitry Impairment"**

    **a.**   "Electronic circuitry impairment" means a fortuitous event involving "electronic circuitry" within "covered equipment" that causes the "covered equipment" to suddenly lose its ability to function as it had been functioning immediately before such event. This definition is subject to the conditions specified in b., c., and d. below.

    **b.**   We shall determine that the reasonable and appropriate remedy to restore such "covered equipment's" ability to function is the replacement of one or more "electronic circuitry" components of the "covered equipment."

    **c.**   The "covered equipment" must be owned or leased by you, or operated under your control.

    **d.**   None of the following is an "electronic circuitry impairment":

       (1)   Any condition that can be reasonably remedied by:

          (a)   Normal maintenance, including but not limited to replacing expendable parts, recharging batteries or cleaning;

          (b)   Rebooting, reloading or updating software or firmware; or

          (c)   Providing necessary power or supply.

       (2)   Any condition caused by or related to:

          (a)   Incompatibility of the "covered equipment" with any software or equipment installed, introduced or networked within the prior 30 days; or

          (b)   Insufficient size, capability or capacity of the "covered equipment."

       (3)   Exposure to adverse environmental conditions, including but not limited to change in temperature or humidity, unless such conditions result in an observable loss of functionality. Loss of warranty shall not be considered an observable loss of functionality.

15.  **"Extra Expense"** means the additional cost you incur to operate your business over and above the cost that you normally would have incurred to operate your business during the same period had no Covered Cause of Loss occurred.



Equipment Breakdown Coverage Agreement
Effective 9/1/2020
© 2020 TASB Risk Management Fund

16. **"Hazardous Substance"** means any substance that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

17. **"Interruption of Service"**

    a. "Interruption of Service" means a failure or disruption of the normal supply of any of the Covered Services listed in b. below, when such failure or disruption is caused by an "accident" to "covered equipment," subject to the conditions listed in c. through f. below. The failure or disruption must arise from an "accident."

    b. Covered Services are electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, Internet access, telecommunications services, wide area networks, "cloud computing services" and data transmission.

    c. The "covered equipment" must either be:

       (1) Owned by a company with whom you have a contract to supply you with one of the Covered Services; or

       (2) Used to supply you with one of the Covered Services and located within one mile of a location described in the Equipment Breakdown Coverage Summary.

    d. If a Service Interruption Distance Limitation is indicated in the Equipment Breakdown Coverage Summary, the "covered equipment" suffering the "accident" must be located within the indicated distance of any location described in the Equipment Breakdown Coverage Summary.

    e. Unless otherwise shown in the Equipment Breakdown Coverage Summary, no failure or disruption of service will be considered to qualify as an "interruption of service" until the failure or disruption exceeds 24 hours immediately following the "accident."

    f. "Interruption of service" does not include any failure or disruption, whether or not arising from or involving an "accident," in which a supplier could have continued to provide service to the location but chose for any reason to reduce or discontinue service.

18. **"Interruption of Supply"**

    a. "Interruption of Supply" means a failure or disruption of the normal supply of any of the Covered Contingencies listed below, when such failure or disruption is caused by an "accident" to "covered equipment" that is located at a Contingent Business Income supplier or receiver location indicated in the Equipment Breakdown Coverage Summary. If no Contingent Business Income supplier or receiver location is indicated in the Equipment Breakdown Coverage Summary, the "covered equipment" must be owned by a supplier from whom you have received the Covered Contingency for at least six months prior to the "accident" or a receiver to whom you have supplied the Covered Contingency for at least six months prior to the "accident."

    b. Covered Contingencies are raw materials, intermediate products, finished products, packaging materials and product processing services.

19. **"Media"** means material on which "data" is recorded, such as magnetic tapes, hard disks, optical disks or floppy disks.

20. **"One Equipment Breakdown"** means all "accidents" or "electronic circuitry impairments" occurring at the same time from the same event. If an "accident" or "electronic circuitry impairment" causes other "accidents" or "electronic circuitry impairments," all will be considered "one equipment breakdown."

21. **"Ordinary Payroll"** means the Payroll Expenses associated with all employees other than executives, department managers and employees under contract.

    As used above, Payroll Expenses means all payroll, employee benefits directly related to payroll, FICA payments you pay, union dues you pay and workers compensation contributions.

    "Ordinary payroll" does not include pensions or directors fees.

    This term does not appear elsewhere in this coverage form, but may appear in the Equipment Breakdown Coverage Summary.

22. **"Period of Restoration"** means the period of time that begins at the time of the Covered Cause of Loss and continues until the earlier of:

    a. The date the physical damage to "covered equipment" is repaired or replaced; or

    b. The date on which such damage could have been repaired or replaced with the exercise of due diligence and dispatch,



plus the number of days, if any, shown in the Equipment Breakdown Coverage Summary for Extended Period of Restoration.

23. **"Perishable Goods"** means any "covered property" subject to deterioration or impairment as a result of a change of conditions, including but not limited to temperature, humidity or pressure.

24. **"Production Machinery"** means any machine or apparatus that processes or produces a product intended for eventual sale. This includes all component parts of such machine or apparatus and any other equipment used exclusively with such machine or apparatus. However, "production machinery" does not mean any boiler, or fired or unfired pressure vessel.

    This term does not appear elsewhere in this coverage form, but may appear in the Equipment Breakdown Coverage Summary.

25. **"Spoilage"** means any detrimental change in state. This includes but is not limited to thawing of frozen goods, warming of refrigerated goods, freezing of fresh goods, solidification of liquid or molten material and chemical reactions to material in process.

26. **"Vehicle"** means any machine or apparatus that is used for transportation or moves under its own power. "Vehicle" includes, but is not limited to, car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester.

    However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power source will not be considered a "vehicle."



# TERRORISM ENDORSEMENT

1. **Endorsement Intent.** This Terrorism Endorsement modifies coverage under the Property Coverage Agreement. Coverage is amended, as set forth in this endorsement, to amend the language related only to terrorism as included in § 9.27 "terrorism" of Part C "Limited Coverage, Supplemental Coverage, Excluded Property, and Excluded Loss" of the Property Coverage Agreement.

2. **Payments.** The Fund will pay for the **Loss** to **Covered Property** resulting from an Official Act of Terrorism that is in excess of the deductible amount and within the limits of coverage specified in the Contribution and Coverage Summary (CCS). An Official Act of Terrorism means any incident determined to be such by an official, department, or agency that is specifically authorized by federal statute to make such a determination.

3. **Other Applicability.** All other provisions of the Property Coverage Agreement and CCS remain applicable.



Terrorism Endorsement
Property Coverage Agreement
Effective 9/1/2020
© 2020 TASB Risk Management Fund

Page 1 of 1

Page 102 of 166

# APP. C

CONTRACTS WITH LOCAL GOVERNMENTAL ENTITIES

Sec. 271.151.  DEFINITIONS.  In this subchapter:

(1)  "Adjudication" of a claim means the bringing of a civil suit and prosecution to final judgment in county or state court and includes the bringing of an authorized arbitration proceeding and prosecution to final resolution in accordance with any mandatory procedures established in the contract subject to this subchapter for the arbitration proceedings.

(2)  "Contract subject to this subchapter" means:

(A)  a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity; or

(B)  a written contract, including a right of first refusal, regarding the sale or delivery of not less than 1,000 acre-feet of reclaimed water by a local governmental entity intended for industrial use.

(3)  "Local governmental entity" means a political subdivision of this state, other than a county or a unit of state government, as that term is defined by Section 2260.001, Government Code, including a:

(A)  municipality;

        (B)    public school district and junior college district; and
        (C)    special-purpose district or authority, including any
levee improvement district, drainage district, irrigation district, water
improvement district, water control and improvement district, water control
and preservation district, freshwater supply district, navigation district,
conservation and reclamation district, soil conservation district,
communication district, public health district, emergency service
organization, and river authority.

Added by Acts 2005, 79th Leg., Ch. 604 (H.B. 2039), Sec. 1, eff. September
1, 2005.
Amended by:
    Acts 2013, 83rd Leg., R.S., Ch. 1138 (H.B. 3511), Sec. 2, eff. June
14, 2013.


    Sec. 271.152.    WAIVER OF IMMUNITY TO SUIT FOR CERTAIN CLAIMS.  A local
governmental entity that is authorized by statute or the constitution to
enter into a contract and that enters into a contract subject to this
subchapter waives sovereign immunity to suit for the purpose of
adjudicating a claim for breach of the contract, subject to the terms and
conditions of this subchapter.

Added by Acts 2005, 79th Leg., Ch. 604 (H.B. 2039), Sec. 1, eff. September
1, 2005.


    Sec. 271.153.    LIMITATIONS ON ADJUDICATION AWARDS.    (a)    Except as
provided by Subsection (c), the total amount of money awarded in an
adjudication brought against a local governmental entity for breach of a
contract subject to this subchapter is limited to the following:
        (1)    the balance due and owed by the local governmental entity
under the contract as it may have been amended, including any amount owed
as compensation for the increased cost to perform the work as a direct
result of owner-caused delays or acceleration;
        (2)    the amount owed for change orders or additional work the
contractor is directed to perform by a local governmental entity in
connection with the contract;
        (3)    reasonable and necessary attorney's fees that are equitable
and just; and
        (4)    interest as allowed by law, including interest as calculated
under Chapter 2251, Government Code.

(b)  Damages awarded in an adjudication brought against a local governmental entity arising under a contract subject to this subchapter may not include:

      (1)  consequential damages, except as expressly allowed under Subsection (a)(1);

      (2)  exemplary damages; or

      (3)  damages for unabsorbed home office overhead.

(c)  Actual damages, specific performance, or injunctive relief may be granted in an adjudication brought against a local governmental entity for breach of a contract described by Section 271.151(2)(B).

Added by Acts 2005, 79th Leg., Ch. 604 (H.B. 2039), Sec. 1, eff. September 1, 2005.
Amended by:
    Acts 2009, 81st Leg., R.S., Ch. 1266 (H.B. 987), Sec. 8, eff. June 19, 2009.
    Acts 2011, 82nd Leg., R.S., Ch. 226 (H.B. 345), Sec. 1, eff. September 1, 2011.
    Acts 2013, 83rd Leg., R.S., Ch. 1138 (H.B. 3511), Sec. 3, eff. June 14, 2013.


Sec. 271.154.  CONTRACTUAL ADJUDICATION PROCEDURES ENFORCEABLE. Adjudication procedures, including requirements for serving notices or engaging in alternative dispute resolution proceedings before bringing a suit or an arbitration proceeding, that are stated in the contract subject to this subchapter or that are established by the local governmental entity and expressly incorporated into the contract or incorporated by reference are enforceable except to the extent those procedures conflict with the terms of this subchapter.

Added by Acts 2005, 79th Leg., Ch. 604 (H.B. 2039), Sec. 1, eff. September 1, 2005.


Sec. 271.155.  NO WAIVER OF OTHER DEFENSES.  This subchapter does not waive a defense or a limitation on damages available to a party to a contract, other than a bar against suit based on sovereign immunity.

Added by Acts 2005, 79th Leg., Ch. 604 (H.B. 2039), Sec. 1, eff. September 1, 2005.

Sec. 271.156.  NO WAIVER OF IMMUNITY TO SUIT IN FEDERAL COURT.  This subchapter does not waive sovereign immunity to suit in federal court.

Added by Acts 2005, 79th Leg., Ch. 604 (H.B. 2039), Sec. 1, eff. September 1, 2005.


Sec. 271.157.  NO WAIVER OF IMMUNITY TO SUIT FOR TORT LIABILITY.  This subchapter does not waive sovereign immunity to suit for a cause of action for a negligent or intentional tort.

Added by Acts 2005, 79th Leg., Ch. 604 (H.B. 2039), Sec. 1, eff. September 1, 2005.


Sec. 271.158.  NO GRANT OF IMMUNITY TO SUIT.  Nothing in this subchapter shall constitute a grant of immunity to suit to a local governmental entity.

# APP. D

## TEX. GOV'T CODE §791.001.  Purpose

The purpose of this chapter is to increase the efficienty and effectiveness of local governments by authorizing them to contract, to the greatest possible extent, with one another and with agencies of the state.

## TEX. GOV'T CODE §791.011(a).  Contracting Authority; Terms

(a) A local government may contract or agree with another local government or a federally recognized Indian tribe, as listed by the United States secretary of the interior under *25 U.S.C. Section 479a-1*, whose reservation is located within the boundaries of this state to perform governmental functions and services in accordance with this chapter...

## TEX. GOV'T CODE §311.034.  Waiver of Sovereign Immunity

In order to preserve the legislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language. In a statue, the use of "person," as defined by Section 311.005 to include governmental entities, does not indicate legislative intent to waive sovereign immunity unless the context of the statute indicates no other reasonable construction. Statutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity.

## TEX. GOV'T CODE §2259.001.  Definitions

In this chapter:

(1) "Governmental unit" means:

    (A)    a state agency or institution;

    (B)    a local government; or

    (C)    an entity acting on behalf of a state agency or institution or local government.

(2) "Local government" means a municipality or other political subdivision of this state or a combination of political subdivisions, including a combination created under Chapter 791.

…

## TEX. GOV'T CODE §2259.002.  Self-Insurance Not Waiver of Immunity

The establishment and maintenance of a self-insurance program by a governmental unit is not a waiver of immunity or of a defense of the governmental unit or its employees.

## TEX. GOV'T CODE §2259.031. Establishment of Fund

(a) A governmental unit may establish a self-insurance fund to protect the governmental unit and its officers, employees, and agents from any insurable risk or hazard…

## TEX. GOV'T CODE §2259.037. Applicability of Insurance Laws

The Insurance Code and other laws of this state relating to the provision or regulation of insurance do not apply to:

(1)     an agreement entered into under this subchapter; or

(2)     the proceeds of public securities issued under this subchapter.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Penny Johnson on behalf of Jack Higdon
Bar No. 24007360
pljohnson@blankrome.com
Envelope ID: 105443172
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of Appellant
Status as of 9/10/2025 12:26 PM CST

Associated Case Party: Texas Association of School Boards Risk Management Fund

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Barry Abrams | | barry.abrams@blankrome.com | 9/10/2025 12:20:18 PM | SENT |
| Jack Higdon | | jack.higdon@blankrome.com | 9/10/2025 12:20:18 PM | SENT |
| Joshua Huber | | josh.huber@blankrome.com | 9/10/2025 12:20:18 PM | SENT |
| Penny Johnson | | penny.johnson@blankrome.com | 9/10/2025 12:20:18 PM | SENT |
| Gregory J.Moore | | Greg.Moore@BlankRome.com | 9/10/2025 12:20:18 PM | SENT |
| Clarissa Rodriguez | | cmrodriguez@rampagelaw.com | 9/10/2025 12:20:18 PM | SENT |
| Liniuse Umunna | | Liniuse.Umunna@blankrome.com | 9/10/2025 12:20:18 PM | SENT |
| Noorhan Chahal | | noorhan.chahal@blankrome.com | 9/10/2025 12:20:18 PM | SENT |
| Yvette Manzano | | yvette.manzano@blankrome.com | 9/10/2025 12:20:18 PM | SENT |
| Christopher W.Caudill | | Christopher.Caudill@BlankRome.com | 9/10/2025 12:20:18 PM | SENT |

Associated Case Party: Southwest Texas Junior College

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Preston J.Dugas III | | pdugas@dcclawfirm.com | 9/10/2025 12:20:18 PM | SENT |
| Vincent P. Circelli | | vcircelli@dcclawfirm.com | 9/10/2025 12:20:18 PM | SENT |
| Andrew D. Spadoni | | aspadoni@dcclawfirm.com | 9/10/2025 12:20:18 PM | SENT |
| Sarah Arroyo | | sarroyo@dcclawfirm.com | 9/10/2025 12:20:18 PM | SENT |